**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

VICTOR BUQUERAS AND JOHN DEMER individually and on behalf of all others similarly situated,

Plaintiff,

v.

SHARECARE, INC., JEFFREY T. ARNOLD, AND JUSTIN FERRERO

Defendants.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS

Civil Action No. 1:24-CV-2769-LMM

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 7

III. PARTIES AND FORMER EMPLOYEE .......... 8

IV. DEFENDANTS' MISCONDUCT .......... 9

A. Sharecare's Enterprise Business .......... 9

B. Sharecare's Relationship with Anthem .......... 10

1. Sharecare Partners with Anthem to Sell the App .......... 10

2. Sharecare Acquires an Anthem Affiliate .......... 12

3. Anthem Invests in Sharecare .......... 13

4. Sharecare Announces the Carelon Agreement .......... 14

C. The Anthem Relationship Sours .......... 15

1. Defendants Claim Sharecare's Relationship with Anthem Is Thriving Right Up Until They Announce Its Termination .......... 15

2. Sharecare's Relationship with Anthem Was Collapsing For More than a Year Before March 2024 .......... 18

3. Sharecare's Class Period Financial Statements Corroborate FE 1's Account .......... 23

4. The Carelon Agreement Was Not Profitable Because Sharecare Remitted Almost Every Dollar It Made to Anthem .......... 28

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .......... 31

A. False Statements About the Delays Signing the Carelon Agreement .......... 31

B. False Statements About the Scope of the Carelon Agreement .......... 34

C. False Statements About the Status of the Anthem Relationship ..........40

D. False Statements That It's "Business As Usual" After Sharecare Cuts Anthem Off..........50

VI. LOSS CAUSATION ..........53

A. Defendants Admit that a Carelon Customer Was Leaving Sharecare+ and that Sharecare+ Expenses Are Higher Than Past Statements Suggested..........53

B. Sharecare Admits that Its Relationship With Anthem Has Unraveled ..........57

VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER.......58

A. False Exculpatory Statements Are Probative of Scienter ..........58

B. The importance of the Carelon Agreement and Anthem relationship to Sharecare supports an inference of scienter..........59

C. Defendant Arnold Knew His Statements About the Carelon Agreement in November 2023 Were False Because Arnold's Approval Would Have Been Necessary To Cut Carelon Off In October 2023..........60

D. Repeated False Statements To Analysts Support Scienter..........61

E. Sharecare's Failure To File the Carelon Agreement Or Disclose the Transaction Underlying the Concession Supports Scienter..........62

VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS..........64

IX. PRESUMPTION OF RELIANCE..........66

X. COUNTS..........68

COUNT I ..........68

COUNT II..........70

XI. PRAYER FOR RELIEF ..........72

XII. JURY TRIAL DEMANDED..........72

Lead Plaintiff Victor Buqueras and Named Plaintiff John Dehmer ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants Sharecare, Inc., Jeffrey T. Arnold, and Justin Ferrero ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I. INTRODUCTION

1. This is a class action brought on behalf of persons or entities who purchased or otherwise acquired publicly traded Sharecare securities between August 10, 2022 and March 28, 2024, inclusive ("Class Period"), and who held such shares through at least one of the corrective disclosures identified below, bringing claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2. Since Sharecare's introduction to U.S. capital markets in June 2021, Defendants have pitched its multifaceted burgeoning relationship with insurance giant Anthem, which included Sharecare's "largest contract ever", as a key asset. Contrary to Defendants' rosy statements about the two firms' partnership, beginning in 2022, Anthem expressed ever greater dissatisfaction with the relationship, prompting Sharecare to make ever greater concessions to Anthem. Defendants concealed these concessions, but in March 2024, finally admitted that the

relationship had terminated. Sharecare's stock price immediately fell, damaging investors.

***Sharecare Develops a Relationship with Anthem***

3. Sharecare operates a phone app ("App") that provides healthcare services to employers and insurers. Employers and insurers offer access to App as part of their employees' or members' insurance plans, paying Sharecare a few dollars per employee or member per month.

4. An insurance giant is a perfect partner for Sharecare. As Sharecare repeatedly boasted to investors, Anthem could incorporate the App as a plan benefit into its responses to employer requests for proposals ("RFPs"). By convincing Anthem to do so, Sharecare can end up in the hands of all of Anthem's customers' employees, earning tens or hundreds of millions of dollars in revenues. And indeed, Defendants claimed Sharecare was being included in all of Anthem's RFP responses.

5. Sharecare had two enormous contracts with Anthem. The first, a $100-million 5-year contract was through a company Sharecare acquired, doc.ai, Inc. ("DocAI Agreement"). The second was the Carelon Agreement.

6. Carelon is an Anthem brand that sells healthcare services to employers who offer insurance plans from multiple companies. Working with Anthem, Sharecare developed a premium version of its App which allowed patients to speak to customer representatives, Sharecare+. Sharecare would start offering Sharecare+

to customers through Carelon. The Carelon Agreement was, Defendant Arnold said, Sharecare's "largest contract ever."

***Sharecare Misleads Investors As Its Relationship With Anthem Collapses***

7. Unbeknownst to investors, throughout 2022 and 2023, Sharecare's relationship with Anthem was collapsing. Anthem was not paying its bills on the DocAI Agreement and even cancelled the Agreement in mid-2023. Nor was Anthem paying its bills on the Carelon Agreement, even though the agreement was, contrary to what Defendants told investors, a one-sided giveaway to Anthem. Yet throughout this time, Defendants continued to boast that Sharecare's relationship with Anthem was going exactly as planned—even after Sharecare cut Anthem off for failing to pay its bills.

8. Defendants' false statements about the Carelon Agreement began in August 2022 when they simultaneously announced that Sharecare was negotiating the Carelon Agreement ***and*** withdrew its financial guidance for 2022. Defendants explained that Sharecare withdrew guidance in part because it had expected to sign the Carelon Agreement in the first half of 2022. But to counter stock analysts' questions expressing concern about Sharecare's relationship with Anthem, Defendants falsely responded three times that the delay resulted from the mere length and complexity of the contract—concealing the delay's true cause, that Anthem was not honoring certain contractual promises.

9. While Sharecare ultimately signed the Carelon Agreement in Q3 2022, there was less there than met the eye. Sharecare+ has two components, Sharecare's traditional App, and the ability to speak to a human being for advice. It was the latter that was valuable, but it was Carelon that provided it. As a result, unbeknownst to investors, while Sharecare recognized revenues from the Carelon agreement, it entered into purportedly separate agreements to purchase goods and services from Carelon, without disclosing what those goods and services were. For the first three quarters in which the Carelon Agreement was effective, Sharecare incurred expenses from these purportedly separate agreements that amounted to approximately 99% of the total revenues it recognized from the Carelon Agreement. In the two following quarters, the percentages were 84% and 90%. Sharecare made no money from the Carelon Agreement because it was required to remit the revenues to Anthem.

10. Defendants took further steps to conceal the Carelon Agreement's terms from investors. Sharecare was obligated under the securities laws to file "material contracts"; Sharecare's "largest contract ever" plainly qualified. Had Sharecare done what the law required, investors could have reviewed the Carelon Agreement for themselves and determined that it was a round-trip revenue agreement. But Sharecare never filed the Carelon Agreement, leaving investors to go by Defendants' false public description of the Agreement.

11. The Carelon Agreement was still more one sided. The Carelon Agreement included an $8.1 million "contract asset", accounting lingo for consideration delivered to the counterparty free of charge. Throughout the Class Period, Anthem was expressing dissatisfaction with the DocAI Agreement. These expressions of dissatisfaction and Anthem's cancellation of the DocAI Agreement soon thereafter show the "contract asset" was really a concession to mollify Anthem.

12. Yet the giveaway did not end Anthem's expressions of dissatisfaction. Within two quarters of the Carelon Agreement's execution, Anthem breached a contractual obligation to ensure that a certain number of its customers use Sharecare+ by January 1, 2023. Announcing low 2023 guidance on a call to discuss Q4 2022 earnings, Defendants admitted that one of the clients brought in by Carelon had opted for a lower-priced version of the App that did not allow employees to speak to a human being. Sharecare's stock price fell 27.2% upon the partial revelation of some troubles with the Carelon Agreement and the simultaneous announcement that Sharecare had hired certain unspecified "outside partners" (really Anthem itself) to service the contract. But Defendants assured investors the declination had nothing to do with the Carelon Agreement, telling analysts Carelon is "a fantastic partner for us", that "the number of lives [covered by the Carelon Agreement] aren't going to reduce", that "the momentum isn't going to reduce", and that "we see the relationship only expanding."

13. Sharecare's concessions did not address Anthem's dissatisfaction. Starting from the end of Q1 2023 and the beginning of Q2 2023, Anthem took a much more aggressive bargaining position. In Q2 2023, Anthem cancelled the DocAI Agreement outright, notified Sharecare that it would not pay outstanding invoices, and stopped payments on the Carelon Agreement. Likewise, in Q2 2023, both Sharecare and Anthem stopped paying each other's bills under the Carelon Agreement. Yet in contemporaneous statements, Defendants told investors that the Carelon Agreement was "meeting expectations" and that the Enterprise segment dominated by the Carelon Agreement is "rolling out as expected … there haven't been surprises … what we thought would happen is happening." In an atypical boast, Defendants highlighted one way in which there were "no surprises": Sharecare's contracts were being implemented according to their terms (***"we're implementing our signed contracts"***).

14. Finally, in October 2023, Sharecare cut Carelon off entirely. From then until the Carelon Agreement's formal severance, there was no business between Carelon and Sharecare. Yet in November 2023, even after severing the Carelon Agreement, Defendant Arnold still described the Carelon Agreement as ***"business as usual."***

15. With no revenues coming from Anthem, Defendants had no more room to dissemble. In announcing Q4 2023 results, under new management, Sharecare

finally admitted that the relationship had terminated. Sharecare's stock price immediately fell by 28.3%.

16. Defendants misled investors about Sharecare's collapsing relationship with Anthem for more than a year and a half. When Defendants admitted that the Anthem relationship had collapsed, they claimed that the cause of the collapse was Anthem's repeated failure to honor its contractual promises. But companies may not affirmatively mislead investors about the status of a contract regardless of whether the counterparty is to blame. Defendants' statements touting the health of Sharecare's relationship with Anthem even as the relationship fell apart misled investors and violated the securities laws.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

20. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES AND FORMER EMPLOYEE

21. Plaintiff Victor Buqueras, as set forth in his PSLRA certification which was previously filed and is incorporated by reference, purchased Sharecare securities during the Class Period and was economically damaged thereby.

22. Plaintiff John Dehmer, as set forth in his PSLRA certification, which is attached hereto as **Exhibit A**, purchased Sharecare securities during the Class Period and was economically damaged thereby.

23. Founded in 2010, Defendant Sharecare is a Delaware corporation whose common shares were publicly traded on the NASDAQ under ticker SHCR throughout the Class Period.

24. Defendant Jeffrey T. Arnold founded Sharecare and served as its Chairman from inception to the present and as its Chief Executive Officer from inception through to December 31, 2023.

