# Exhibit F

Chart of Alleged False and Misleading Statements Contained in Plaintiffs'
Amended Complaint

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| ¶ 87 | Q: Hi. With respect to the Enterprise division and the, sort of, previously expected onboarding of lives in the back half of '22, is Elevance and Carelon, is that delay sort of the only change relative to your previous thinking? Or were there also other clients that you were going to onboard that have also delayed or is there an elongation sort of across the board? Thanks.<br><br>DEFENDANT ARNOLD: [Analyst], no, we signed this MOU several months ago with Carelon and have just been working through the transitional services. *It's hundreds of people that are involved with this. It will be our largest contract ever and it's–the date has slipped. So–and so we're confident, it will hit this year. It will be full year next year. But it's a large contract that's moved on us*. And–but the other implementations are happening on schedule. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 88 | Q: Okay. So it's only the Carelon-Elevance contract that has pushed, it's probably going to deploy in the back half of '22, certainly in '23. And quite frankly, it's so big and so large and so important, that's what's leading to the delay? It's not like there's a cancellation of the contract?<br><br>DEFENDANT ARNOLD: No. *It's only–the contract negotiation–contract is only longer now than it was in the beginning. It's just a lot of work. Like they've got hundreds of health guides that we'll be transitioning into our partnership. And there's a lot of detail in the implementation work. And–but all the conversations are–all the work is being done around that transitional services and implementation work*. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |

---

* Any emphasis in these statements exists in Plaintiffs' Amended Complaint. ECF 32.

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| ¶ 89 | Q: Okay. And when I listened to Elevance Earnings Call this quarter, they talked a lot about their digital health strategy, they talked a lot about value-based care. And it sounds to me like Sharecare is a key integral part of that. And if anything, it's such a large deployment, that's maybe what's leading to some delay here. *It's not headwinds or a potential recession that Elevance is facing. It's simply the size of the implementation*.<br><br>DEFENDANT FERRERO: *Yes*. The–hey, [analyst], thanks for the question. This is Justin. We don't see this as a systemic issue. *This is a timing issue around this relationship*. And there's uncertainty as to exactly when that will come in. But we are highly confident that, that will–that relationship will come to fruition this year. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 90† | Q: Yes. So on suspending the guidance, so it sounds as though you've had some weakness, potential headwinds on the life sciences. Enterprise, you have this delay a little bit. And then provider seems like it's going okay, but you have some lower audit. Why the decision to suspend all your guidance rather than just make some sort of cut to it?<br><br>DEFENDANT FERRERO: Well, so I can start. We can do this together, but it's the breadth of the moving pieces to–there's brackets around timing of the Carelon. There's brackets around 35%, sometimes 37% of our business in life sciences in Q4 alone. We have inbound interest on the strategic review. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |

† For statements, such as this one, where Plaintiffs did not emphasize any language in the quoted statement, it is not clear from the Amended Complaint what, if any, portion of the statement Plaintiffs are challenging. These statements are listed in the section of the Amended Complaint concerning the challenged statements, but the Amended Complaint confusingly also refers to the reasons why the "emphasized statements" are false or misleading. *See, e.g.*, ECF 32 ¶¶ 92, 96, & 118. Plaintiffs' failure to specify what statements they are challenging does not satisfy the PSLRA's pleading requirements. *See* Defs.' Br. Sec. I. Nevertheless, they are included here out of an abundance of caution, and without waiver of Defendants' argument that they fail the PSLRA's specificity requirement.

