**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| VICTOR BUQUERAS, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SHARECARE, INC., JEFFREY T. ARNOLD, and JUSTIN FERRERO,<br><br>    Defendants. | **CASE No.  1:24-cv-02769-LMM**<br><br>**CLASS ACTION** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................1

II.  FACTS ...............................................................................................................4

   A.  Sharecare Ties Its Success to Anthem....................................................4

   B.  Defendants Overstate the Scope of the Carelon Agreement....................5

   C.  The DocAI Agreement Collapses.............................................................6

   D.  The Carelon Agreement Collapses...........................................................7

   E.  Defendants' False Statements Cause Investor Losses..............................7

III. THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY ...........................8

   A.  Standard....................................................................................................8

   B.  Late Class Period Statements About the Carelon Agreement..................9

      1.  Defendants' Statements Were Affirmatively Misleading ................9

      2.  The Former Employee Is Reliable and Corroborated ...................14

      3.  The Statements Are Neither Puffery nor Opinions.......................15

   C.  Statements About Carelon Agreement Delays.......................................17

   D.  Statements About the Carelon Agreement's Scope...............................18

IV.  THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER........................20

   A.  Standard..................................................................................................20

   B.  August-November 2023 Statements Concerning Sharecare's Contracts with Anthem ...............................................................................................21

      1.  Defendants' Suggested Inference Is Culpable..............................21

2.  The Complaint Sufficiently Alleges Scienter Even Without Defendants'
    Concession ........................................................................22

    C.  Statements about the Carelon Agreement .........................................25

    D.  Statements About the Scope of the Carelon Agreement .................................26

V.  THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION...........28

VI. CONCLUSION.................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. MiMedx Grp., Inc.*,
   37 F. Supp. 3d 1271 (N.D. Ga. 2014) .......................................................... 25, 29

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ........................................................................29

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ..................................................................................11

*Bryant v. Dupree*,
   252 F.3d 1161 (11th Cir. 2001) ................................................................30

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ................................................................15

*City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*,
   2016 WL 4705718 (S.D. Fla. June 21, 2016) ...........................................13

*City of Warren Gen. Employees' Ret. Sys. v. Teleperformance SE*,
   2024 WL 3965001 (S.D. Fla. Aug. 28, 2024).................................... 14, 22, 23, 27

*Cross v. Equity Experts.Org, LLC*,
   2019 WL 13059913 (N.D. Ga. Aug. 16, 2019) .......................................17

*FindWhat Inv. Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ............................................................ 8, 28

*Freeburg v. Wolf*,
   42 F. App'x 715 (6th Cir. 2002) ...............................................................12

*Freedman v. Louisiana-Pac. Corp.*,
   922 F. Supp. 377 (D. Or. 1996)..................................................................28

*Glassman v. Computervision Corp.*,
90 F.3d 617 (1st Cir. 1996) ..................................................................13

*Gorlamari v. Verrica Pharms., Inc.*,
2024 WL 150341 (E.D. Pa. Jan. 11, 2024) .......................................27

*In re Catalina Mktg. Corp Sec. Litig.*,
2006 WL 8439909 (M.D. Fla. Jan. 29, 2006)....................................30

*In re Coca-Cola Enterprises Inc. Sec. Litig.*,
510 F. Supp. 2d 1187 (N.D. Ga. 2007) ..............................................25

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ......................................... 8, 15

*In re Express Scripts Holding Co. Sec. Litig.*,
2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)......................................12

*In re Immucor, Inc. Sec. Litig.*,
2011 WL 3844221 (N.D. Ga. Aug. 29, 2011).....................................29

*In re NDCHealth Corp., Inc. Sec. Litig.*,
2005 WL 6074918 n.10 (N.D. Ga. July 27, 2005) ...................... 24, 25

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011) ...............................................27

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021).......................................................... 9, 10

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)................................................. 22, 23, 26

*Leadersel Innotech ESG v. Teladoc Health, Inc.*,
2024 WL 4274362 (2d Cir. Sept. 24, 2024)......................................10

*Luczak v. Nat'l Beverage Corp.*,
812 F. App'x 915 (11th Cir. 2020)......................................................22

iv

*MacPhee v. MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023)....................................................................30

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008)......................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................ 3, 9, 13, 18

*Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*,
    2019 WL 1429667 (M.D. Fla. Mar. 29, 2019)........................................12

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008)..................................................................24

*Nasyrova v. Immunomedics, Inc.*,
    2015 WL 382846 (D.N.J. Jan. 28, 2015)..................................................11

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016)......................................................................11

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023)......................................................................10

*Plymouth Cnty. Ret. Sys. v. Carter's Inc.*,
    2011 WL 13124501 (N.D. Ga. Mar. 17, 2011)........................................24

*Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
    564 F. Supp. 3d 1272 (N.D. Ga. 2021)....................................................14

*Reiss v. Pan Am. World Airways, Inc.*,
    711 F.2d 11 (2d Cir. 1983) .......................................................................11

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
    111 F. Supp. 3d 1336 (S.D. Fla. 2015)....................................................25

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016).....................................................................21

v

*Shafer v. Glob. Payments, Inc.*,
  2024 WL 2789447 (N.D. Ga. Mar. 29, 2024)................................................ 15, 16

*Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*,
  600 F. Supp. 3d 1189 (N.D. Ala. 2021) ................................................ 15, 16, 24

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020)........................................................21

*T.V. v. Grindr, LLC*,
  2024 WL 4128796 (M.D. Fla. Aug. 13, 2024) ......................................................15

*Teachers' Ret. Sys. Of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007)..................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights*, Ltd.,
  551 U.S. 308 (2007)............................................................................... 8, 20, 21

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)........................................................30

*Wu v. GSX Techedu Inc.*,
  2024 WL 3163219 (D.N.J. June 25, 2024)............................................................24

## Statutes

15 U.S.C. §78u-4(b)(1)(B)...............................................................................................8

## Regulations

17 C.F.R. §240.10b-5(b) ..................................................................................................8

## I.    INTRODUCTION[1]

From the moment it announced it was going public, healthcare services company Sharecare told investors that it was primed for explosive growth because it had partnered with insurance giant Anthem. Even as that agreement fell apart, Defendants made specific statements denying any difficulties. Even after Sharecare cut Anthem off for failing to pay its bills, Defendants still boasted to investors about imaginary ongoing business. When Defendants could no longer conceal its acrimonious end, Sharecare's stock price fell, damaging investors.