25. Defendant Justin Ferrero has served as Sharecare's Chief Financial Officer and President since inception. Ferrero is a close associate of Defendant

Arnold. Before joining Sharecare, both were employed by HowStuffWorks.com. Ferrero co-founded the fund that owned HowStuffWorks.com until 2007, and Arnold founded the company itself.

26. Former Employee 1 ("FE 1") was a Sharecare Senior Vice President from December 2021 through July 2023, where he led its Advocacy & Wellness business. FE 1 was the Sharecare executive tasked with developing and running Sharecare+.

## IV. DEFENDANTS' MISCONDUCT

### A. Sharecare's Enterprise Business

27. Sharecare provides healthcare services to individuals primarily through contracts with employers and insurers. In its Enterprise segment, which during the Class Period accounted for about 60% of its revenues, Sharecare offers a health-related smartphone app ("App"). The App's advantage, according to Defendants, is that it consolidates functions that might otherwise require several different apps. For example, the App allows a patient to access his or her medical records which the patient might otherwise have to access through a provider's app, includes health tips and articles that the user might have to obtain from websites like WebMD, and tracks sleep or steps, functions that usually necessitate stand-alone apps.

28. Sharecare calls its sales of the App business-to-business-to-customer, or B2B2C. Sharecare contracts directly with employers and insurers to provide

access to the App to their employees or members. In exchange, these counterparties pay Sharecare a monthly fee based on the number of employees or members who have access to the App, regardless of whether the ultimate users actually use the App. Sharecare tracks these payments as the per-member-per-month rate, or PMPM. On occasion, Sharecare reports the PMPM rate for certain contracts.

## B. Sharecare's Relationship with Anthem

### *1. Sharecare Partners with Anthem to Sell the App*

29. Sharecare went public in 2021 through a reverse merger with an existing publicly traded company ("Business Combination"). The Business Combination was announced in January 2021 and closed in June.

30. Around the same time, Sharecare sought to develop a multi-prong relationship with the world's second-largest insurer, Anthem, Inc. (n/k/a Elevance Healthcare, Inc.). A partnership with a large insurer like Anthem could turbocharge Sharecare's growth. Insurers regularly respond to requests for proposals ("RFPs") issued by employers (or other institutions like universities that offer benefits to non-employees). In these responses, insurers propose to provide employees with a variety of benefits. Sharecare hoped that the App could be included in those benefits.

31. The potential market is immense. The health insurance industry refers to insureds as covered "lives." As of the end of 2021, Sharecare had 9.7 million lives under contract. Of these, approximately 1 million were Anthem members. As of May

2022, Anthem covered approximately 44 million lives. Thus, as Defendant Arnold emphasized to investors on a May 2022 call, Anthem offered Sharecare a potential market of 43 million lives. If Sharecare convinces Anthem to include Sharecare as a standard benefit in the suite of benefits it offers employers, then Sharecare can add tens of millions of covered lives through Anthem.

32. Defendants maintained that Anthem was including Sharecare in all Anthem's RFP responses. As a Sharecare executive stated at a May 24, 2022 presentation at the UBS Global Healthcare Conference, "we're embedded in all [Anthem's] RFPs", meaning that whenever Anthem issued a proposal to offer coverage to a company, Sharecare was part of that proposal. Smith added that "we more probably have close to two dozen RFPs, just with Anthem alone, that are going out to large employers."

33. Sharecare had other relevant ties to Anthem. First, Sharecare had acquired doc.ai, Inc. ("DocAI"), a company whose principal business relationship was with Anthem. Second, Sharecare had pursued a direct investment from Anthem. And third, the jewel in the relationship's crown, in August 2022, Sharecare announced an agreement with Anthem subsidiaries operating under its Carelon brand to offer a premium version of Sharecare, Sharecare+, as a standard plan benefit.

*2. Sharecare Acquires an Anthem Affiliate*

34. In January 2021, Sharecare announced that it was acquiring DocAI. Founded in 2016, DocAI is a specialized healthcare data company whose primary customer, since 2018, had been Anthem. DocAI's relationship with Anthem had deepened just before Sharecare's acquisition. In September 2020, DocAI and Anthem signed a $100-million 5-year services contract, effective January 1, 2021. The contract was transformational: DocAI's total 2020 revenues were just $14.8 million. Anthem had also previously acquired a 25% stake in DocAI.

35. Sharecare's acquisition valued DocAI at $175 million. Anthem rolled over its DocAI investment. Thus, the acquisition left Anthem with a 25% stake in a business majority-owned by Sharecare.

36. According to FE 1, Sharecare's primary interest in DocAI derived from its work with Anthem. Defendants' public statements corroborate FE 1's claim. Arnold himself stated at a June 24, 2021 fireside chat that "what got us really interested [in DocAI] is Anthem executed a $100 million AI deal with them last year."

37. In connection with the DocAI acquisition, Sharecare also appointed an Anthem executive to its Board of Directors, Rajeev Ronanki.

*3. Anthem Invests in Sharecare*

38. The DocAI acquisition was only part of Sharecare's purportedly burgeoning relationship with Anthem. In February and April 2021, Anthem invested $50 million in Sharecare at a $4 billion valuation.

39. According to Defendants, the purpose of Anthem's investment was just as meaningful as the fact of the investment itself. In the healthcare services industry, patient advocacy refers to providing members with the ability to speak to a human being to obtain assistance with health insurance, understand their benefits, or locate a healthcare provider. According to Defendants, Anthem was finding that employers increasingly demanded that insurance coverage include patient advocacy. Defendants told investors that Anthem and Sharecare had agreed that Sharecare would use Anthem's $50 million investment to develop, working with Anthem, a new premium version of the App that offers patient advocacy, called Sharecare+.

40. Defendants told investors that Sharecare+ was Anthem's response to the demand for advocacy services and that Anthem would offer Sharecare+ as its version of patient advocacy, in many and perhaps all its RFP responses.

41. In prepared remarks at a September 7, 2022 presentation at a Wells Fargo Conference, Defendant Arnold explained why Sharecare+ and the relationship with Anthem was "a huge deal" for Sharecare:

> This is becoming a huge deal for us because it's taken our per member per month up ***three to four times X***. And kind of the evolution of us

> with Anthem was get them to invest, get a partnership with their national accounts team so they could ***resell what we call Sharecare+ and then be able to get them to shift over hundreds of thousands of members into Sharecare+.***

42. Defendants told investors that Sharecare offered its existing product at $1-2 per member per month, but Sharecare+ at $6-10. In November 2022, Sharecare told investors that it would have 900,000 covered lives on Sharecare+ starting on January 1, 2023. At $6 PMPM—the bottom of the range Defendants disclosed—Sharecare would earn $65 million annually from just these initial lives, with every expectation that the number would grow over time.

*4. Sharecare Announces the Carelon Agreement*

43. On August 10, 2022, Sharecare announced that it had entered into an agreement with Anthem subsidiaries operating under the Carelon brand. Carelon offers health services to employees whose employers offer insurance plans offered by multiple companies. As Sharecare's President explained the next day at a Canaccord Genuity Conference, Anthem "were seeing their clients more and more looking for a third party to deliver that solution [patient advocacy] versus the payer itself, because of potentially mixed agendas." Carelon could provide services to multi-insurer companies because though it was owned by Anthem, it was a separate entity. Sharecare+ was purportedly useful because it was "payer agnostic", meaning that employees could use it regardless of whether they selected an Anthem insurance plan.

44. According to Sharecare, Anthem agreed to integrate Sharecare and Sharecare+ into Carelon's Health Guide services. Sharecare would immediately gain several hundred thousand lives for Sharecare+.

45. Defendants boasted that the Carelon Agreement was transformative. On the August 10 call, Arnold stated that "[t]his Carelon partnership is a ***massive*** one for us." Indeed, Arnold told investors, "hundreds of people" were involved in the relationship and it would be Sharecare's "***largest contract ever***."

46. Moreover, as Arnold explained on the same call, other customers were telling Sharecare that "show us Anthem, Elevance, we'll do more business with you … [P]ut that on Sharecare+ gives us a reference account." Customers purportedly took Sharecare's relationship with Anthem as a seal of approval.

## C. The Anthem Relationship Sours

### *1. Defendants Claim Sharecare's Relationship with Anthem Is Thriving Right Up Until They Announce Its Termination*

47. Defendants told investors right up until March 28, 2024, that Sharecare's relationship with Anthem was thriving.

48. Sharecare explained away apparent conflict in the relationship as nothing of the sort. For instance, on August 10, 2022, even as it announced the Carelon Agreement, Sharecare withdrew its 2022 guidance. The guidance had incorporated an assumption that Sharecare would sign the Carelon Agreement in the first half of 2022. Because of delays in signing the agreement, the guidance was now

unachievable. Sharecare explained away this problem by claiming that the mere complexity and length of the agreement was to blame, specifically denying that there was any friction in the Carelon Agreement. Asked directly whether "it's not like there's a cancellation of the contract?", Defendant Arnold stated that "It's only–the contract negotiation–contract is only longer now than it was in the beginning. It's just a lot of work."

49. When Defendants were forced to disclose on a March 29, 2023 investor call, that a large Carelon customer had elected not to use Sharecare+, Sharecare blamed not Carelon but one of Carelon's customers. About Carelon, Defendants stated that it is "a fantastic partner for us", that "the number of [Carelon Agreement] lives [covered by Sharecare] aren't going to reduce", that "the momentum isn't going to reduce", and that "we see the relationship only expanding."

50. Based on these representations and other representations on non-public follow-up calls, analysts generally reported that the problem was isolated to one customer and had nothing to do with the Carelon agreement more broadly:

a. In a March 29, 2023 report, a Canaccord Genuity analyst stated that "we note that the reduction is not the result of diminished pricing power or lack of perceived value in Sharecare's services. We note that a majority of clients through the Carelon relationship are still receiving the higher PMPM rates and accompanying services, and the affected

client has the ability to upgrade their service offering at the higher PMPM at a later date."

b. In a March 29, 2023 report, a BTIG analyst stated that "We believe it is very likely that ultimately, after this one larger customer sees all the value that other entities are getting from the Advocacy solution, at $6+ PMPM, it will likely ultimately decide to buy the higher-priced product."

c. In a March 30, 2023 report, a Morgan Stanley analyst stated that "this appears to be an isolated case."

51. In 2023, Sharecare continued to assure investors about the Carelon agreement. Defendants' disclosures about the Carelon Agreement raised lofty hopes, and Defendants now claimed that it was "meeting expectations." Indeed, Arnold claimed Enterprise "is rolling out as expected": "what we thought ... would happen is happening." Arnold immediately added an example that Sharecare's contracts were being implemented pursuant to their terms: "***we're implementing to our signed contracts.***"

52. On November 9, 2023, Sharecare was asked about "how that [Carelon] relationship is going." Defendant Arnold answered that "it's stay the course. Everything is kind of tracking on expectations. … I would say it's business as usual."