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | And if it was–really just one variable around that, I think we would have. But in order to–and each of those impact, not only revenue, but EBITDA, that bracketing all of those together would have created straight a wide bracket that we don't think it would be helpful to you and in modeling.<br><br>So that's why we suspended and said that we will give an updated business update when we know that timing comes in. I mean, it's–just the timing of the Carelon piece alone, it could be tens of millions of dollars. So it's–that's why it wouldn't have been helpful because we did have to go way low to a much, much higher number and it would have been helpful. | | |
| ¶ 91 | Q: Okay. But–and thanks for the clarification.<br><br>DEFENDANT ARNOLD: And just kind of reiterate what Justin said, it's like, we're sitting here now where we've got really strong visibility on 2023. And we've built the product, we've got the go-to-market, we're going to have pretty significant scale. I mean, if you think, this is going to be hundreds of thousands of Sharecare+ members in the first year of launch. . . . | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 93 | As alleged above, Defendant Arnold stated on the August 10, 2022 call that the Carelon Agreement "*will be our largest contract ever*." ¶ 87. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); |

3

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | | | Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 94 | As alleged above, on that call, Defendant Ferrero also stated "I mean, it's–*just the timing of the Carelon piece alone, it could be tens of millions of dollars*." ¶ 90. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 95 | Q: Yes. Thank you. Outside of the timing issue with Carelon, can you just talk about enterprise more broadly given some of the macro headwinds? What you're seeing from a sales cycle perspective and any sensitivity to price on the enterprise side?<br><br>DEFENDANT ARNOLD: I think, we feel good about the pipeline that we're building. And I think the sales cycles don't feel like they're changing. I mean, it's still a long sales cycle. But our pipeline is robust; our RFPs are way ahead of last year. *This Carelon partnership is a massive one for us*. And we're kind of still staying within that range based on client size of—on the PMPM. We haven't seen a lot of headwinds there yet. We've kind of set price and we've been kind of holding to it. | August 10, 2022 Q2 Earnings Call (Ex. C) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |

4

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | But yes, no, we feel good about the enterprise business. We think—if you think about how we're selling, we've got our current sales force, which continues to grow. We've got the national accounts team at Anthem that's opening up opportunities for us. We've now added Carelon, so their book of business, and hopefully, the ability to grow that. And sales cycle remains the same, and we haven't felt the price pressure. | | |
| ¶ 98 | The Series A Preferred Stock is held by a customer that also has an employee serving on our Board of Directors… *Revenues recognized for the three months ended September 30, 2022 and 2021 totaled $10.0 million and $5.0 million, respectively. Revenues recognized for the nine months ended September 30, 2022 and 2021 totaled $20.4 million and $11.9 million, respectively*. | Q3 2022 10-Q: Related Party Transactions (filed November 10, 2022) (Ex. I) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 101 | Additionally, during 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. *Revenues recognized related to these services for the year ended December 31, 2022, totaled $17.4 million. … The Company also entered into separate agreements during 2022 for the purchase of distinct goods and services from that customer for amounts totaling $18.0 million* which are recorded in cost of sales. Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above. | 2022 10-K: Related Party Transactions (filed March 31, 2023) (Ex. B) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| ¶ 104 | Additionally, during the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. Separate from the above disclosed amounts for this related party, *revenues recognized related to these distinct services for the three months ended March 31, 2023, totaled $10.6 million. . . . The Company also entered into separate agreements during the third quarter of 2022 for the purchase of distinct goods and services from that customer for amounts totaling $10.9 million which are recorded in cost of sales for the three months ended March 31, 2023.* Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above. | Q1 2023 10-Q: Related Party Transactions (filed May 10, 2023) (Ex. J) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 107 | Additionally, during the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. *Separate from the above disclosed amounts for this related party, revenues recognized related to these distinct services for the three and six months ended June 30, 2023, totaled $10.9 million and $23.0 million, respectively. . . . The Company also entered into separate agreements during the third quarter of 2022 for the purchase of distinct goods and services from that customer for amounts totaling $9.5 million and $20.4 million which are recorded in cost of sales for the three and six months ended June 30, 2023, respectively.* Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above. | Q2 2023 10-Q: Related Party Transactions (filed August 9, 2023) (Ex. K) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 110 | Additionally, during the third quarter of 2022, we entered into a revenue contract with the Series A Preferred Stockholder to provide patient advocacy services. *Separate from the above disclosed amounts for this related party, revenues recognized related to these distinct services for the three months ended September 30, 2023 and 2022 totaled $8.9 million and $5.7 million, respectively. … The Company also entered into separate agreements during the third quarter of 2022 for the purchase of distinct goods and services from that customer for* | Q3 2023 10-Q: Related Party Transactions (filed November 9, 2023) (Ex. L) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | *amounts totaling $8.4 million and $5.7 million for the three months ended September 30, 2023 and 2022, respectively, and $24.8 million and $5.7 million for the nine months ended September 30, 2023 and 2022, respectively, which are which are recorded in cost of sales for each respective period.* Amounts paid under the agreements that were not determined to be distinct were recorded as a reduction of revenues as described above. | | Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 112 | Q: Okay. With respect to Elevance and—or the old Anthem, I think back when you guys originally de-SPAC-ed, you talked about there was a 10 million lives opportunity with Elevance in terms of clients they had where there were multiple payers, I guess, insurers in those employers. Can you just talk to us a little bit about like that 10 million number and maybe where you guys are with upselling or cross – or penetrating that base?<br><br>DEFENDANT ARNOLD: Sure. Yes. So I think, this is an important relationship and it's multifaceted. *So one part of the relationship is we provide AI services to Anthem, and that's going well.* And [Sharecare executive] leads those efforts for us. *But that's an important part of the relationship.*<br><br>And then the second important part of the relationship was they invested in Sharecare, and we had to show them that we could take those dollars and we could build a better advocacy solution that's in the market. And we think we've done that. And why we think we have done that is Carelon moved 500,000 plus members over to our platform. And so we're going through that execution right now, and that's a ton of work. But we're building confidence, I think, with them and us and how we can work well together.<br><br>And then the next piece was how could we bring on a big important client like Koch Industries, and that is one of their clients, and be able to have flawless | March 29, 2023 Q4 2022 Earnings Call (Ex. G) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. II (No Scienter); Sec. III (No Loss Causation) |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | execution with a new product offering. So we launched Sharecare+ to Koch in partnership with Anthem, that would fall in that national accounts category that you're talking about, and have done really well rolling that out starting in January. So that builds confidence.<br><br>And then it's—and then we've—we're starting to get better muscle memory on how to include Sharecare into national account RFPs. We're getting better on how to think about things like Deal Desk, where—how do we approach clients, separately or together. And we expect that more business is going to come over. And it already has through Carelon, from where we started in Q4, we've already onboarded new big important clients. [Ferrero] mentioned one payer, there's others. And so we think that we're on a good path. | | |
| ¶ 114 | Q: Hi. Can you talk a little bit about like the 1Q revenue expectations? Why would there be a significant sequential decline from 4Q to 1Q? And then can you also talk a little bit about the Carelon deal? Is the PMPM rate for those lives coming in, in the range that you had expected? Any color around that would be helpful. I guess, the revenue guide for '23 looks a little bit lower than what we were expecting. Maybe just talk about that on the enterprise side. Thank you.<br><br>DEFENDANT FERRERO: Yes. Thanks, Dave. It's Justin. So the Q1, if you remember, Q4—is typically a dip in Q1, because in Q4 is our strongest quarter for Life Sciences. And typically, there's $8 million to $9 million dip going from Q4 to Q1. So that's normal. We've also factored in, as we talked about, none of this has been finalized, but we were fortunate to close the relationship with Carelon.<br><br>And now what we're doing through the course of this year is working with them to tech-enable that business, and there will be trade-offs. So ultimately, we think | March 29, 2023 Q4 2022 Earnings Call (Ex. G) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |

8

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | they will be less revenue or lower PMPM, but a higher margin business, as we go through the year. So that's why we factored in little bit of a dip in the enterprise revenue in Q1 as well.<br><br>DEFENDANT ARNOLD: *Yes. I would just add, I mean, the—it's a large contract with Carelon. And it's—and there's—the customer base is becoming broader, and some customers have less high-touch services. So it's less PMPM.*<br><br>And then as it relates to your question on revenue guidance for the year, we made a decision to only guide to what's booked in enterprise, which is not what we've historically done. So we have taken out any new logos that we might add during the year, any upsells, any cross-sells and any upside. | | |
| ¶ 115 | Q: Yes. Thanks for the questions. Justin, can you just clarify, I think you said enterprise is expected to be down from fourth quarter to first quarter. So I guess I want to understand why specifically it would be down. If you guys are generating revenue on a per member per month basis, why would it go down?<br><br>DEFENDANT FERRERO: That is all around the Carelon discussion. So we are taking a conservative approach. Nothing has been finalized. *But as came out in our opening remarks, that's a fantastic partner for us.* And what we're working on with them is to tech-enable that business. And as part of that, the conversations include potentially less revenue, but a higher margin business. And nothing is finalized. But in the theme of our guidance for this year as we want to be conservative, there's a chance that PMPM could reduce. And so we have built that into our forecast.<br><br>*But at the end of the day, the number of lives aren't going to reduce. The momentum with that client hasn't reduced. We've actually added an additional* | March 29, 2023 Q4 2022 Earnings Call (Ex. G) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |

9

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | *health plan in Q1 with Carelon. And so we see that relationship only expanding*. However, there's a large client inside of that relationship that we're working on to tech-enable. And it will have pressure on the PMPM, but ultimately, we believe better gross margin. So that's why there is a little bit of pressure in Q1.<br><br>DEFENDANT ARNOLD: Yes. So I mean just to explain what we mean by tech-enable, is provide less services, physical services, high-touch services with more digital services, which for that particular client would reduce the PMPM. | | |
| ¶ 116 | Q: Yes. But I still don't understand why, sequentially, your revenue would go down. Was there any one-time revenue in enterprise in the fourth quarter? Or I mean—because if you have the lives, you got more revenue, right?<br><br>DEFENDANT ARNOLD: Because we are taking a conservative approach on that particular client, we—it hasn't been discounted. It wasn't discounted in Q4. But we believe that the likelihood of us moving in this direction with this particular client is why we're going to guide that way.<br><br>DEFENDANT FERRERO: Yes. So if you have the same number of lives against the client and the PMPM is higher in Q4 than it is in Q1, the client reduces cost. | March 29, 2023 Q4 2022 Earnings Call (Ex. G) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 117 | Q: Yes. Thanks. Following up on the lower PMPM at Carelon, can you just talk about, does this shape your view of the broader opportunity set? Do you think it's specific to them? Or just how you're thinking bigger picture on the enterprise side and opportunity?<br><br>DEFENDANT ARNOLD: Yes. So what we believe is special about Sharecare+ is it's a digital-first offering. And what we mean by that is it's self-service. So anything that I could do with an advocate, I should be able to do directly within | March 29, 2023 Q4 2022 Earnings Call (Ex. G) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. I.D (Financial Impact of |

10

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | the platform myself. And that's not—doesn't cost as much, obviously, to execute that type of experience.

And so there are certain clients that will gravitate to that for certain reasons. Maybe they've got the right demographic of the population or maybe there's cost constraints. We have an example within the Carelon partnership where there was some cost constraints and there was the desire to get to digital-first. And so—so that particular client, we're moving down the path of the more digital offering with the less high-touch services, which is going to reduce that particular client's PMPM, but it's also going to make higher margin.

We also have a big mix of clients that have the combination of both. And so you get the advocate with the care console, and you get the digital-first approach. And we're taking both of those approaches to market. And so sometimes the digital-first works really well, as I said, for people that might not have substantial budgets for these types of things. We like it because it's higher margin and it's easy to turn on. I mean I think I've shown it to you in the past, literally, it's like turning Wi-Fi on, the little blue button shows up and all the data is there. And so I don't see—I see it as an advantage that we—as a go-to-market that we've got both offerings. And depending on the client, we tailor the offering to fit the need. | | Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 119 | Q: Thank you. To start on the Enterprise side, good to hear about the lives additions. Could you speak a little bit about development of the marketplace and maybe as we think about lives ex-Carelon, what you're seeing among the Blues [i.e., Blue Cross Blue Shield entities] targets for the year and whether it's keeping pace with expectation?