Sharecare sells an App ("App") to employers for their employees' use, charging a small monthly fee per employee. Since 2021, Sharecare has boasted that it was supercharging sales by reaching a series of agreements with insurance giant Anthem. The two largest parts of the relationship were a $100 million 5-year contract involving Sharecare's subsidiary Doc.AI, Inc. ("DocAI Agreement") and an agreement with Anthem's subsidiary Carelon ("Carelon Agreement"). The latter, announced August 2022, would include the App as a standard Anthem insurance plan benefit, potentially adding millions of new customers. CEO Defendant Jeff Arnold called the Carelon Agreement Sharecare's "largest contract ever."

---

[1] Citations to "¶_", "D.Br. _", and "Ex. _" are to paragraphs of the Complaint (dkt no. 32), pages of Defendants' Motion to Dismiss (dkt no. 35-1), and Exhibits to the Declaration of Jonathan Horne. Unless otherwise noted, all emphases are added.

Having staked Sharecare's future on its agreements with Anthem, Defendants owed a duty not to misinform investors when the agreements collapsed. The problems began with the Carelon Agreement itself: its signing was delayed because of problems with Anthem. Then in April 2023, Sharecare and Anthem each stopped making payments. Anthem cancelled the DocAI Agreement in June 2023 and Sharecare stopped servicing the Carelon Agreement entirely in October 2023.

Despite this collapse, on conference call after conference call, Defendants continued to announce steady progress on each of these agreements. Announcing the delay signing the Carelon Agreement, Arnold told investors that the Agreement's complexity was the sole cause, not any hard bargaining by Anthem or anything else that might call the Anthem relationship into question. In August 2023, after the cancellation of the DocAI Agreement and the mutual breach of the Carelon Agreement, Arnold stated that Sharecare's business was going as planned, specifically calling out (of all things) contractual compliance: "we're implementing to our signed contracts." Then, in November 2023, after Sharecare stopped performing entirely on the Carelon Agreement, Defendants told investors Sharecare had "lots of opportunities within Carelon that we're pursuing." The Complaint sufficiently alleges that these statements were false.

The Complaint sufficiently alleges loss causation. Defendants' false statements artificially inflated Sharecare's stock price; the price fell when Sharecare

2

announced that one of the Carelon Agreement customers had opted out of premium services in March 2023 and again when Sharecare announced the termination of the DocAI and Carelon Agreements in March 2024.

The Complaint sufficiently alleges scienter. Defendants knew investors would closely monitor the Anthem agreements because they themselves told investors that Sharecare's relationship with Anthem was key to its future. Yet for more than a year, they misled investors about its status. Arnold, who made most of the false statements, would have had to know of the developments, because no one else at Sharecare would have been authorized to cut Anthem off or stop payments.

Defendants' motion to dismiss fails because it rejects the first principle of the securities laws: "[C]ompanies can control what they have to disclose … by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). Defendants claim that they were entitled not to disclose the collapse of the Anthem relationship, but in the cases they cite, the defendants did not have any obligation to disclose the negative facts because they had not made any contradictory statements.

Defendants' arguments that the Complaint inadequately alleges scienter also ignores their statements. Defendants advance an inference they deem non-culpable: that they believed Sharecare and Anthem would ultimately reach some agreement

notwithstanding any existing problems. But that is fraud, because Defendants denied to investors that there were any problems.

Defendants owed a duty not to mislead investors. They breached that duty with affirmative misstatements. The Court should deny their motion to dismiss.

## II.    FACTS

### A.    Sharecare Ties Its Success to Anthem

Sharecare sells healthcare services in three segments. It its Enterprise segment, which accounted for about 60% of its revenues during the Class Period, it sells employers subscriptions to its health-related App ("App") for their employees' use. ¶¶27-28. Sharecare charges the employers a small monthly fee for every employee with access to the App, typically $1-2. ¶42.

Sharecare boasted that it had found a way to turbocharge growth by partnering with Anthem. In January 2021, weeks before it announced its plans to go public, Sharecare announced that it would purchase healthcare company Doc.AI, whose principal client was Anthem. ¶¶34-37. DocAI's most important asset, according to Defendants, was the DocAI Agreement, a 5-year $20-million-per-year contract with Anthem which had just come into effect that January. ¶36.

The DocAI Agreement was only the start. According to Defendants, as of May 2022, the App was included as a benefit in "all" the proposals for healthcare

4

coverage Anthem made to employers. ¶32. Indeed, an Anthem representative sat on Sharecare's Board of Directors. ¶37.