*2. Sharecare's Relationship with Anthem Was Collapsing For More than a Year Before March 2024*

53. In fact, throughout the period, Defendants' relationship with Anthem was slowly collapsing, because of what Defendants would later characterize as Anthem's breaches of contract.

54. On March 28, 2024, Sharecare held a call to discuss its Q4 2023 earnings. On the call, Sharecare delivered a bombshell: Sharecare had terminated a contract with a large customer which (a) had dramatically reduced earnings and (b) would result in significantly lower earnings for at least Q1 and Q2 2024. Though Sharecare did not name the customer on the call or in the accompanying press release, in Sharecare's 2023 10-K, filed March 29, 2024, Defendants identified the customer as Sharecare's "Series A Preferred Stockholder." The only holder of Sharecare's Series A Preferred Stock is Anthem.

55. Sharecare's disclosures established that the Anthem relationship was collapsing long before the Q4 2023 earnings call. First, Sharecare admitted that the relationship had completely collapsed by October 2023, before the Q3 2023 earnings call on which Defendants described the status of the Carelon Agreement as "business as usual". As Sharecare stated in the 2023 10-K:

> ***In October 2023, the Company ceased providing patient advocacy services in accordance with the revenue contract with the Series A Preferred Stockholder*** [Anthem], pending the resolution of certain contractual matters in dispute.

56. Sharecare provides "patient advocacy services" through the Carelon Agreement. Thus, Sharecare had stopped providing services under the Carelon Agreement in October 2023.

57. But Sharecare's disclosures indicated that the relationship was collapsing much earlier than October 2023.

58. On the March 28, 2024 call, Defendants admitted that Sharecare's problems with Anthem were longstanding and included the latter's repeated breach of contract:

> [W]e have adopted new rules of engagement. We'll only work with committee partners and clients who are aligned with us in driving meaningful outcomes, leveraging our solutions, so all parties success, especially the people in the communities we serve. ***That's why in Q4, Sharecare eliminated non-performing disputed contracts with a client that has historically affected our forecasting.***

59. Asked for further details about the dispute, Defendant Arnold linked Sharecare's difficulties forecasting with Anthem breaches of contract:

> So this particular client, we have discussed in the past and we've been advised not to get into contractual disputes, but it represents several hundred thousand of our lives under Sharecare Plus. ***And this particular contract from this client has given us challenges in the past in which some of the commitments weren't honored***, which made it difficult for us to forecast.

60. Then, an analyst employed by Canaccord Genuity reported on further discussions held with Sharecare just after the Q4 2023 call that the relationship had been collapsing for at least "several quarters":

**Additional takeaways from 4Q report, conference call, and management follow-up**:

- **Customer dispute leads to shortfall of expectations**: A contracts dispute with a customer, whom we believe to be [Anthem]'s Carelon, led to a shortfall in the quarter of roughly $14.2 million in revenue and $6.2 million in adj-EBITDA. From our understanding, $8 million of the revenue hit was related to lower PMPM revenue not recognized in the quarter and $6.2 million was related to contract asset impairment that was also not added back to adj-EBITDA. The company has had ongoing disputes with the customer ***over the last several quarters that has led to difficulty forecasting in the past***.

61. Sharecare's admissions showed that Anthem's breaches of contract had started long before October 2023. Sharecare's difficulties forecasting revenues from Anthem dated back to the very same August 10, 2022 call on which Sharecare announced the Carelon Agreement. Yet instead of acknowledging that the forecasting difficulties arose from Anthem's breaches of contract, or saying nothing about their causes, Defendants instead blamed other causes—the mere complexity, length and scope of the Carelon Agreement—denying any friction with Anthem.

62. Then, in announcing its Q4 2022 earnings on March 28, 2023, Sharecare reported that it would henceforth base guidance only on signed contracts rather than its expectation of additional clients it could sign up during the guided period. Sharecare also cited the decision of a customer on the Carelon contract to cut the number of services it obtained because of cash concerns. Sharecare stated that the relationship with Carelon itself was going well and, in fact, expanding.

63. FE 1, a well-placed former Sharecare employee, also explains that Sharecare's problems with Carelon were longstanding.

64. According to FE 1, the DocAI Agreement was "not going well" for Anthem for a long time, so Anthem had long expressed dissatisfaction to Sharecare. Further, Anthem stopped paying Sharecare pursuant to the DocAI Agreement's terms.

65. Anthem's Senior Vice President & Chief Digital Officer, Rajeev Ronanki, had overseen the relationship with Sharecare, including through the DocAI acquisition and Anthem's investment in Sharecare. Ronanki also sat on Sharecare's Board. According to FE 1, at some point, a more senior Anthem executive became involved in the Sharecare relationship. This executive did not approve of the DocAI contract. Shortly before FE 1 left Sharecare in July 2023, the new Anthem executive demanded that Sharecare cancel the DocAI contract outright. According to FE 1, the new Anthem executive also started "ganging up on Sharecare because of DocAI" by linking Anthem's negotiating position on the DocAI Agreement to the other agreements between Anthem and Sharecare, expanding the potential hit to Sharecare's revenues and bottom line. According to FE 1, under the new executive's watch, Anthem stopped paying Sharecare under the Carelon Agreement.

66. The new executive took control of the Sharecare account in March 2023, at the latest. First, Ronanki left Anthem in April 2023.[1] It is unlikely that Ronanki would have continue to manage the Sharecare account until the day of his departure. Second, as further set out in ¶¶76-78, Anthem did not pay ***any*** of its bills under the Carelon Agreement in either Q2 or Q3, 2023. Because it was the new executive who stopped payment the Carelon Agreement, he must have taken over before Q2 2023 started, in March 2023 or before.

67. According to FE 1, Sharecare recognized that it had a poor negotiating position. Thus, Sharecare acceded to Anthem's request to cancel the DocAI Agreement ***and*** write off millions of dollars in overdue payments for work already completed ***provided*** that Sharecare hit the lives target set out in the separate Carelon Agreement.

68. Sharecare's post-Class Period disclosures support FE 1's account. In the 2023 10-K, Defendants explained that one dispute with Anthem results from "an attempted termination by [Anthem] of a contract we believe is non-terminable, with remaining fees owed to the Company totaling $50 million over the life of the contract." The language does not refer to the Carelon Agreement, because in the same paragraph, Sharecare clarified that it had other, different disputes regarding the

[1] Sharecare's 2023 proxy statement confirms that "[a]s of April 2023, Mr. Ronanki is no longer employed by" Anthem.

patient advocacy services covered by the Carelon Agreement: "[w]e also have ***other commercial contracts related to advocacy services*** with certain subsidiaries of the same party that we believe have been breached by such subsidiaries." But Sharecare had only one other contract with Anthem that involved $50 million or more in fees: the DocAI Agreement.

69. Defendants' disclosure that the remaining fees "total[ed] $50 million over the life of the contract" also shows that Anthem cancelled the contract as of the middle of 2023. The DocAI contract was a $20 million per year, five-year contract. It became effective on January 1, 2021. That there were $50 million in fees left to earn shows that the cancellation occurred about two and a half years into the contract, or the middle of 2023. This is exactly the time at which FE 1 claims Anthem cancelled the DocAI Agreement.

*3. Sharecare's Class Period Financial Statements Corroborate FE 1's Account*

70. Sharecare's Class Period financial statements also corroborate FE 1's account. Sharecare's financial statements included puzzling and incomplete disclosures about financial transactions with Anthem. Reasonable investors would not have read these transactions as evidence that Defendants' statements were false. But they corroborate FE 1's account that Sharecare's relationship with Anthem was collapsing beginning 2022 and that Sharecare offered Anthem various inducements to attempt to keep it as a client.

71. Sharecare executed the Carelon Agreement in Q3 2022. In its 2022 10-K, Sharecare's disclosure about the Carelon Agreement noted a $8.1 million contract asset ("Concession"):

> Additionally, during 2022, we entered into a revenue contract with the Series A Preferred Stockholder [Anthem] to provide patient advocacy services. Revenues recognized related to these services for the year ended December 31, 2022, totaled $17.4 million. As of December 31, 2022, there were $18.1. million in receivables, $28.0 million in accrued expenses, $6.9 million of long-term liabilities, ***$1.7 million of current contract assets, and $5.8 million in long-term contract assets recorded in connection with these agreements***.[2] The contract assets are being amortized as a reduction of revenue over the contract term. Revenue for the year ended December 31, 2022, included $0.6 million of amortization of such contract assets.[3]

72. Under Generally Accepted Accounting Principles ("GAAP"), a contract asset "is an entity's right to consideration in exchange for goods or services that the entity has transferred to a customer." ASC 606-10-20. Companies recognize contract assets for past performance when the right to payment for the asset is conditional on something other than the passage of time. ASC 606-10-45-3.

73. Sharecare amortized its contract asset over time by reducing the revenue earned from the contract. Such treatment is reserved for consideration paid

[2] In the Q1 2023 10-Q, Sharecare acknowledged that it entered into the Carelon Agreement in Q3 2022.

[3] The amount of the contract asset is the current value ($1.7 million) plus the long-term value ($5.8 million) plus the accumulated depreciation ($0.6 million).

to a customer when no distinct good or service is received in exchange. ASC 606-10-32-25 to 27.

74. The disclosure of a contract asset corroborates FE 1's account that Sharecare had to offer inducements to placate Anthem. Sharecare's recognition of the Concession as a contract asset shows that it delivered something of value to Anthem, worth $8.1 million ($5.8 million plus $1.7 million plus $0.6 million) for free. The $8.1 million payment is a significant expenditure to secure a contract. Moreover, as further alleged below, Sharecare earned far less than $8.1 million from the Carelon Agreement.

75. But the disclosure does not necessarily indicate that Sharecare was forced to make the Concession because of Anthem's dissatisfaction with overall relationship or the DocAI Agreement in particular. Reasonable investors would not draw the conclusion that Defendants' positive statements boasting of Sharecare's relationship with Anthem were false. Companies may offer additional consideration for all sorts of reasons. For example, a manufacturer may compensate a customer at the inception of the contract for the changes the customer needs to make to its shelving to accommodate the manufacturer's products, so that the transaction price, and therefore revenue, is reduced when the manufacturer recognizes revenue for the transfer of the goods. ASC 606-10-55-251 to 254. That the manufacturer is

compensating the customer is not a sign that the manufacturer and customer are falling out.

76. Second, Sharecare's accounts receivable and accounts payable balance related to the Carelon Agreement support FE 1's account. FE 1 reports it was the new Anthem executive who weaponized the Carelon Agreement. As an accounting matter, revenues and expenditures are recorded when they are earned or incurred, respectively, and are added to the accounts receivable and accounts payable balance. When the issuer or customer pays the invoiced amounts, the accounts receivable and accounts payable balances are reduced by the amounts paid. If the accounts receivable or accounts payable balances increase by more than the total revenues or expenses over a given fiscal period, then that means that either the customers (in the case of accounts receivable) or the issuer (in the case of accounts payable) are not paying their bills.