DEFENDANT ARNOLD: I think on covered lives, we're keeping pace with expectations, *so selling through our partners like Carelon is meeting* | August 9, 2023 Q2 2023 Earnings Call (Ex. N) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C (Safe Harbor for Forward Looking Statements); Sec. |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | *expectations*. Our sales force delivering new logos, is meeting expectations. Our continued focus on the Blues plan and we've added a new Blues plan this year, continues to be on the mark. **So, all those things are progressing as planned**.<br><br>As the marketplace goes, we're having success in upselling our digital therapeutics to our installed base and we're leading with our own solutions, which give us higher margin and more revenue and so we're starting to see some good pull-through in that area as well. | | II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 121 | Q: Got it. I do want to segue just to the macros and one of the themes across the conference. I mean, as you know, there's no shortage of crosscurrents out there that companies are dealing with. You reported recently a clean report, kind of a slight beat, took the low end of the revenue guidance up. That's better than a lot of other companies in the space. So I just wanted to dig into what are you seeing in your business in terms of maybe some of the resiliency that you would call out?<br><br>DEFENDANT ARNOLD: Well, I think we're growing into being a public company, number one. So how to forecast and the things, the fundamentals that you need to get right. And so I contribute some of that to all the great work our finance team and others are doing. ***And in the spirit of that, I think Enterprise is rolling out as expected, right? They just—they're not—there haven't been surprises. It's like what we thought was happening—would happen is happening. That we're implementing to our signed contracts***. We're onboarding people. We're administering rewards. We're enrolling people into programs.<br><br>We're getting them talking to advocate. We're starting to cross-sell our home care services into that. Our work that we've done in advanced analytics has given us not only precision targeting but better clinical outcomes, which has given us lower | September 13, 2023 presentation at Morgan Stanley Global Healthcare Conference (Ex. O) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | cost. So I think planning and execution has given us what we expected in Enterprise. | | |
| ¶ 123 | Q: Got it. Well, it's a great segue into Sharecare+ and I do want to dig into that in terms of the advocacy offering. How is it going versus your initial expectations? And I also want to touch on having an anchor customer like a Carelon, how important that is to really drive and ultimately scale this business?<br><br>DEFENDANT ARNOLD:<br><br>* * * *<br><br>And then fourth is to answer your question on Carelon, absolutely, that's beneficial to us for many reasons. One is it gave us some scale right out of the gates. So to start with over 0.5 million members just with one client, that was a big deal. ***Second is, it gives us the license to hunt together, and I think we complement each other well in the sales room***. When you look at kind of our advanced analytics and our strong engagement, some of the things I've been talking about with the relationships that they have and the other bundling opportunities they can create with us, it gives us some really interesting opportunities to win. | September 13, 2023 presentation at Morgan Stanley Global Healthcare Conference (Ex. O) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 125 | Q Got it. So you mentioned the [0.5 million] with Carelon. ***Overall, roughly how big is this business? And how should we think about what's a reasonable growth cadence in the next number of years as you grow the platform?***<br><br>DEFENDANT ARNOLD: Yes. So I would think of it as about a ***$50 million business***. Think about it—in year one. So basically, that's pretty impressive. Like | September 13, 2023 presentation at Morgan Stanley Global Healthcare Conference (Ex. O) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
| | we weren't in this business a year ago, **and we're already at $50 million in revenue**. And our goal is like this is a double-digit growth opportunity for us. And so how do we do double-digit growth? Well, we need to land and expand. We have tons of clients on our wellness product, our digital front door. We need to convince them to turn WiFi on, which is our Sharecare+. That's a great way to grow.<br><br>Second **is like we have to continue to add value to Carelon and help them close deals that we're a part of**.<br><br>And then the third is our sales team needs to win over the brokers. And if we do that, as we continue to get better in RFPs and how to talk about our value proposition and price, I think we're going to continue to win business. | | Looking Statements); Sec. I.D (Financial Impact of Carelon Agreement Adequately Disclosed); Sec. II (No Scienter); Sec. III (No Loss Causation) |