The Class Period begins with Defendants' August 10, 2022 announcement that Sharecare neared signing a blockbuster new agreement with an Anthem subsidiary, Carelon ("Carelon Agreement"). ¶¶1, 43. Carelon offers payer-agnostic healthcare services to employers who offer plans from multiple companies to guarantee employees benefits whichever plan they choose. ¶43. Through the Carelon Agreement, Sharecare would provide "patient advocacy services," an industry term for giving members the ability to speak to a human being. ¶39. Sharecare called the combined App and patient advocacy services, which it developed with a $50 million Anthem investment, "Sharecare+." ¶39, 44. On the August 10 call, Arnold called the Carelon Agreement Sharecare's "largest contract ever." ¶87.

## B.    Defendants Overstate the Scope of the Carelon Agreement

Sharecare's 2022 earnings guidance had included significant revenues from the Carelon Agreement. ¶48. But delays negotiating the Carelon Agreement left those revenues, and therefore guidance, unachievable. *Id.* So Sharecare announced the still-unfinished Carelon Agreement on the August 2022 call to explain why it was withdrawing the 2022 guidance. *Id.*

Sharecare's announcement raised concerns from analysts, who naturally asked whether the delays spelled trouble for Sharecare's relationship with Anthem. ¶¶87-

5

91. Defendants repeatedly stated on the call that the *only* cause of the delays was the contract's length and complexity. ¶¶87-91. But the analysts were right to be concerned. The delays were part of a pattern in which Anthem, in Sharecare's view, failed to adhere to contractual obligations. ¶¶58-59. The pattern would continue until the relationship's ultimate collapse.

Contrary to what Defendants told investors, the Carelon Agreement was far from a barnburner. To entice Anthem, Sharecare offered Carelon $8.1 million of free consideration. ¶¶73-74. The Carelon Agreement also provided that Sharecare would have to remit whatever revenues it nominally "earned" back to Carelon. Sharecare kept 0% of the Carelon Agreement revenues in 2022, and 1%, 16%, and 10% in Q1-Q3, 2023, respectively. ¶83. Sharecare did not disclose the funds it remitted to Carelon until March 2023. Thereafter, it maintained that these funds were expenditures arising from "separate agreements" to provide "distinct services." ¶138

## C.    The DocAI Agreement Collapses

Anthem's dissatisfaction grew, in part, from the DocAI Agreement. The DocAI Agreement was "not going well" for Anthem for a long time before 2023, and Anthem communicated its dissatisfaction. ¶64. Then, no later than June/July 2023, Anthem demanded that Sharecare terminate the DocAI Agreement outright. ¶65. According to a former employer ("FE"), Sharecare agreed to Anthem's demands if Anthem remedied its ongoing breach of the Carelon Agreement. *Id.*

Sharecare's later disclosures confirm the FE's account. After the Class Period, Sharecare admitted that Anthem cancelled the DocAI Agreement exactly halfway through its five-year term, which was mid-2023. ¶68.

### D.    The Carelon Agreement Collapses

By April 2023, Anthem and Sharecare had stopped making payments required by the Carelon Agreement. ¶77. Beginning that quarter, amounts due under the Carelon Agreement increased by more than amounts billed. So each party sent invoices to the other without paying any invoices it received. ¶76. Despite this, in September 2023, and even after Anthem cancelled the DocAI Agreement, Arnold told investors "we're implementing to our signed contracts." ¶121.

In October 2023, Sharecare cut Carelon off entirely. ¶55. Yet on November 9, 2023, Defendant Arnold told investors, among other things, that "***we've got current clients*** with Carelon that we're executing against" and "***we have*** lots of opportunities within Carelon that ***we're pursuing***." ¶128. In a 10-Q filed that same day, Defendants acknowledged "no … material events" since September 30, 2023. ¶131.

### E.    Defendants' False Statements Cause Investor Losses

On March 29, 2023, Sharecare announced 2023 revenue guidance that came in well below estimates. ¶135. In response to multiple analyst questions, Sharecare explained that a customer it serviced under the Carelon Agreement had opted not to use Sharecare+. ¶135. That day, Sharecare's stock price fell 27.2%. ¶139.

On March 28, 2024, in explaining why it had missed Q4 2023 guidance, Sharecare admitted that it had terminated a contract with a customer (Anthem), thereby losing $14 million of anticipated revenues (11.8% of total) in Q4 2023. ¶¶140, 142. Sharecare told investors to expect similar losses going forward. The next trading day, the price of Sharecare's shares fell 28.3%. ¶143.

## III. THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY

### A. Standard

On a motion to dismiss, the Court "accept all factual allegations . . . as true," and construes them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 309-10, 322-23 (2007). A complaint should only be dismissed "where it appears that the facts alleged fail to state a 'plausible' claim for relief." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1214 (N.D. Ga. 2019). Defendants only challenge falsity, scienter, and loss causation, conceding that the Complaint sufficiently alleges all other elements.

Complaints alleging securities fraud must "specify each statement alleged to have been misleading [and] the reason or reasons why." 15 U.S.C. §78u-4(b)(1)(B). "Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).

8

**B.    Late Class Period Statements About the Carelon Agreement**

*1.    Defendants' Statements Were Affirmatively Misleading*

Defendants maintain that the Court should dismiss the Complaint because, they say, facts about business relationships need not be disclosed unless the relationship has completely broken down. D.Br. 9-12. But the Complaint does not allege a freestanding duty to disclose facts. Instead, it alleges that Defendants made affirmatively misleading statements about its relationship with Anthem. So the relevant question is not whether the concealed problems with Anthem were reparable, but whether concealing the problems made Defendants' statements misleading. "Companies can control what they have to disclose … by controlling what they say to the market." *Matrixx*, 563 U.S. at 45

The Second Circuit, from which Defendants draw all their principal cases, provided a recent example in *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157 (2d Cir. 2021). In *Synchrony*, the plaintiffs alleged that the defendants concealed their souring relationship with one of their largest customers, Walmart. Walmart had expressed concerns and solicited competing bids as the contract's renewal date approached. *Id.* at 163-64. Walmart had not cancelled any agreement outright, or even threatened to. But the seriousness of the problems in the abstract was not relevant, because the Second Circuit affirmed the dismissal of some statements but reversed one. *Id.* at 168. Rather, the Second Circuit reversed because the Defendants

9

claimed they received "no pushback" and Walmart's actions constituted "pushback." *Id. See also Leadersel Innotech ESG v. Teladoc Health, Inc.*, 2024 WL 4274362, at *4 (2d Cir. Sept. 24, 2024) (statement that integration "fully complete" misleading because integration ongoing); *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023) (declining to impose requirement that plaintiff show construction timeline "impossible" because question is whether plaintiff has alleged sufficient facts to show defendants' statements were false).