77. That's what happened in Q2 and Q3 2023. In each quarter, Sharecare's Carelon Agreement accounts receivable and accounts payable balances both increased more than the revenues and expenses attributable to the Carelon Agreement over the same quarter:

| | Q2 2023 | Q3 2023 |
|---|---|---|
| Gross revenues from Carelon agreement | $11.3 million | $9.3 million |
| Increase in accounts receivable balance related to Carelon Agreement | $14.0 million | $10.0 million |
| **Bills paid** | **($2.7 million)** | **($0.7 million)** |
| Expenses from Carelon Agreement | $9.5 million | $8.4 million |
| Increases in accounts payable and accrued expenses related to Carelon Agreement | $10.4 million | $9.3 million |
| **Bills paid** | **($1.1 million)** | **($0.9 million)** |

78. Thus, while Sharecare and Carelon were exchanging invoices, by Q2 2023, neither side was paying the other's—corroborating FE 1's account that Anthem weaponized the Carelon Agreement with the arrival of the new executive.

79. Finally, in Q2 2023, Sharecare recorded an adjustment in its previously reported revenues under the DocAI Agreement. Specifically, Sharecare reduced Q1 2023 revenues by $1.5 million. The reduction in revenue is consistent with FE 1's report that Sharecare offered Anthem a credit on outstanding amounts in around mid-2023. ¶67.

### 4. *The Carelon Agreement Was Not Profitable Because Sharecare Remitted Almost Every Dollar It Made to Anthem*

80. The advantage Sharecare+ has over Sharecare is the ability to speak with an actual human being. Yet Sharecare and Anthem divided responsibility for Sharecare+. Sharecare provided the basic digital functionality, but if a customer wanted to speak to a representative, Anthem answered the call. Sharecare itself did not have the telephonic backend to service callers.

81. Sharecare entered into the Carelon Agreement in Q3 2022. In the 2022 10-K and its Q1-Q3 2023 10-Qs, Sharecare acknowledged that it had entered into agreements to purchase certain goods and services from Anthem in the same quarter as the Carelon Agreement ("Anthem Purchase Agreement"). But Sharecare maintained that these agreements were "separate" and "for the purchase of distinct goods and services." Beginning immediately where the text in ¶71 leaves off, the 2022 10-K continues:

> Additionally, the Company acquired certain intellectual property which was determined to be distinct and recorded an intangible asset of $7.9 million, which is being amortized over its estimated useful life. ***The Company also entered into separate agreements during 2022 for the purchase of distinct goods and services from that customer totaling $18.0 million which are recorded in cost of sales. Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above.***

82. Sharecare did not otherwise mention these purportedly separate agreements with Anthem in its financial statements, and they were never discussed

on Sharecare's earnings calls. Nor did Defendants explain why Sharecare would be buying goods and services from Anthem, rather than the other way around.

83. The total amount Sharecare spent on the Anthem Purchase Agreements almost exactly matched the total gross revenue it earned from the Carelon Agreement (i.e., revenue before amortizing the contract asset):

| | Q3 2022[4] | Q4 2022[5] | Full Year 2022 | Q1 2023 | Q2 2023 | Q3 2023 |
|---|---|---|---|---|---|---|
| Gross revenues from Carelon Agreement[6] | $5.9 million | $12.1 million | $18.0 million | $11.0 million | $11.3 million | $9.3 million |
| Expenditures from Anthem Purchase Agreements | $5.7 million | $12.3 million | $18.0 million | $10.9 million | $9.5 million | $8.4 million |
| ***Difference ($)*** | ***$0.2 million*** | ***$(0.2) million*** | ***$0.0 million*** | ***$0.1 million*** | ***$1.8 million*** | ***$0.9 million*** |
| ***Difference (%)*** | ***3.4%*** | ***(1.7%)*** | ***0.0%*** | ***0.9%*** | ***15.9%*** | ***9.7%*** |

[4] Source: Q3 2023 10-Q.

[5] Source: Amounts recorded for FY 2022 in 2022 10-K minus amounts recorded for Q3 2022 in Q3 2023 10-Q.

[6] This row is the sum of the revenues from the Carelon Agreement in the relevant period and the amortization of the Carelon Agreement contract assets over the relevant period.

84. Thus, almost every dollar Sharecare earned from the Carelon Agreement was matched by a dollar of expenses paid to Anthem for some undisclosed goods and services.

85. The close match between revenues from the Carelon Agreement and expenditures on the Anthem Purchase Agreement does not necessarily show that Defendants' affirmative statements about the Carelon Agreement's size and profitability are false. Nor does it show the falsity of Sharecare's statements that the agreements are separate and distinct. But Defendants admitted as much after the close of the Class Period. In Sharecare's 2023 10-K, Defendants admitted that the revenues from the Carelon Agreement and the expenses from the Anthem Purchase Agreement are not two unrelated agreements but two halves of the same round-trip agreement:

> During the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. We also entered into separate agreements to purchase distinct goods and services. ***These agreements are now subject to a dispute.*** Separate from the above disclosed amounts, revenues recognized ***related to these distinct services*** for the year ended December 31, 2023 and 2022 totaled $27.9 million and $17.4 million, respectively. For the year ended December 31, 2023, the $27.9 million of revenue recognized includes the effects of the $6.2 million contract asset impairment, which was recorded as a reduction to revenue, as described below. ***Cost of sales totaled $28.6 million and $18.0 million for the year ended December 31, 2023 and 2022, respectively.*** Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues.

86. By conceding that the reported purchases are just the cost of sales of the Carelon Agreement, Sharecare admitted that the Anthem Purchase Agreement was just the cost of servicing the Carelon Agreement. Sharecare's admission shows that the two agreements are merely the two halves of the same round-trip transaction. Anthem purportedly pays Sharecare for its services under the Carelon Agreement but Sharecare immediately remits the payments back to Anthem. From Q3 2022 to Q3 2023, Sharecare earned just $2.8 million in revenues from the Carelon Agreement, net of the payments it was remitting to Anthem. That is $5.3 million less than the $8.1 million consideration it transferred to Anthem to obtain the contract.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A. False Statements About the Delays Signing the Carelon Agreement

87. On August 10, 2022, Sharecare held a call to discuss Sharecare's Q2 2022 earnings. On the call, Sharecare withdrew its previously-issued guidance for 2022 revenue and earnings, blaming, in part, delays in signing the Carelon Agreement. In response to questions from an analyst employed by BTIG, Defendants denied any friction:

> Q: Hi. With respect to the Enterprise division and the, sort of, previously expected onboarding of lives in the back half of '22, is Elevance and Carelon, is that delay sort of the only change relative to your previous thinking? Or were there also other clients that you were going to onboard that have also delayed or is there an elongation sort of across the board? Thanks.

> DEFENDANT ARNOLD: [Analyst], no, we signed this MOU several months ago with Carelon and have just been working through the transitional services. ***It's hundreds of people that are involved with this. It will be our largest contract ever and it's–the date has slipped. So–and so we're confident, it will hit this year. It will be full year next year. But it's a large contract that's moved on us.*** And–but the other implementations are happening on schedule.

88. The BTIG analyst immediately followed up by asking whether the delay was indicative of trouble in the relationship, which Defendant Arnold denied:

> Q: Okay. So it's only the Carelon-Elevance contract that has pushed, it's probably going to deploy in the back half of '22, certainly in '23. And quite frankly, it's so big and so large and so important, that's what's leading to the delay? It's not like there's a cancellation of the contract?
>
> DEFENDANT ARNOLD: No. ***It's only–the contract negotiation–contract is only longer now than it was in the beginning. It's just a lot of work. Like they've got hundreds of health guides that we'll be transitioning into our partnership. And there's a lot of detail in the implementation work. And–but all the conversations are–all the work is being done around that transitional services and implementation work.***

89. The BTIG analyst immediately repeated the Defendants' explanation, and Defendant Ferrero agreed:

> Q: Okay. And when I listened to Elevance earnings call this quarter, they talked a lot about their digital health strategy, they talked a lot about value-based care. And it sounds to me like Sharecare is a key integral part of that. And if anything, it's such a large deployment, that's maybe what's leading to some delay here. ***It's not headwinds or a potential recession that Elevance is facing. It's simply the size of the implementation.***
>
> DEFENDANT FERRERO: ***Yes.*** The–hey, [analyst], thanks for the question. This is Justin. We don't see this as a systemic issue. ***This is a timing issue around this relationship***. And there's uncertainty as to

exactly when that will come in. But we are highly confident that, that will–that relationship will come to fruition this year.

90. Near the end of the call, a Canaccord Genuity analyst expressed concern about the withdrawn guidance. Defendants again falsely reassured the analyst:

> Q: Yes. So on suspending the guidance, so it sounds as though you've had some weakness, potential headwinds on the life sciences. Enterprise, you have this delay a little bit. And then provider seems like it's going okay, but you have some lower audit. Why the decision to suspend all your guidance rather than just make some sort of cut to it?
>
> DEFENDANT FERRERO: Well, so I can start. We can do this together, but it's the breadth of the moving pieces to–there's brackets around timing of the Carelon. There's brackets around 35%, sometimes 37% of our business in life sciences in Q4 alone. We have inbound interest on the strategic review.
>
> And if it was–really just one variable around that, I think we would have. But in order to–and each of those impact, not only revenue, but EBITDA, that bracketing all of those together would have created straight a wide bracket that we don't think it would be helpful to you and in modeling.
>
> So that's why we suspended and said that we will give an updated business update when we know that timing comes in. I mean, it's–just the timing of the Carelon piece alone, it could be tens of millions of dollars. So it's–that's why it wouldn't have been helpful because we did have to go way low to a much, much higher number and it would have been helpful.

91. The analyst was still skeptical, but Defendants again issued reassurances about the Carelon Agreement:

> Q: Okay. But–and thanks for the clarification.

> DEFENDANT ARNOLD: And just kind of reiterate what Justin said, it's like, we're sitting here now where we've got really strong visibility on 2023. And we've built the product, we've got the go-to-market, we're going to have pretty significant scale. I mean, if you think, this is going to be hundreds of thousands of Sharecare+ members in the first year of launch. …

92. The foregoing emphasized statements falsely attributed the delays in negotiating the Carelon Agreement entirely to the complexity, length, and breadth of the negotiations, and specifically denied that there was any risk to Sharecare's relationship with Anthem. In truth, the negotiations were delayed, in part, because of Anthem's hard bargaining and failure to honor its contractual promises. Defendants' false statements excluding the possibility of and denying any cracks in the relationship gave investors the misleading impression that Defendants were not aware of anything that might imperil the relationship with Anthem.

**B. False Statements About the Scope of the Carelon Agreement**

93. As alleged above, Defendant Arnold stated on the August 10, 2022 call that the Carelon Agreement "***will be our largest contract ever***." ¶87.

94. As alleged above, on that call, Defendant Ferrero also stated "I mean, it's–***just the timing of the Carelon piece alone, it could be tens of millions of dollars***." ¶90.