| ¶ 127 | Q: Congratulations on the excellent EBITDA growth. Can you talk a little bit about the progress you're making in the Enterprise division, RFP activity, the sales pipeline? Then what was the revenue for Enterprise in the quarter? Then any color or thoughts on Carelon without getting too specific, obviously.<br><br>DEFENDANT FERRERO: Thanks, Dave. There's a lot to unpack on that one. Which one do you want me to focus on first?<br><br>I'll start with the quarter. We had a—I think we set out for significant EBITDA growth. We came in at a record since our IPO, 8.4%. As you know, that's almost 3x our percentage EBITDA that we did in Q2. So sequentially, just a significant lift there. And—so we're really pleased with the quarter.<br><br>Relative to the pipeline, it continues to grow. It's a very strong pipeline. We had a number of—we can't talk to them yet, but we had double-digit wins in new | November 9, 2023 Q3 2023 Earnings Call (Ex. H) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
|  | customers in Q3. Those will come out later, and are real excited about how that sets us up for 2024.<br><br>DEFENDANT ARNOLD: Yes. I would just add to that, [analyst], it's Jeff, not only great quarter, strong pipeline, *but we're starting to get in a lot of results from our Sharecare+ deployments, some in conjunction with Carelon and the results have been really great, like satisfaction, really high, outcomes coming in better than expected. So we're super encouraged by that*. |  |  |
| ¶ 128 | Q: Guys, this is [analyst] And good luck—or good luck, [Arnold], on kind of the next steps and congrats to Brent [Sharecare's incoming CEO] on the new role. Just wanted to talk about Carelon. I know you kind of saw some pressure with PMPMs earlier in the year. I just want to talk about how that relationship is going? And if you've kind of seen those PMPM stabilize?<br><br>Then also, just kind of as open enrollment has started up again I just wanted to see how Sharecare+ plus engagement is going and if that's kind of tracking in line with expectations.<br><br>DEFENDANT ARNOLD: Yes. *I think it's stay the course. Everything is kind of tracking on expectations. It's kind of the same story as the last question I answered is that we've got current clients with Carelon that we're executing against, which we believe become great references for us and the results have been really good.*<br><br>*We have lots of opportunities within Carelon that we're pursuing across both our Enterprise segment and our Provider segment. And things are staying the course.* The platform is becoming more mature as time goes on. Awareness is growing with the brokers, which there's been a big emphasis on this year of | November 9, 2023 Q3 2023 Earnings Call (Ex. H) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. I.B (Corporate Puffery or Opinion); Sec. I.C. (Safe Harbor for Forward Looking Statements); Sec. II (No Scienter); Sec. III (No Loss Causation) |

15

| Paragraph of Am. Compl. | Statement* | Source | Reasons Why Statement is Non-Actionable (Section References are to Defendants' Brief) |
|---|---|---|---|
|  | driving awareness at Sharecare+ offers advocacy. So we're seeing an increase in the number of RFPs that are coming in the door. The dialogue that we're having with the brokers is kind of way up. <br><br> We've seen some delays in decision-making, but ultimately seeing the pull-through at the end of the day like we had one this week that we were a finalist. We did our finalist presentation six months ago and found out yesterday that we won that contract. ***But yes, I would say it's business as usual***. |  |  |
| ¶ 131 | The Company considers events or transactions that occur after the balance sheet date [September 30, 2023], but before the consolidated financial statements are issued, to provide additional evidence relative to certain estimates or identify matters that require additional disclosures. ***The Company evaluated subsequent events through, November 9, 2023, the date on which the consolidated financial statements were available to be issued, noting no such material events***. | Q3 2023 10-Q: Subsequent Events (filed November 9, 2023) (Ex. L) | Sec. I.A (Not Alleged With Particularity to be False or Misleading); Sec. II (No Scienter); Sec. III (No Loss Causation) |

16