Here, Defendants' statements were misleading because of the facts they concealed. Plaintiffs set out a timeline showing some of the key misstatement. Ex. 1. By April 2023, at the latest, Anthem and Sharecare each stopped making payments required by the Carelon Agreement. In June or July 2023, Anthem formally cancelled the DocAI Agreement (which Sharecare later claimed the DocAI Agreement did not allow). ¶68. Yet on August 9, Defendant Arnold told investors that "selling through our partners like Carelon is meeting expectations" and "progressing as planned." ¶119. Told that selling met expectations, a reasonable investor would assume that the company was being paid for its sales. Arnold again denied any "surprises" on September 13, mentioning that one area with no surprises was contractual compliance: "we're implementing to our signed contracts." ¶121.

Then, in a November 2023 call, Arnold still reassured investors that Sharecare was "stay[ing] the course," "tracking on expectations," and seeing "business as

10

usual." ¶128. Arnold referred to Sharecare's work with Carelon in the present tense: "we've got current clients with Carelon," "[w]e have … opportunities within Carelon that we're pursuing." *Id.* When Arnold made his statement, there was no business that could be "usual" or current clients: Sharecare had cut Carelon off.

Defendants' argument that contractual developments short of termination need not be disclosed relies on bad law and inapposite cases. Defendants claim *Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983) identifies a special looser disclosure standard applicable to contractual developments. If so, it was overruled just five years later when the Supreme Court cited *Reiss*'s reasoning as an example of a policy-based rule of thumb that "stands soundly rejected" because it "assumes that investors are nitwits, unable to appreciate—even when told—that mergers are risky propositions up until the closing." *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988). The remainder of Defendants' cases are inapposite. In one, the plaintiffs claimed the defendants violated an abstract disclosure obligation; they did not even argue that any of the defendants' affirmative statements were misleading. *Nasyrova v. Immunomedics, Inc.*, 2015 WL 382846, at *6 (D.N.J. Jan. 28, 2015). In another, a defendant's mere statement that its shareholders had voted in favor of an acquisition did not trigger an obligation to disclose anything and everything about the acquisition (there, that the acquiror had requested a lower price). *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 505 (3d Cir. 2016) (omission "did

11

not make any affirmative statement misleading"). And in *Michigan Carpenters'*

*Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at \*14, 22

(M.D. Fla. Mar. 29, 2019), the defendant's generic statements about the quality of

its **products** did not require them to disclose contractual difficulties with its

**customers**, particularly because the counterparty was honoring the contract and had

not threatened to terminate.[2]

Defendants mainly rely on *In re Express Scripts Holding Co. Sec. Litig.*, 2017

WL 3278930 (S.D.N.Y. Aug. 1, 2017). D.Br. 11-12. But they conflate two separate

rulings. The court first found that the mere fact that the defendants had mentioned

the relationship did not obligate them to disclose all contractual developments short

of termination. *Id.* at \*13. Defendants rely on language from this ruling, but

Plaintiffs' theory is not just that Defendants touted Sharecare's relationship with

Anthem, but that they made specific false representations about it. The *Express*

*Script* court analyzed those plaintiffs' similar argument in a separate section. *Id.* at

\*14. The court ultimately dismissed because the statements and allegedly concealed

developments were consistent, not because the developments were not disclosable.

So *Express Scripts* merely shows there is no special rule of thumb excusing the

---

[2] Defendants cite *Freeburg v. Wolf*, 42 F. App'x 715, 716 (6th Cir. 2002) but *Freeburg* adopts the lower court's opinion without adding any reasoning of its own. The lower court opinion is not available on either Westlaw or PACER, and Defendants have not submitted it.

failure to disclose contractual developments. Just like any other statement, statements about contracts are actionable if the defendants omit contradictory facts.

The rest of Defendants' argument attacks claims that Plaintiffs do not make. Defendants argue they had no obligation to disclose the Carelon Agreement's effective termination before March 2024. D.Br. 7-10. Correct or not, the Complaint nowhere alleges that their mere failure to do so is actionable.[3] Instead, Defendants assumed an obligation to disclose that they had stopped providing services when they told investors that there had been "no … material events" between September 30, 2023, and November 9, 2023. ¶131. *Matrixx*, 563 U.S. at 45.[4]

---

[3] Not correct. There is no rule permitting companies to conceal material developments that have already occurred until the end of the quarter. In *City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718, at *8 (S.D. Fla. June 21, 2016), the defendant had "no duty to disclose its financial results ahead of time" because the plaintiffs had not sufficiently alleged that the event requiring disclosure **had even occurred**. Defendants quote their other case as holding that "[a]n issuer is not required to disclose interim operating results for the quarter in progress," but they cut the sentence short. It continues "***whenever*** it perceives a ***possibility*** that the quarter's results may disappoint the market.'" *Glassman v. Computervision Corp.*, 90 F.3d 617, 632 n. 28 (1st Cir. 1996). *Glassman* states when a defendant must disclose results: if, ***as here***, they know "hard nonpublic information that the quarter in progress will be an extreme departure from the range of results which could be anticipated based on currently available information." *Id.*

[4] Defendants also invoke the business judgment rule and argue that they had no obligation to impair the Carelon Agreement before March 2024. The business judgment rule protects certain company actions from challenges that they violated fiduciary duties, not false statements from charges of fraud. And the complaint does not allege that Sharecare's financial statements should have impaired the Carelon Agreement earlier.