95. In addition, Defendant Arnold described the Carelon Agreement as "massive":

> Q: Yes. Thank you. Outside of the timing issue with Carelon, can you just talk about enterprise more broadly given some of the macro headwinds? What you're seeing from a sales cycle perspective and any sensitivity to price on the enterprise side?
>
> DEFENDANT ARNOLD: I think, we feel good about the pipeline that we're building. And I think the sales cycles don't feel like they're changing. I mean, it's still a long sales cycle. But our pipeline is robust; our RFPs are way ahead of last year. ***This Carelon partnership is a massive one for us.*** And we're kind of still staying within that range based on client size of—on the PMPM. We haven't seen a lot of headwinds there yet. We've kind of set price and we've been kind of holding to it.
>
> But yes, no, we feel good about the enterprise business. We think—if you think about how we're selling, we've got our current sales force, which continues to grow. We've got the national accounts team at Anthem that's opening up opportunities for us. We've now added Carelon, so their book of business, and hopefully, the ability to grow that. And sales cycle remains the same, and we haven't felt the price pressure.

96. The foregoing emphasized statements that the Carelon Agreement was the "largest" Sharecare had ever signed, that it was a "massive" deal, and that the timing "could be tens of millions of dollars", gave investors the impression that under the Carelon Agreement, Sharecare would earn substantial real revenues. In fact, the Carelon Agreement was a round-trip agreement wherein Sharecare remitted nearly all the revenues it earned to Carelon. The remainder of revenues net of costs Sharecare had to pay Carelon to service the agreement would be minimal.

97. On November 10, 2022, Sharecare filed its Q3 2022 10-Q. Defendants Arnold and Ferrero signed the Q3 2022 10-Q.

98. In the Q3 2022 10-Q, under Related Party Transactions, Defendants stated:

> The Series A Preferred Stock is held by a customer that also has an employee serving on our Board of Directors… ***Revenues recognized for the three months ended September 30, 2022 and 2021 totaled $10.0 million and $5.0 million, respectively. Revenues recognized for the nine months ended September 30, 2022 and 2021 totaled $20.4 million and $11.9 million, respectively.***

99. The foregoing emphasized statements were false because: (1) of the $10.0 million in purported revenue recognized in Q3 2022 ($10.2 million before amortizing the contract asset), $5.9 million (before amortizing the contract asset) related to the Carelon Agreement; (2) Sharecare also paid Anthem $5.7 million for servicing the Carelon Agreement; (3) Sharecare's $5.9 million from the Carelon Agreement were illusory and round-trip revenues that artificially inflated Sharecare's reported revenues; and (4) Q3 2022 revenues from Carelon were only $4.5 million; and, for the same reason (5) Q1-Q3 2022 revenues from Carelon were only $14.7 million.

100. On March 31, 2023, Sharecare filed its 2022 10-K. Defendants Arnold and Ferrero signed the 2022 10-K.

101. In the 2022 10-K, Defendants stated, under related party transactions:

> Additionally, during 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. ***Revenues recognized related to these services for the year ended December 31, 2022, totaled $17.4 million. … The Company also entered into separate agreements during 2022 for the purchase of***

> ***distinct goods and services from that customer for amounts totaling $18.0 million*** which are recorded in cost of sales. Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above.

102. The foregoing emphasized statements were misleading because: (1) the $18.0 million in expenses Sharecare recognized were from agreements to service the Carelon Agreement; (2) the $18.0 million in revenues and the $18.0 million in expenses were illusory round-trip revenues and expenses that went from Carelon to Sharecare and then back to Carelon as part of a single, integrated set of contracts that constituted the Carelon Agreement; (3) the $18.0 million artificially inflated Sharecare's reported revenues; and, therefore (4) true revenues from the Carelon Agreement were ($0.6 million).[7]

103. On May 10, 2023, Sharecare filed its Q1 2023 10-Q. Defendants Arnold and Ferrero signed the Q1 2023 10-Q.

104. In the Q1 2023 10-Q, Defendants stated, under related party transactions:

> Additionally, during the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. Separate from the above disclosed amounts for this related party, ***revenues recognized related to these distinct services for the three months ended March 31, 2023, totaled $10.6 million***. … ***The Company also entered into separate agreements during the third quarter of 2022 for the purchase of distinct goods and services from***

[7] Sharecare amortized $0.6 million of the Concession in 2022, which reduced revenues under the Carelon Agreement by $0.6 million. Without accounting for the reduction in revenue, net revenues would have been $0.0.

> ***that customer for amounts totaling $10.9 million which are recorded in cost of sales for the three months ended March 31, 2023.*** Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above.

105. The foregoing emphasized statements were misleading because: (1) the $10.9 million in purchases Sharecare recognized were from agreements to service the Carelon Agreement; (2) the $10.6 million were illusory round-trip revenues and expenses that went from Carelon to Sharecare and then back to Carelon as part of a single, integrated set of contracts that constituted the Carelon Agreement; (3) the $10.9 million artificially inflated Sharecare's revenues; and, therefore (4) revenues from the Carelon Agreement were ($0.3 million).[8]

106. On August 9, 2023, Sharecare filed its Q2 2023 10-Q. Defendants Arnold and Ferrero signed the Q2 2023 10-Q.

107. In the Q2 2023 10-Q, Defendants stated, under related party transactions:

> Additionally, during the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. ***Separate from the above disclosed amounts for this related party, revenues recognized related to these distinct services for the three and six months ended June 30, 2023, totaled $10.9 million and $23.0 million, respectively.*** … ***The Company also entered into separate agreements during the third quarter of 2022 for the purchase of distinct goods and services from that customer for amounts totaling $9.5 million and $20.4 million which are recorded in cost of sales for***

[8] Sharecare amortized $0.4 million of the Concession in Q1 2023, which reduced revenues under the Carelon Agreement by $0.4 million. Without accounting for the reduction in revenue, net revenues would have been $0.1 million.

> ***the three and six months ended June 30, 2023, respectively***. Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above.

108. The foregoing emphasized statements were misleading because: (1) the $9.5 million in purchases Sharecare recognized were from agreements to service the Carelon Agreement; (2) the $9.5 million were illusory round-trip revenues and expenses that went from Carelon to Sharecare and then back to Carelon as part of a single, integrated set of contracts that constituted the Carelon Agreement; (3) the $9.5 million artificially inflated revenues; and, therefore (4) revenues from the Carelon Agreement were $1.4 million.[9]

109. On November 9, 2023, Sharecare filed its Q3 2023 10-Q. Defendants Arnold and Ferrero signed the Q3 2023 10-Q.

110. In the Q3 2023 10-Q, Defendants stated, under related party transactions:

> Additionally, during the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. ***Separate from the above disclosed amounts for this related party, revenues recognized related to these distinct services for the three months ended September 30, 2023 and 2022 totaled $8.9 million and $5.7 million, respectively***. … ***The Company also entered into separate agreements during the third quarter of 2022 for the purchase of distinct goods and services from that customer for amounts totaling $8.4 million and $5.7 million for the three months ended September 30, 2023 and 2022, respectively, and $24.8 million***

[9] Sharecare amortized $0.4 million of the Concession in Q2 2023, which reduced revenues under the Carelon Agreement by $0.4 million. Without accounting for the reduction in revenue, net revenues would have been $1.8 million

> ***and $5.7 million for the nine months ended September 30, 2023 and 2022, respectively, which are which are recorded in cost of sales for each respective period.*** Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above.

111. The foregoing emphasized statements were misleading because: (1) the $8.4 million in purchases Sharecare recognized were from agreements to service the Carelon Agreement; (2) the $8.4 million were illusory round-trip revenues and expenses that went from Carelon to Sharecare and then back to Carelon as part of a single, integrated set of contracts that constituted the Carelon Agreement; (3) the $8.4 million artificially inflated revenues; and, therefore, (4) true revenues from the Carelon Agreement were $0.5 million.[10]

### C. False Statements About the Status of the Anthem Relationship

112. On March 29, 2023, Sharecare held a call to discuss its Q4 2022 earnings. On the call, Defendant Arnold stated:

> Q: Okay. With respect to Elevance and—or the old Anthem, I think back when you guys originally de-SPAC-ed, you talked about there was a 10 million lives opportunity with Elevance in terms of clients they had where there were multiple payers, I guess, insurers in those employers. Can you just talk to us a little bit about like that 10 million number and maybe where you guys are with upselling or cross -- or penetrating that base?
>
> DEFENDANT ARNOLD: Sure. Yes. So I think, this is an important relationship and it's multifaceted. ***So one part of the relationship is we provide AI services to Anthem, and that's going well.*** And [Sharecare

[10] Sharecare amortized $0.4 million of the Concession in Q3 2023, which reduced revenues under the Carelon Agreement by $0.4 million. Without accounting for the reduction in revenue, net revenues would have been $0.9 million

> executive] leads those efforts for us. ***But that's an important part of the relationship.***
>
> And then the second important part of the relationship was they invested in Sharecare, and we had to show them that we could take those dollars and we could build a better advocacy solution that's in the market. And we think we've done that. And why we think we have done that is Carelon moved 500,000 plus members over to our platform. And so we're going through that execution right now, and that's a ton of work. But we're building confidence, I think, with them and us and how we can work well together.
>
> And then the next piece was how could we bring on a big important client like Koch Industries, and that is one of their clients, and be able to have flawless execution with a new product offering. So we launched Sharecare+ to Koch in partnership with Anthem, that would fall in that national accounts category that you're talking about, and have done really well rolling that out starting in January. So that builds confidence.
>
> And then it's—and then we've—we're starting to get better muscle memory on how to include Sharecare into national account RFPs. We're getting better on how to think about things like Deal Desk, where—how do we approach clients, separately or together. And we expect that more business is going to come over. And it already has through Carelon, from where we started in Q4, we've already onboarded new big important clients. [Ferrero] mentioned one payer, there's others. And so we think that we're on a good path.

113. The foregoing emphasized statements were false because, by this time, Anthem had stopped using Sharecare's AI offerings and had also stopped making payments on the DocAI contract. Thus, Arnold's statement that the provision of AI was "important" or that the portion of the relationship was going "well" was misleading, because the relationship was not "going" at all.

114. On the same call, Sharecare announced guidance that estimated Q1 2023 revenues that were lower than Q4 2022. The very first question, from a BTIG

analyst, was about the reduction. In response, Defendants Ferrero and Arnold denied that the guidance reduction had anything to do with the deterioration of the relationship between Anthem and Sharecare:

> Q: Hi. Can you talk a little bit about like the 1Q revenue expectations? Why would there be a significant sequential decline from 4Q to 1Q? And then can you also talk a little bit about the Carelon deal? Is the PMPM rate for those lives coming in, in the range that you had expected? Any color around that would be helpful. I guess, the revenue guide for '23 looks a little bit lower than what we were expecting. Maybe just talk about that on the enterprise side. Thank you.
>
> DEFENDANT FERRERO: Yes. Thanks, Dave. It's Justin. So the Q1, if you remember, Q4—is typically a dip in Q1, because in Q4 is our strongest quarter for Life Sciences. And typically, there's $8 million to $9 million dip going from Q4 to Q1. So that's normal.
>
> We've also factored in, as we talked about, none of this has been finalized, but we were fortunate to close the relationship with Carelon. And now what we're doing through the course of this year is working with them to tech-enable that business, and there will be trade-offs. So ultimately, we think they will be less revenue or lower PMPM, but a higher margin business, as we go through the year. So that's why we factored in little bit of a dip in the enterprise revenue in Q1 as well.
>
> DEFENDANT ARNOLD: ***Yes. I would just add, I mean, the—it's a large contract with Carelon. And it's—and there's—the customer base is becoming broader, and some customers have less high-touch services. So it's less PMPM.***
>
> And then as it relates to your question on revenue guidance for the year, we made a decision to only guide to what's booked in enterprise, which is not what we've historically done. So we have taken out any new logos that we might add during the year, any upsells, any cross-sells and any upside.