13

### 2.    The Former Employee Is Reliable and Corroborated

Citing both the FE and Defendants' own admissions, the Complaint sufficiently alleges that Anthem cancelled the DocAI Agreement in June or July 2023 and that neither party paid any amounts due under the Carelon Agreement beginning with Q2 2023. Defendants do not contend otherwise. Because they do not challenge most of the facts the FE establishes, Defendants' challenge to the FE's reliability (D.Br. 12-13) is largely academic.

In any case, the Complaint's FE allegations suffice. Complaints need only allege facts sufficient to show that the "witness has reliable first-hand knowledge [rather than relying on] unreliable hearsay or gossip." *Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1289 (N.D. Ga. 2021). The standard is met by "identifying the dates of the witness's employment, his or her work location, roles within the company, and experiences." *City of Warren Gen. Employees' Ret. Sys. v. Teleperformance SE*, 2024 WL 3965001, at *8 (S.D. Fla. Aug. 28, 2024). The Complaint pleads the FE's dates of employment and job title, as well as his role: head of the Sharecare+ division. Because the facts the FE reports occurred within that division, the FE plainly knows the facts the FE relates.

And the FE reports dates, persons involved, dollar amounts, and negotiating positions. These facts are hardly "vague."

14

### 3. *The Statements Are Neither Puffery nor Opinions*

Section 10(b) prohibits only ***materially*** misleading statements. Thus, courts recognize that certain kinds of vague positive statements, called puffery, are typically "too general to cause a reasonable investor to rely upon them." *Equifax*, 357 F. Supp. 3d at 1223. But the standard on a motion to dismiss is high: the court must find the statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 1224. Materiality determinations depend on the statement's context. *E.g. T.V. v. Grindr, LLC*, 2024 WL 4128796, at *44 (M.D. Fla. Aug. 13, 2024) (whether "safe" is puffery depends entirely on context). And the context includes the reason why the statement is false. *Equifax Inc.*, 357 F. Supp. 3d at 1225 (statement of company's commitment to cybersecurity misleading in part because of "widespread nature of the deficiencies."); *see also Shafer v. Glob. Payments, Inc.*, 2024 WL 2789447, at *6 (N.D. Ga. Mar. 29, 2024) (May, J.)(finding statements materially misleading because they relate to the program the plaintiffs allege was misleadingly described).

Thus, as the Eleventh Circuit has recognized, even statements that "smack[] of puff" may be materially misleading. *Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1199 (N.D. Ala. 2021) (quoting *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019); *see also Shafer.*, 2024 WL 2789447 at *6 ("Although some statements … may constitute puffery, the

15

Court cannot say that they were 'obviously unimportant' to a reasonable investor."). Take an example: "the company has a great contract with Walmart" might be puffery if the plaintiffs alleged that the contract was mediocre, but not if they alleged there was no contract.

Here, the Complaint's allegations are of the latter kind. A concerned analyst asked how the "Carelon relationship [was] going" in light of industry pressure. The analyst's obvious concern about the status of the Carelon Agreement shows materiality. *Sheet Metal*, 600 F. Supp. 3d at 1215 (statements about "discipline" and "conservativism" not puffery because made to "allay investor concerns about increasing loss severity in the [health insurance] industry"). In response, Arnold claimed "[b]usiness as usual" and that Sharecare was currently conducting business with and within Carelon. Arnold's statements conveyed a verifiable fact: the Carelon Agreement was ongoing.

Defendants also claim that the statements are opinion. But Defendants did not use opinion words (*e.g.* "we believe," "in our opinion").[5] That Defendants did not use opinion words is, at a minimum, "significant." *Shafer*, 2024 WL 2789447, at *5

---

[5] Defendants used opinion words to qualify statements Plaintiffs do not allege are misleading. For instance, after stating that "we've got current clients" with Carelon, Arnold added "we believe [they] become great references." The Complaint just alleges that there were no "current" clients. ¶128.

16

(N.D. Ga. Mar. 29, 2024). Because Defendants do not cite any other basis for their claim that the statements are opinions, it is decisive.

In any case, the Court need not analyze the statements to determine whether they are puffery or opinion because Defendants (D.Br. 14-16) didn't. Instead, they cited the puffery and opinion doctrines and then cited literally every statement in the complaint except those that appear in financial statements without explaining why or even quoting them. Defendants "waived" these "perfunctory" arguments. *Cross v. Equity Experts.Org, LLC*, 2019 WL 13059913, at *2 (N.D. Ga. Aug. 16, 2019)

## C.     Statements About Carelon Agreement Delays

In August 2022, Sharecare announced the Carelon Agreement. Though the agreement itself was good news, Sharecare had to disclose it at that time because delays negotiating it had placed 2022 guidance out of reach.

Negotiation delays can result from many things, including the counterparty's cold feet or excess demands. Zeroing in on this possibility, analysts repeatedly asked whether the delays reflected any reluctance on Anthem's part. But Defendants dismissed the analysts' concerns, maintaining that the delays resulted from the Carelon Agreement's complexity—and nothing else. ¶88 ("It's only—the contract negotiation—contract is only longer now than it was in the beginning"); ¶89 (Q: "It's not headwinds or a potential recession that [Anthem] is facing. It's simply the size of the implementation." DEFENDANT FERRERO: "Yes.").