115. Later in the call, another analyst asked about the reduction in guidance. Defendants again denied any deterioration in the relationship:

Q: Yes. Thanks for the questions. Justin, can you just clarify, I think you said enterprise is expected to be down from fourth quarter to first quarter. So I guess I want to understand why specifically it would be down. If you guys are generating revenue on a per member per month basis, why would it go down?

DEFENDANT FERRERO: That is all around the Carelon discussion. So we are taking a conservative approach. Nothing has been finalized. ***But as came out in our opening remarks, that's a fantastic partner for us.*** And what we're working on with them is to tech-enable that business. And as part of that, the conversations include potentially less revenue, but a higher margin business. And nothing is finalized. But in the theme of our guidance for this year as we want to be conservative, there's a chance that PMPM could reduce. And so we have built that into our forecast.

***But at the end of the day, the number of lives aren't going to reduce. The momentum with that client hasn't reduced. We've actually added an additional health plan in Q1 with Carelon. And so we see that relationship only expanding.*** However, there's a large client inside of that relationship that we're working on to tech-enable. And it will have pressure on the PMPM, but ultimately, we believe better gross margin. So that's why there is a little bit of pressure in Q1.

DEFENDANT ARNOLD: Yes. So I mean just to explain what we mean by tech-enable, is provide less services, physical services, high-touch services with more digital services, which for that particular client would reduce the PMPM.

116. The analyst was not satisfied, and asked again:

Q: Yes. But I still don't understand why, sequentially, your revenue would go down. Was there any one-time revenue in enterprise in the fourth quarter? Or I mean—because if you have the lives, you got more revenue, right?

DEFENDANT ARNOLD: Because we are taking a conservative approach on that particular client, we—it hasn't been discounted. It wasn't discounted in Q4. But we believe that the likelihood of us moving in this direction with this particular client is why we're going to guide that way.

> DEFENDANT FERRERO: Yes. So if you have the same number of lives against the client and the PMPM is higher in Q4 than it is in Q1, the client reduces cost.

117. Later in the call, a third analyst asked for Defendants to explain the price cut:

> Q: Yes. Thanks. Following up on the lower PMPM at Carelon, can you just talk about, does this shape your view of the broader opportunity set? Do you think it's specific to them? Or just how you're thinking bigger picture on the enterprise side and opportunity?
>
> DEFENDANT ARNOLD: Yes. So what we believe is special about Sharecare+ is it's a digital-first offering. And what we mean by that is it's self-service. So anything that I could do with an advocate, I should be able to do directly within the platform myself. And that's not—doesn't cost as much, obviously, to execute that type of experience.
>
> And so there are certain clients that will gravitate to that for certain reasons. Maybe they've got the right demographic of the population or maybe there's cost constraints. We have an example within the Carelon partnership where there was some cost constraints and there was the desire to get to digital-first. And so—so that particular client, we're moving down the path of the more digital offering with the less high-touch services, which is going to reduce that particular client's PMPM, but it's also going to make higher margin.
>
> We also have a big mix of clients that have the combination of both. And so you get the advocate with the care console, and you get the digital-first approach. And we're taking both of those approaches to market. And so sometimes the digital-first works really well, as I said, for people that might not have substantial budgets for these types of things. We like it because it's higher margin and it's easy to turn on. I mean I think I've shown it to you in the past, literally, it's like turning Wi-Fi on, the little blue button shows up and all the data is there. And so I don't see—I see it as an advantage that we—as a go-to-market that we've got both offerings. And depending on the client, we tailor the offering to fit the need.

118. The foregoing emphasized statements were false because, first, Sharecare's relationship with Carelon and Anthem was collapsing, in that (1) Anthem had expressed dissatisfaction with DocAI, and Sharecare had had to use contractual inducements to mollify it; (2) Anthem had breached its contracts in connection with Sharecare+; (3) Sharecare's revenues from the Carelon Agreement were round-trip revenues in that they were matched by substantially equivalent payments back to Anthem. As a result, the "momentum" of the relationship was not increasing but moving towards a collapse. Second, the reduction in Sharecare+ lives from the loss of a customer did not merely reflect a diversifying client base, but also a breach of contract by Anthem.

119. On August 9, 2023, Sharecare held a call to discuss Q2 2023 earnings. On the call, Defendant Arnold told investors that selling through Carelon is "meeting expectations":

> Q: Thank you. To start on the Enterprise side, good to hear about the lives additions. Could you speak a little bit about development of the marketplace and maybe as we think about lives ex-Carelon, what you're seeing among the Blues [i.e., Blue Cross Blue Shield entities] targets for the year and whether it's keeping pace with expectation?
>
> DEFENDANT ARNOLD: I think on covered lives, we're keeping pace with expectations, ***so selling through our partners like Carelon is meeting expectations.*** Our sales force delivering new logos, is meeting expectations. Our continued focus on the Blues plan and we've added a new Blues plan this year, continues to be on the mark. ***So, all those things are progressing as planned.***

> As the marketplace goes, we're having success in upselling our digital therapeutics to our installed base and we're leading with our own solutions, which give us higher margin and more revenue and so we're starting to see some good pull-through in that area as well.

120. The foregoing emphasized statements were false because, by this point: (1) Anthem had not been paying its bills under the Carelon Agreement for at least four months; (2) Sharecare had not been paying its bills under the Carelon Agreement for at least four months; (3) Anthem had cancelled the DocAI Agreement; and, therefore, (4) selling through Carelon was not meeting expectations and it was apparent that the collapse of the entire Anthem relationship neared.

121. On September 13, 2023, Sharecare delivered a presentation at the Morgan Stanley Global Healthcare Conference. During the presentation, Arnold stated:

> Q: Got it. I do want to segue just to the macros and one of the themes across the conference. I mean, as you know, there's no shortage of crosscurrents out there that companies are dealing with. You reported recently a clean report, kind of a slight beat, took the low end of the revenue guidance up. That's better than a lot of other companies in the space. So I just wanted to dig into what are you seeing in your business in terms of maybe some of the resiliency that you would call out?
>
> DEFENDANT ARNOLD: Well, I think we're growing into being a public company, number one. So how to forecast and the things, the fundamentals that you need to get right. And so I contribute some of that to all the great work our finance team and others are doing. ***And in the spirit of that, I think Enterprise is rolling out as expected, right? They just—they're not—there haven't been surprises. It's like what we thought was happening—would happen is happening. That we're implementing to our signed contracts.*** We're onboarding people. We're administering rewards. We're enrolling people into programs.

> We're getting them talking to advocate. We're starting to cross-sell our home care services into that. Our work that we've done in advanced analytics has given us not only precision targeting but better clinical outcomes, which has given us lower cost. So I think planning and execution has given us what we expected in Enterprise.

122. The foregoing emphasized statements were false because Sharecare's agreements with Anthem, which were a key source of Enterprise revenues, were collapsing. By this point, Anthem had already cancelled the DocAI Agreement and had been withholding payments on the Carelon Agreements since at least April 2023, five months earlier. Sharecare had also retaliated by withholding payments to Anthem. These were "surprises", and it was not true that Sharecare's forecasting was bearing out. Similarly, Defendants' specific representation "that we're implementing to our signed contracts" gave investors the misleading impression that the course of performance of Sharecare's written contracts followed the contracts' written terms. In fact, Anthem had (a) cancelled the DocAI contract, which Sharecare maintained was not contractually permitted; (b) stopped payments on the Carelon Agreement; and (c) stopped payment on the DocAI Agreement. In Sharecare's view, these actions violated the respective Agreements.

123. Later in the call, Defendant Arnold stated:

> Q: Got it. Well, it's a great segue into Sharecare+ and I do want to dig into that in terms of the advocacy offering. How is it going versus your initial expectations? And I also want to touch on having an anchor customer like a Carelon, how important that is to really drive and ultimately scale this business?

> DEFENDANT ARNOLD:
>
> * * * *
>
> And then fourth is to answer your question on Carelon, absolutely, that's beneficial to us for many reasons. One is it gave us some scale right out of the gates. So to start with over 0.5 million members just with one client, that was a big deal. ***Second is, it gives us the license to hunt together, and I think we complement each other well in the sales room.*** When you look at kind of our advanced analytics and our strong engagement, some of the things I've been talking about with the relationships that they have and the other bundling opportunities they can create with us, it gives us some really interesting opportunities to win.

124. The foregoing emphasized statements were misleading because by this point, Anthem had been withholding payments on the Carelon Agreements since at least April 2023, five months before. Sharecare had also retaliated by withholding payments to Anthem. Thus, Arnold's reference to a "license to hunt together" in the present tense gave investors the misleading impression that the relationship with Anthem was actively ongoing though in truth it had already collapsed beyond repair.

125. Defendant Arnold continued in response to the next question:

> Q Got it. So you mentioned the [0.5 million] with Carelon. ***Overall, roughly how big is this business? And how should we think about what's a reasonable growth cadence in the next number of years as you grow the platform?***
>
> **DEFENDANT ARNOLD:** Yes. So I would think of it as about a ***$50 million business.*** Think about it—in year one. So basically, that's pretty impressive. Like we weren't in this business a year ago, ***and we're already at $50 million in revenue.*** And our goal is like this is a double-digit growth opportunity for us. And so how do we do double-digit growth? Well, we need to land and expand. We have tons of clients on

> our wellness product, our digital front door. We need to convince them to turn WiFi on, which is our Sharecare+. That's a great way to grow.
>
> Second ***is like we have to continue to add value to Carelon and help them close deals that we're a part of.***
>
> And then the third is our sales team needs to win over the brokers. And if we do that, as we continue to get better in RFPs and how to talk about our value proposition and price, I think we're going to continue to win business.

126. Defendant Arnold's statements were misleading because, first, by this point, Anthem had been withholding payments on the Carelon Agreements since at least April 2023, five months before. Carelon clients Sharecare services pursuant to the Carelon Agreement accounted for a substantial majority of Sharecare+ revenues. As a result, Sharecare+ was not a "$50 million business", because revenues from the Sharecare+ business were about to collapse. Moreover, though Sharecare had recorded revenues from the Sharecare+ business, neither Anthem nor Sharecare itself were paying their bills. Accordingly, Sharecare had no reason to expect that it would collect the revenues, and the disclosure of revenues under the Carelon Agreement was misleading without also disclosing that these revenues were uncollectable. And third, even if Sharecare collected the revenues, it would have to immediately remit almost all of them to Anthem. For these same reasons, Sharecare was not "continu[ing] to add value to Carelon and help[ing] them close deals", because the relationship had collapsed.