In truth, the delays were caused, in part, by friction with Anthem. Defendants' own statements show as much. At the end of the Class Period, Defendants admitted that Anthem's purported failure to honor its contractual commitments was the reason "it was difficult to forecast" earnings. ¶59. Sharecare's August 2022 announcement was the only guidance it withdrew. ¶61. The strikingly one-sided Carelon Agreement, which required Sharecare to provide $8.1 million of free consideration to Carelon, ¶74, and remit nearly every dollar it earned pursuant to the Agreement to Carelon, ¶83, further shows that cause of the delay was Anthem's hard bargaining.

Defendants also argue that their statements were true because the Carelon Agreement's complexity was one of the reasons for the delays. D.Br. 19. While they could have stayed silent about the cause of the delays, they misled investors by attributing it *entirely* to the agreement's complexity. *Matrixx*, 563 U.S. at 45.

### D.    Statements About the Carelon Agreement's Scope

In August 2022, Defendants told investors that the Carelon Agreement would be Sharecare's "largest contract ever." Then, in its Q3 2022 10-Q, Sharecare disclosed Q3 2022 revenues from Anthem of $10.0 million, or about as much as it had earned from Anthem in Q1 and Q2 2022 combined—a promising start to the Carelon Agreement. ¶98.

The additional revenues were illusory. Sharecare's revenues from the Carelon Agreement were matched, dollar for dollar, with payments made to Anthem to

18

service the Carelon Agreement. ¶83. Sharecare disclosed revenues from the Carelon Agreement because all payments from *or to* Anthem were disclosable related party transactions. But Sharecare did not disclose the $5.7 million in outgoing payments until March 2023.[6] ¶98. By omitting one leg, Sharecare made the Carelon Agreement seem profitable, concealing that it only generated round-trip revenues.

In Q1, Q2, and Q3 2023, Sharecare remitted to Anthem 99.1%, 84.1%, and 90.3% of the revenues it earned from the Carelon Agreement, respectively, to service the contract. While Defendants acknowledged the amounts as related party transactions, they concealed the link between revenues and expenses by representing that the expenses resulted from "separate agreements … for the purchase of distinct goods and services" from Anthem. *E.g.* ¶101. Defendants' affirmative false statements hid that the Carelon Agreement was so one-sided that Sharecare had a near-0% profit margin just from customer service.

Defendants cite disclosures supposedly putting investors on notice. D.Br. 19-20. But all Defendants disclosed was that Sharecare had hired someone to service the Carelon agreement. Defendants withheld, for example, that the payments Sharecare made to service the agreements matched the revenue Sharecare earned from the agreements, such that Sharecare's 2022 margin was 0%. ¶138 (b). And by

---

[6] Total 2022 revenues from and expenses incurred through the Carelon Agreement matched exactly, though $0.2 million was recognized as revenues in Q3 but not as expenses until Q4, for a 3.4% difference between Q3 revenues and expenses. ¶83.

19

falsely calling the servicers "outsourced partners," Defendants gave the misleading impression that at most, Sharecare had paid too much money to some customer service firms. ¶138 (a). By concealing that the payments were to Anthem, Sharecare hid that it must make immense concessions just to keep Anthem interested.

Defendants argue that the Court should dismiss the claims because the transactions are not proper "round trip" transactions. D.Br. 20-21. Defendants' argument ignores the Q3 2022 10-Q in which Sharecare omitted to disclose the payments to Carelon entirely, which is misleading regardless of whether the transactions are round-trip. Defendants' argument also ignores their affirmative mischaracterizations. But Defendants' argument fails even on its terms. Round-trip transactions are called such because they "wash out." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 178 (4th Cir. 2007). Plaintiffs may establish round-tripping by showing both legs lacked economic substance, but that's not the only way. *Id.* Here, the transactions between Sharecare and Carelon "wash out" because the same money that went into Sharecare for the agreement went out of Sharecare as expenses, and hence "round tripped."

## IV.   THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER

### A.   Standard

A complaint sufficiently alleges scienter when, accepting allegations as true and considering them collectively, a reasonable person would deem the inference of

scienter as least as strong as an opposing inference. *Tellabs*, 551 U.S. at 324. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. The inference of scienter "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.

## B.   August-November 2023 Statements Concerning Sharecare's Contracts with Anthem

### 1.   *Defendants' Suggested Inference Is Culpable*

Courts have recognized in all sorts of contexts that misstating current conditions hoping that problems will be fixed is fraud. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (misstatements concerning the likelihood of FDA approval fraudulent even though defendants could only benefit if the FDA ultimately approved product; *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (similar, with overstating new product's prospects). Indeed, it is fraud even if the defendant is correct. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) ("It is the failure to disclose 'issues' and 'concerns' with the Rat Study and the FDA's interest in the outcome of those studies—not who was ultimately right about the underlying science—that matters.").

Defendants admit that the Complaint sufficiently alleges they knew about the DocAI termination and the cessation of payments and services under the Carelon Agreement when they made false statements. But they argue that notwithstanding

21

the existing and mounting difficulties, they believed they would be able to negotiate a satisfactory resumption of the DocAI and Carelon Agreements. D.Br. 26-28.

Defendants are liable because they knew or were reckless in not knowing that their descriptions of current conditions were false. Their supposed belief that things would work out in the end is not exculpatory; it is culpable.