### D. False Statements That It's "Business As Usual" After Sharecare Cuts Anthem Off

127. On November 9, 2023, Sharecare held a call to discuss Q3 2023 earnings. On the call, an analyst asked Defendants for more information about the "Enterprise division, RFP activity, the sales pipeline" and "color or thoughts on Carelon". Defendants' response misleadingly omitted that Sharecare had already stopped providing patient advocacy services because of contract disputes with Carelon:

> Q: Congratulations on the excellent EBITDA growth. Can you talk a little bit about the progress you're making in the Enterprise division, RFP activity, the sales pipeline? Then what was the revenue for Enterprise in the quarter? Then any color or thoughts on Carelon without getting too specific, obviously.
>
> DEFENDANT FERRERO: Thanks, Dave. There's a lot to unpack on that one. Which one do you want me to focus on first?
>
> I'll start with the quarter. We had a—I think we set out for significant EBITDA growth. We came in at a record since our IPO, 8.4%. As you know, that's almost 3x our percentage EBITDA that we did in Q2. So sequentially, just a significant lift there. And—so we're really pleased with the quarter.
>
> Relative to the pipeline, it continues to grow. It's a very strong pipeline. We had a number of—we can't talk to them yet, but we had double-digit wins in new customers in Q3. Those will come out later, and are real excited about how that sets us up for 2024.
>
> DEFENDANT ARNOLD: Yes. I would just add to that, [analyst], it's Jeff, not only great quarter, strong pipeline, ***but we're starting to get in a lot of results from our Sharecare+ deployments, some in conjunction with Carelon and the results have been really great, like satisfaction, really high, outcomes coming in better than expected. So we're super encouraged by that.***

128. Shortly after Defendants' initial statements, another analyst asked about Carelon:

> Q: Guys, this is [analyst] And good luck—or good luck, [Arnold], on kind of the next steps and congrats to Brent [Sharecare's incoming CEO] on the new role. Just wanted to talk about Carelon. I know you kind of saw some pressure with PMPMs earlier in the year. I just want to talk about how that relationship is going? And if you've kind of seen those PMPM stabilize?
> Then also, just kind of as open enrollment has started up again I just wanted to see how Sharecare+ plus engagement is going and if that's kind of tracking in line with expectations.
>
> DEFENDANT ARNOLD: Yes. ***I think it's stay the course. Everything is kind of tracking on expectations. It's kind of the same story as the last question I answered is that we've got current clients with Carelon that we're executing against, which we believe become great references for us and the results have been really good.***
>
> ***We have lots of opportunities within Carelon that we're pursuing across both our Enterprise segment and our Provider segment. And things are staying the course.*** The platform is becoming more mature as time goes on. Awareness is growing with the brokers, which there's been a big emphasis on this year of driving awareness at Sharecare+ offers advocacy.
>
> So we're seeing an increase in the number of RFPs that are coming in the door. The dialogue that we're having with the brokers is kind of way up.
>
> We've seen some delays in decision-making, but ultimately seeing the pull-through at the end of the day like we had one this week that we were a finalist.
>
> We did our finalist presentation six months ago and found out yesterday that we won that contract. ***But yes, I would say it's business as usual.***

129. Arnold's statements were false. That Sharecare was "pursuing" "opportunities within Carelon" gave investors the misleading impression that Sharecare was working with Carelon to seek new opportunities. In fact, Sharecare was not doing so because it had altogether stopped providing patient advocacy services to Carelon in October. That Sharecare was "stay[ing] the course" and that it was "business as usual" with Carelon gave investors the misleading impression that Sharecare's work with Carelon was proceeding as it had previously disclosed. In fact, because Sharecare had stopped providing advocacy services, there was no ongoing "business", let alone "business as usual" or "stay[ing] the course". Nor, because Sharecare was not providing Sharecare+ through Carelon, were there "current clients with Carelon [Sharecare is] executing against" or "opportunities." Finally, the Carelon Agreement was not "tracking expectations," because Sharecare had stopped servicing the contract.

130. On November 9, 2023, Sharecare filed its Q3 2022 10-Q. Arnold and Ferrero signed the Q3 2023 10-Q.

131. In the Q3 2023 10-Q, Defendants stated, under Subsequent Events:

> The Company considers events or transactions that occur after the balance sheet date [September 30, 2023], but before the consolidated financial statements are issued, to provide additional evidence relative to certain estimates or identify matters that require additional disclosures. ***The Company evaluated subsequent events through, November 9, 2023, the date on which the consolidated financial statements were available to be issued, noting no such material events.***

132. The emphasized statement was false because in October 2023, Sharecare had stopped providing patient advocacy services to Carelon under the Carelon Agreement. Defendants had called the Carelon Agreement Sharecare's "largest contract ever". The deterioration and probable elimination of Sharecare's "largest contract ever" is a material event that "require[s] additional disclosures". Further, at the time, Sharecare carried the Concession on its balance sheet at a value of $6.3 million. With no Carelon Agreement, Sharecare would have to record a $6.3 million impairment of the Concession. Thus, Sharecare's October stoppage is also "additional evidence relative to certain estimates," in that it would force Sharecare to record a $6.3 million impairment.

## VI. LOSS CAUSATION

### A. Defendants Admit that a Carelon Customer Was Leaving Sharecare+ and that Sharecare+ Expenses Are Higher Than Past Statements Suggested

133. On March 29, 2023, before trading Sharecare published a press release announcing its Q4 and FY 2022 financial results. That same day, also before trading, Sharecare held a call to discuss the results.

134. On the call, Sharecare announced 2023 revenue guidance that came in 12% below street consensus estimate, attributing the lower guidance to its Enterprise segment.

135. Many analysts asked Sharecare why its 2023 revenue guidance was so much lower than expectations. ¶¶112-117. In response, Sharecare disclosed that a large Carelon customer that would have been included in the number of Sharecare+ lives had instead opted for a lower-priced digital-only version of Sharecare's product. As Defendant Arnold explained, "it's a large contract with Carelon. And it's—and there's—the customer base is becoming broader, and some customers have less high-touch services. So it's less PMPM."

136. Notwithstanding Defendants' statements to the contrary, the disclosure revealed that there were at least potentially problems with the Carelon Agreement. Three analysts wrote that the disclosures did raise questions about the relationship, though all three then reported management's explanation that it did not and sided with management:

a. A Morgan Stanley analyst wrote that:

> **Commentary on the call about lower PMPM with Carelon for Sharecare+ led to many questions.** We clarified on our callback that this is specific to one large customer who needed to reduce costs and thus opted for a digital offering with lower services/touch points, resulting in a PMPM of ~$3.50 vs. $6 at some other customers. While this appears to be an isolated case, ***nonetheless it raises the question about the pricing environment and potential implications of a more challenging economic backdrop.***

b. A Canaccord Genuity analyst wrote that:

**Enterprise sequential revenue decline not a pricing power concern**:

Management outlined on the call that guidance contemplates a sequential reduction in revenue within the Enterprise segment due to lowering PMPMs from the Carelon relationship which was signed in the back half of 2022. Though management reiterated throughout the call the conservatism baked into guidance, ***the sequential reduction called into question the company's pricing power and the ultimate value from the Carelon relationship.*** In further discussion with management, the cut in PMPMs was ultimately due to one specific large client through the Carelon relationship where costs needed to be cut across the board. The resulting PMPM reduction is due to reorientation of services to higher margin digital offerings to accommodate this one client to fit their current budget constraints. Thus, the reduction is not the result of diminished pricing power or lack of perceived value in Sharecare's services. We note that a majority of clients through the Carelon relationship are still receiving the higher PMPM rates and accompanying services, and the affected client has the ability to upgrade their service offering at the higher PMPM at a later date.

c. A BTIG analyst wrote that:

**A $20M per year Enterprise deal may have been delayed, and could ultimately get signed.** Within Enterprise one of Carelon's very large clients was facing some cost pressures, and this client needed to price its Sharecare Solution at a lower, tech-only PMPM rate, which was a few dollars below the higher Sharecare+ rate of ~$6+. As any good long-term partner would do, SHCR accommodated the need of this client and decided to provide a technology priced solution, at a lower PMPM rate, while protecting its own EBITDA margin. We estimate that this change was worth ~$20M in revenue in 2023, and explains the largest piece of the revenue miss, relative to expectations. We believe it is very likely that ultimately, after this one larger customer sees all the value that other entities are getting from the Advocacy solution, at $6+ PMPM, it will likely ultimately decide to buy the higher-priced product.

137. Sharecare also disclosed that the costs of the Carelon Agreement were higher than it had previously stated:

> Q: Got it. And then as a follow-up, Justin, you mentioned just some infrastructure support for enterprise. Can you maybe touch on, on like an intermediate to longer-term basis, where you think ultimately gross margin will shake out and what the implications are for that?
>
> DEFENDANT FERRERO: Yes. So we're making significant investments to support largely bringing on 900,000 lives. If you just put that in perspective, that's a massive lift between Q4 and Q1. And so we overinvested to make sure that our delivery for those customers was flawless, and it has gone extremely well.
>
> We mentioned on the last call that we think that this business can be a mid-30s gross margin business long term, and that's what we believe. So that's ultimately how we'll model this out. ***In order to deliver, we had to use outsourced partners, which is why it's showing up in the cost of sales line.*** But over the course of this year, we'll optimize, we'll start to bring more of those resources in-house. And so you'll see the gross margin begin to expand through the course of this year. And ultimately, our belief is that this is a 35% plus gross margin business for us as you look to 2024 and beyond.

138. Ferrero's answer was a partial revelation that the Carelon Agreement was not as profitable as Defendants had previously claimed. However, Ferrero's answer was only a partial disclosure for the following reasons, among others:

a. Ferrero claimed that Sharecare had used "outsourced partners", when in fact, it had used Anthem. Anthem was not an outside partner, it was Sharecare's counterparty. This is a key fact because disclosure that Sharecare is remitting the money it received from Anthem back to Anthem would raise questions about whether that revenue was legitimate rather than round-trip.

b. At this point, Sharecare had only disclosed overall costs of sales for all its business combined. Investors could not determine the amount Sharecare had spent on building infrastructure. When Sharecare later filed its 2022 10-K disclosing payments to Anthem, Sharecare maintained that these payments were separate and distinct. So investors could not connect the disclosure on the call of increased costs of sales to the disclosure in the 10-K that Sharecare was purchasing unspecified goods and services from Anthem, and discern that Sharecare remitted nearly every dollar it earned under the Carelon Agreement back to Anthem.

139. On March 29, the price of Sharecare shares fell from their previous close of $2.13 to close at $1.55, down $0.58 (27.2%), damaging investors.