2.    *The Complaint Sufficiently Alleges Scienter Even Without Defendants' Concession*

A defendant's false statements themselves—because they are extravagantly false, are repeated, respond to repeated inquiries, or address facts key to the company's story—can constitute powerful evidence of scienter. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009); *accord Teleperformance*, 2024 WL 3965001 at *9. The reasons are not hard to discern. For instance, repeating false answers "diminishes the likelihood that a misstatement was made out of carelessness." *Teleperformance*, 2024 WL 3965001, at *9; *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 925 (11th Cir. 2020) (finding scienter in part because statements made repeatedly). And analysts' repeated questions demonstrate that investors are closely watching the subject. *Avaya*, 564 F.3d at 269.

In *Teleperformance*, which Defendants cite, the plaintiffs sufficiently alleged scienter by showing that the defendants repeated the false statements, that on one occasion they gave evasive answers, and that there were some public disclosures that could cause the defendants to investigate. 2024 WL 3965001, at *9-10.

22

This case is much stronger. On November 9, after Sharecare finally cut Anthem off following six months of Anthem not paying its bills, Defendant Arnold was asked about the Carelon Agreement. His answer ran to 200 words. ¶128. In it, he twice stated that Sharecare was currently working with Carelon. *Id.* He said four times that the agreement was proceeding as planned. *Id.* In August and September, Arnold had told investors that Carelon was a $50 million business, that Sharecare was performing to its signed contracts, and stated a half-dozen times that the Carelon Agreement was developing exactly as planned. ¶¶ 117, 121, 125.

Analysts kept asking about the Carelon Agreement; Arnold kept feeding them false information. Arnold's answers were not just a little bit off. Boasting about current opportunities with a customer after ***voluntarily cutting the customer off because it kept breaking the contract*** is a dramatic misstatement. The inference that Arnold did not know the statements were false is itself culpable, because it is reckless for him to keep giving investors wildly incorrect answers to the same question month after month without inquiring whether his answer was true. *Avaya*, 564 F.3d at 269.

In any case, the Complaint sufficiently alleges that Arnold knew about the negative developments as they occurred. Most required his approval. No company would stop paying its largest client, or cut the client off, or agree to terminate a 5-year agreement accounting for about 5% of annual revenues, without approval from the company's founder and CEO. *E.g.* ¶¶158-59.

23

Defendants cite a rule of thumb that plaintiffs must supplement so-called core operations allegations with more particularized allegations to support an inference of scienter. D.Br. 21-22. The core operations inference charges executives with knowledge of information about the company because the **information** is too important for the executive not to know. *Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *24 (D.N.J. June 25, 2024).[7] This is not what the Complaint alleges. As *Mizzaro* recognized, "certain types of fraud … undeniably **require the participation of senior management** [because] these frauds simply cannot be carried out by low-level employees acting on their own." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249-50 (11th Cir. 2008). This case is an example. Arnold knew his statements were false because Sharecare would not have taken any of the major corporate actions against Anthem without his approval. *See Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1203-04, 1220-21 (N.D. Ala. 2021) (finding scienter because size of contract in defendant's portfolio demanded personal attention); *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1278 (N.D. Ga. 2014)

---

[7] Defendants' cases are clear on this point. *Plymouth Cnty. Ret. Sys. v. Carter's Inc.*, 2011 WL 13124501, at *25 (N.D. Ga. Mar. 17, 2011) (core operations inference "is used by plaintiffs not to show actual knowledge, but instead, to show what the defendant(s) should have known by virtue of their position and the importance of the information to the company."); *In re NDCHealth Corp., Inc. Sec. Litig.*, 2005 WL 6074918, at *8 n.10 (N.D. Ga. July 27, 2005) (similar).

(inferring defendants' knowledge that an FDA application had not been submitted because the executives would have had to approve the application).

Defendants cite scattered cases failing to find scienter on very different facts. In *NDCHealth*, the plaintiff "challenge[d] accounting judgments which … do not raise red flags." 2005 WL 6074918, at *9. In two others, the plaintiffs charged the defendants with knowledge of numerous small discrete decisions made at a low level. *In re Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1200 (N.D. Ga. 2007) (individual unwanted deliveries to boost revenues); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1376 (S.D. Fla. 2015) (individual violations of consumer protection laws).

## C.    Statements about the Carelon Agreement

When Defendants introduced the Carelon Agreement, they called it Sharecare's "largest contract ever." Language like that is designed to grab investors' attention. It raises an obvious risk that false statements about the contract will mislead investors.

Defendants brought up the Carelon Agreement to explain that it was delayed. When analysts inevitably asked Defendants to explain the delays, Arnold's answer evinced personal knowledge of the details of the Carelon Agreement negotiations. Arnold specified the subject that purportedly was causing the delays. ¶88 ("[A]ll the conversations [with Anthem] are—all the work is being done around that transitional

25

services and implementation work."). He cited other details, such as that the Agreement would be negotiated in 2022 and the hundreds of health guides who would transition into Sharecare. *Id.* But Defendants categorically told investors, in response to repeated analyst questions, that there were no problems between Sharecare and Anthem. ¶¶87-91.

As in *Avaya*, Defendants' "confident, unhedged denials" of facts on subject to which they intentionally drew attention and on which they implicitly claimed personal knowledge were, at a minimum, reckless. 564 F.3d at 270.

### D.    Statements About the Scope of the Carelon Agreement

Defendants' statements from August 2022 through the close of the Class Period were calculated to hide the Carelon Agreement was anything but Sharecare's "largest contract ever."

Until March 2023, Defendants concealed the payments that Sharecare was making to Anthem in connection with the Carelon Agreement. Then, though the payments were just the other side of the Carelon Agreement's revenues, Defendants disclosed the amount of the payments, but maintained they were pursuant to "separate agreements" for "distinct services."