**B. Sharecare Admits that Its Relationship With Anthem Has Unraveled**

140. On March 28, 2024, after close of business Sharecare held a call to discuss its Q4 2023 earnings, reporting total revenues of $105 million, substantially below guidance. On the call, Defendants revealed that Sharecare had missed guidance because it had terminated a contract with an unnamed customer (Anthem/Carelon), which had caused it to lose $14 million (11.8%) in Q4 2023 revenues. Sharecare also admitted that "[w]e expect definitely for Q1 to have a

similar impact" and while Sharecare was "working to resolve the dispute [] until that has been fully agreed upon, then we expect to continue to see an impact on the P&L."

141. In addition, Sharecare disclosed that it was recording an impairment of $6.2 million corresponding to the remaining unamortized value of the Concession.

142. Then on March 29, 2024, Sharecare filed its 2023 10-K admitting that "***In October 2023, the Company ceased providing patient advocacy services in accordance with the revenue contract with the Series A Preferred Stockholder.***"

143. On April 1, 2024, the next trading day, the price of Sharecare's shares closed at $0.55, down $0.22 (28.3%) from its previous close.[11]

## VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A. False Exculpatory Statements Are Probative of Scienter

144. In the end-of-class period disclosures, Defendants admitted that "***some of [Anthem's] commitments weren't honored, which made it difficult for us to forecast.***"

145. As more fully alleged above, Defendants attributed the withdrawal of guidance in 2022 to the complexity of the agreement Sharecare was negotiating with Carelon. Defendants attributed the reduced guidance in 2023 to conservativism and to a Carelon customer changing its mind and renegotiating a contract. Defendants'

[11] March 28 was a Thursday and March 29 was a trading holiday, so trading did not resume until April 1.

statements blaming the guidance withdrawal and reduction were false exculpatory statements because the true cause was Anthem's reneging on some of its promises.

146. Defendants' false exculpatory statements are probative of scienter.

### B. The importance of the Carelon Agreement and Anthem relationship to Sharecare supports an inference of scienter

147. On the August 10 call, Arnold stated that "[t]his Carelon partnership is a massive one for us." Indeed, "hundreds of people" were involved in the relationship, and it would be Sharecare's "largest contract ever."

148. Sharecare's relationship with Anthem was one of its core operations. Sharecare's existing agreements with Anthem included both the Carelon Agreement and the DocAI Agreement. Sharecare granted Anthem a seat on its Board of Directors.

149. The Carelon Agreement, including its terms and course of performance, was one of Sharecare's core operations. Indeed, according to Arnold, it was Sharecare's "largest contract ever".

150. That Sharecare was required to remit nearly all of the revenue it earned from the Carelon Agreement back to Anthem was a critical fact about the Carelon Agreement. Because of this contractual term, Sharecare hardly earned any true revenues from the Carelon Agreement. Further, that Anthem had threatened to terminate the Carelon Agreement was a critical fact about the course of performance of the Carelon Agreement.

151. Because of its sheer size, the DocAI Agreement was also one of Sharecare's core operations. The DocAI Agreement provided Sharecare with income of $20 million per year, or nearly 5% of its total revenues.

152. That Anthem stopped making payments under, and then cancelled, the DocAI Agreement was a critical fact about the DocAI Agreement.

153. Thus, the importance of the facts Defendants concealed supports an inference of scienter.

### C. Defendant Arnold Knew His Statements About the Carelon Agreement in November 2023 Were False Because Arnold's Approval Would Have Been Necessary To Cut Carelon Off In October 2023

154. As of October 2023, Arnold was Sharecare's CEO.

155. As set out above, Sharecare's relationship with Carelon and Anthem was critical to its success.

156. In addition, in the nine months ended September 30, 2023, Sharecare earned $31.8 million from providing patient advocacy services as part of its relationship with Carelon, or 9.4% of its total revenues from that period.

157. In October 2023, Sharecare escalated its dispute with Anthem by ceasing to provide patient advocacy services to Carelon.

158. Companies do not cut off the source of 9.4% of their revenues without the CEO's approval. Companies also require CEOs' approval before cutting off important customers on which they have staked their future, like Anthem. Thus,

Arnold knew Sharecare had cut off Carelon because his approval would have been necessary to cut Carelon off. Moreover, given that Arnold had previously referred to the Carelon Agreement as Sharecare's "largest contract ever", there is no way he would not have been consulted before Sharecare stopped performing under the Agreement.

159. Thus, when Arnold stated in November 2023 that it was "business as usual" with Carelon, he knew that there was no business because Sharecare had already cut Carelon off in October 2023. Arnold knew his statement (among others made on the November 2023 call) was false.

**D. Repeated False Statements To Analysts Support Scienter**

160. On three separate calls during the Class Period, analysts asked focused, repeated questions about critical matters touching on Sharecare's relationship with Anthem, and Defendants provided misleading answers:

a. On the August 10, 2022 call, analysts asked whether delays in signing the Carelon Agreement were indicative of weaknesses in the relationship. Defendants claimed three times that the entire delay was due to the complexity and length of the Agreement.

b. On the March 29, 2023 call, analysts asked why Sharecare was announcing low 2023 guidance. Defendants acknowledged that the low guidance resulted, in part, from a Carelon customer's decision not to

opt for Sharecare+, but stated that the cancellation was an isolated incident which did not reflect on the Carelon Agreement more broadly.

161. Defendants' repeated, clear, unambiguous, but incorrect answers supports an inference of scienter.

162. Moreover, it is unusual for company officials to state, unprompted, as Arnold did, that the company is "implementing [its] signed contracts." Arnold's specific and unusual reassurance that Sharecare's contracts are performing according to their terms supports an inference that Arnold knew the opposite was true.

**E. Sharecare's Failure To File the Carelon Agreement Or Disclose the Transaction Underlying the Concession Supports Scienter**

163. Item 1.01 to Form 8-K requires issuers to file all material contracts with the SEC.

164. Item 601 of Regulation S-K requires that an issuer file as exhibits to any 10-K or 10-Q all material contracts that became effective during the reporting period reflected by the 10-K or 10-Q. 17 CFR § 229.601(a)(4).

165. The Carelon Agreement was plainly material. Defendant Arnold described the Carelon Agreement as Sharecare's "largest contract ever." Defendant Arnold also described that agreement as "massive".

166. A company's largest ever contract is plainly material. Yet notwithstanding Arnold's acknowledgement, Sharecare never filed the Carelon Agreement.

167. The Carelon Agreement was remarkably one-sided in favor of Anthem. Moreover, the Carelon Agreement's terms demonstrated that Defendants' statements thereon were misleading. For instance, because Sharecare had to remit nearly every dollar it earned under the Carelon Agreement to Anthem, the Carelon Agreement was a round-trip revenue agreement. Excluding the round-trip revenue, Sharecare would earn only minimal revenues from the Carelon Agreement.

168. Defendants' failure to file the Carelon Agreement even as the Agreement's terms contradicted their public statements supports an inference that they intended to conceal the Agreement's terms from investors.

169. Similarly, Defendants' failure to disclose the nature of the Concession, the transaction that gave rise to the Carelon Agreement contract asset, supports scienter.

170. Companies must separately disclose related party transactions in the notes to their financial statements. ASC 850-10-50. The disclosure must include "[a] description of the transactions [] for each of the periods for which income statements are presented." ASC 850-10-50-1 b. Anthem was a related party because an Anthem employee sat on Sharecare's board, as Sharecare acknowledged.

171. Sharecare disclosed the existence of a contract asset but not, as required by ASC 850-10-50-1 b., the transaction that gave rise to the contract asset.

## VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

172. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired publicly traded Sharecare common stock during the Class Period, and held such stock through at least one of the corrective disclosures identified in ¶¶133-143, herein ("Class"). Excluded from the Class are Defendants, the officers and directors of Sharecare, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

173. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sharecare common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members of the proposed Class.

174. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

175. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and

securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

176. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Sharecare;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused Sharecare to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Sharecare common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

177. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. PRESUMPTION OF RELIANCE

178. In addition, common issues of fact and law predominate over individual issues. In particular, to avoid individual proof of reliance, Plaintiffs invoke, in part, the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Sharecare common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
- Sharecare's securities were liquid and traded with moderate to heavy volume during the Class Period;

- As a regulated issuer, Sharecare filed periodic public reports with the SEC and the NASDAQ;
- Sharecare regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
- Unexpected material news about Sharecare was rapidly reflected in and incorporated into its stock price during the Class Period.

179. As a result of the foregoing, the market for Sharecare's common stock promptly digested current information regarding Sharecare from all publicly available sources and reflected such information in the price of Sharecare common stock. Under these circumstances, all purchasers and acquirers of Sharecare's common stock during the Class Period suffered similar injury through their purchase or acquisition of Sharecare's common stock at artificially inflated prices and the presumption of reliance applies.

180. Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired Sharecare common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

## X. COUNTS

### COUNT I

### Violations of Section 10(b) and Rule 10b-5(b) Against All Defendants

181. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182. Plaintiffs assert this claim against all Defendants and based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

183. Defendants made the allegedly false statements set out above.

184. Defendants, by and through themselves, and other senior Sharecare officers and employees, violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that they made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendants' statements directly affected the price of Sharecare common stock during the Class Period.

185. Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of Sharecare were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

186. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Sharecare common stock during the Class Period in purchasing Sharecare common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

187. Had Plaintiffs and the other members of the Class been aware that the market price of Sharecare common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Sharecare common stock at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Sharecare common stock during the Class Period.

188. This action was filed within five years of each of Defendants' fraudulent statements and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against Arnold and Ferrero**

189. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

190. During the Class Period, Arnold and Ferrero participated in the operation and management of Sharecare, and conducted and participated, directly

and indirectly, in the conduct of Sharecare's business affairs. Because of their senior positions, they knew the adverse non-public information about Sharecare's misstatements.

191. As officers of a public business, Arnold and Ferrero had a duty to disseminate accurate and truthful information with respect to Sharecare's financial condition and operations, and to correct promptly any public statements issued by Sharecare which had become materially false or misleading.

192. Because of their positions of control and authority as senior executives and/or directors, Arnold and Ferrero were able to, and did, control the contents of Sharecare's SEC filings, as well as other statements Sharecare publicly disseminated in the marketplace during the Class Period concerning Sharecare's results of operations. Throughout the Class Period, Arnold and Ferrero exercised their power and authority to cause Sharecare to engage in the wrongful acts complained of herein. Arnold and Ferrero, therefore, were "controlling persons" of Sharecare within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sharecare common stock.

193. By reason of the above conduct, Arnold and Ferrero are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sharecare.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 27, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Jonathan Horne*
Laurence Rosen
Jonathan Horne
Henry Bloxenheim
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
lrosen@rosenlegal.com
jhorne@rosenlegal.com
hbloxenheim@rosenlegal.com

*Lead Counsel for Plaintiffs and the putative Class*

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.
Georgia Bar No. 262062
Mary Ellen Conner
Georgia Bar No. 195077
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com
maryellenc@johnsonfistel.com

*Local Counsel for Plaintiffs and the putative Class*

**CERTIFICATE OF SERVICE**

On September 27, 2024, I electronically filed the following **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on September 27, 2024.

*/s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.