Sharecare CFO Defendant Ferrero evinced personal knowledge of how Sharecare was fulfilling the customer service portion of Sharecare+. He told investors on the call to discuss Q4 2023 earnings that "[i]n order to deliver [on the

26

Carelon Agreement], we had to use outsourced partners." ¶137. He then explained exactly how Sharecare was accounting for payments to outsourced partners. *Id.* Then, he made assertions about the Carelon Agreement's gross margins. *Id.* Ferrero's actionable statements concealed that Sharecare had a then-0% margin on the Carelon Agreement because it had had to remit all the proceeds to Anthem. The inference that Ferrero knew Sharecare was remitting the proceeds to Anthem is as plausible as any competing inference; he expressed knowledge of all the facts about the Carelon Agreement (the payments, their recipients, and the resulting margins) necessary to reach such a conclusion.

Second, Ferrero's own artful language when asked about the Carelon Agreement supports an inference of scienter. *Teleperformance*, 2024 WL 3965001, at *9 ("evasive answers" "prompted by questions [the defendants] ultimately failed to address" were probative of scienter) (citing *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011)); *Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at *10 (E.D. Pa. Jan. 11, 2024) (similar). Here, Ferrero referred to "outsourced partners" instead of disclosing that Sharecare had only one partner, and it was Carelon. Ferrero's statements prevented investors from linking the payments coming in from Anthem to the payments going out to Anthem, thus concealing how unprofitable the Carelon Agreement was.

27

Third, the failure to file the Carelon Agreement supports scienter. As the Complaint alleges, failure to make a disclosure which is not itself actionable may show other false statements were made with scienter. *Freedman v. Louisiana-Pac. Corp.*, 922 F. Supp. 377, 390 (D. Or. 1996) ("Though the NYSE Manual and SK–303 do not establish [defendant's] duty to disclose under Rule 10b-5, they are relevant to whether [defendant] violated its alleged duty to disclose with the requisite scienter."). Defendants' argument that Sharecare's "largest contract ever" was not large enough to mandate disclosure relies on *ex post* examination of revenues after the contract failed, not its *ex ante* importance, the relevant question. Moreover, the Carelon Agreement was hardly in Sharecare's "ordinary course of business." Sharecare was not, until Sharecare+, in the customer service business.

## V.    THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION

"The loss causation element of a Rule 10b–5 claim requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." *FindWhat*, 658 F.3d at 1309. Defendants do not dispute that the Complaint sufficiently alleges just such a connection. D.Br. 28-30. Instead, they argue Plaintiffs fail to meet certain technical requirements in their loss causation allegations.

Defendants maintain that Plaintiffs cannot recover from the 2024 drop because Sharecare's stock price traded above the pre-disclosure price on a handful of day in the two months following the corrective disclosure. "[I]t is improper to

28

offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). Without fraud, Plaintiffs could have benefited from the unrelated price gain without suffering the loss. So if they lose their claims, they are worse off than if they had never been defrauded.

Ignoring this case law, Defendants cite Judge Thrash's opinion in *In re Immucor, Inc. Sec. Litig.*, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011). Bu after *Acticon*, Judge Thrash again faced a case where the stock price rebounded within three months. *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). This time, he ruled that "based on *Acticon*, the Court will not hold that the Plaintiffs cannot establish economic loss as a matter of law." *Id.*

Defendants are also wrong on the facts. They claim Sharecare's stock recovered, and indeed soared, on June 21. But they omit the reason: that day, Sharecare announced that it was being acquired. Ex. 2. The increase had nothing to do with the fraud, it is simply that Sharecare's suitor had to pay a premium over the existing stock price to convince investors to sell their shares. That's how acquisitions work.

Defendants also argue that Plaintiffs cannot recover on behalf of the putative class because they did not hold shares through the 2023 disclosure. They cite

29

*MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1235 (11th Cir. 2023). But in *MacPhee*, the plaintiffs had not held shares through *any* corrective disclosure, so they could not allege the element of loss causation. *Id.* at 1248 (plaintiff "sold its … shares before the relevant truth 'leak[ed] out.'"). Named plaintiffs need not hold shares through every corrective disclosure. Instead, where plaintiffs allege a common course of conduct, they may bring claims based on corrective disclosures through which they did not hold shares if they held shares through at least one corrective disclosure. *In re Catalina Mktg. Corp Sec. Litig.*, 2006 WL 8439909, at *16 (M.D. Fla. Jan. 29, 2006), *report and recommendation adopted sub*, 2006 WL 8439908 (M.D. Fla. Feb. 16, 2006); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *8 (S.D. Fla. Mar. 16, 2016).

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss. If the Court grants any part of the motion to dismiss, it should grant leave to amend. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("[W]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.").

30

Dated: January 16, 2025

Respectfully submitted,                    **JOHNSON FISTEL, LLP**


/s/ *Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.
Georgia Bar No. 262062
Mary Ellen Conner
Georgia Bar No. 195077
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com
maryellenc@johnsonfistel.com

*Local Counsel for Plaintiffs and the putative Class*

Laurence Rosen
Jonathan Horne
Henry Bloxenheim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
lrosen@rosenlegal.com
jhorne@rosenlegal.com
hbloxenheim@rosenlegal.com

*Lead Counsel for Plaintiffs and the putative Class*

31

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with

one of the font and point selections approved by the Court in Local Rule 5.1(C)


/s/ Michael Fistel, Jr.
Michael Fistel, Jr.

32

## CERTIFICATE OF SERVICE

On January 16, 2025, I electronically filed the following **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on January 16, 2025.

*/s/ Michael Fistel, Jr.*
Michael Fistel, Jr.