**IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| VICTOR BUQUERAS and JOHN DEMER, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>   v.<br><br>SHARECARE, INC., JEFFREY T. ARNOLD, and JUSTIN FERRERO,<br><br>      Defendants. | CIVIL ACTION:   1:24-CV-2769-LMM |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>**

Dated: February 18, 2025

Jessica P. Corley
B. Warren Pope
Brandon R. Keel
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: 404-572-4600
Facsimile: 404-572-5100
jpcorley@kslaw.com
wpope@kslaw.com
bkeel@kslaw.com

*Counsel for Defendants*

**INTRODUCTION**

As demonstrated in Defendants' opening brief, Plaintiffs' claims fail as a matter of law and should be dismissed. Plaintiffs' Opposition does nothing to save their claims. Plaintiffs fault Defendants for relying on *In re Express Scripts* because it is out of circuit authority. But it is the most analogous case and provides a clear roadmap for this Court to dismiss Plaintiffs' claims. There, Judge Ramos of the Southern District of New York dismissed virtually identical claims to those pressed here, *In re Express Scripts Holding Company Securities Litigation*, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017), and the Second Circuit affirmed, 773 Fed. App'x 9 (2d Cir. 2019). Plaintiffs attempt to distinguish *Express Scripts* on the basis that it did not involve allegations that defendants "omit[t]ed contradictory facts," ECF 42 at 13, but it absolutely did. In affirming dismissal, the Second Circuit held that "where the discussions [with Anthem] were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations." 773 Fed. App'x 14. The same is true here. *Express Scripts*, even if not binding, shows why Plaintiffs have failed to identify any actionable false or misleading statement of fact.

As for pleading the required "strong inference" of scienter, Plaintiffs incorrectly argue that they have done so merely by alleging falsity: namely, that Defendants were aware of the "contradictory" information that Plaintiffs allege rendered the statements misleading. *See* ECF 42 at 21-22. But even if Plaintiffs had

adequately pled falsity, which they have not, pleading falsity is not enough to plead scienter, as that "would read the scienter element out of the analysis" entirely. *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547–48 (4th Cir. 2017); *see also In re AFC Enters. Inc., Secs. Litig.*, 348 F. Supp. 2d 1363, 1371–72 (N.D. Ga. 2004) (collecting cases holding that alleged falsity cannot alone show scienter). There are no indicia of scienter in this case. Defendants did not sell a single share of their stock during the class period and are not alleged to have had any other motive to commit fraud. Moreover, weighing the competing inferences shows that Plaintiffs' theory of scienter is not "compelling": Defendants were in the midst of ongoing negotiations with Anthem, the results of which were uncertain, and Defendants were not required to predict that the negotiations would ultimately fail. With the benefit of hindsight, Plaintiffs criticize Defendants for their ongoing optimism with respect to the Anthem relationship, but there is no "fraud by hindsight" under the securities laws. For all of these reasons, and those discussed below, Plaintiffs have not shown the required "strong inference" of scienter.

Finally, Plaintiffs fail to rehabilitate their defective loss causation allegations, which independently requires the Complaint to be dismissed.

## I.    PLAINTIFFS FAIL TO PLEAD A MATERIAL MISSTATEMENT.

In defense of their falsity allegations, Plaintiffs' Opposition highlights three categories of alleged misstatements: (1) statements about the Carelon Agreement

"delays"; (2) statements about the Agreement's "scope"; and (3) "late class period statements" about the Agreement. None of the challenged statements, however, are actionable under the PSLRA's heightened pleading standards.

**A.      The Carelon Agreement Delay Statements Are Not Misstatements.**

Plaintiffs allege that Defendants attributed any delays in signing the Carelon Agreement "to the complexity, length, and breadth of the negotiations" but that "the negotiations were delayed, *in part*, because of Anthem's hard bargaining and failure to honor its contractual promises." ECF 32 ¶ 92 (emphasis added). The Complaint thus implicitly acknowledges that the complexity, length, and breadth of the negotiations *were* factors related to the delay in signing the agreement. ECF 35-1 at 18–19. And Plaintiffs make no effort to state with particularity why not also mentioning Anthem's "hard bargaining" or purported "failure to honor its contractual promises" made the statements materially misleading. Indeed, the Complaint does not bother to allege any details of the purported "hard bargaining" or explain what "failure to honor [] contractual promises" existed as of this August 2022 timeframe—which was before the Carelon Agreement was even signed. ECF 32 ¶ 92. Plaintiffs even seemingly concede that these statements are inactionable by entirely omitting them from their "Timeline of Misstatements." ECF 43-1.

The Complaint and Opposition also mischaracterize the content of the statements at issue. For example, an analyst asked the following question during the

August 10, 2022 earnings call that forms the basis of Plaintiffs' "delay" challenges:

> With respect to the Enterprise division and the sort of previously expected onboarding of lives in the back half of '22, is Elevance and [Carelon], is that delay sort of the only change relative to your previous thinking, or were there also other clients that you were going to onboard that have also delayed? Or is there an elongation sort of across the board?

ECF 37-4 at 7. Plaintiffs characterize that question as asking "whether the delays reflected any reluctance on Anthem's part." ECF 42 at 17. In response, Defendants Arnold, Ferrero, and others[1] gave their wide-ranging views regarding the Carelon Agreement and other business. *See* ECF 37-4 at 7–8. That included discussing that *Anthem's* earnings call during the same quarter similarly recognized that its work with Sharecare was "such a large deployment that is maybe what is leading to some delay" and that "[i]t is not headwinds or a potential recession that Elevance is facing, it is simply the size of the implementation." *Id.* at 8. These views further included Defendant Ferrero's opinion that "[t]his is a timing issue around this relationship, and there is uncertainty as to exactly when that will come in, but we are highly confident that, that relationship will come to fruition this year." *Id.* Plaintiffs raise no plausible argument that Defendants were required to add to these explanations of the delay that Anthem drives a "hard bargain" or that it had some purported,

---

[1] The Complaint attributes some of the comments during this discussion to an analyst (ECF 32 ¶ 89), whereas the transcript indicates a portion of the comments were provided by another Sharecare employee, *see* ECF 37-4 at 8-9. But the statements are not adequately alleged to be false or misleading, in any event.

unidentified history of not "honoring its contractual promises," nor do Plaintiffs show that Defendant Ferrero's obvious opinion regarding future events is actionable.

**B.      The Carelon Agreement Scope Statements Are Not Misstatements.**

Plaintiffs' challenges to the Carelon Agreement "scope" statements in the Opposition are cabined to revenues and payments related to the Agreement. ECF 42 § III.D. Plaintiffs contend that "the Carelon Agreement was a round-trip agreement wherein Sharecare remitted nearly all the revenues it earned to Carelon." ECF 32 ¶ 96. Defendants obviously disagree with that characterization, but the Court need not resolve it to grant Defendants' motion because the alleged revenues from and payments to Anthem *were* disclosed. ECF 35-1 at 19–21.

Plaintiffs quibble that the Q3 2022 10-Q filed by Sharecare allegedly did not disclose some payments to Carelon. ECF 42 at 20. But that 10-Q, contrary to Plaintiffs' suggestion, is full of references to related party revenues and liabilities, demonstrating the financial push and pull that existed between Sharecare and Anthem, including disclosing all revenue and expenses between the two for the quarter. *See* ECF 37-10 at 11, 21. Plaintiffs do not allege facts showing that Sharecare incurred payments to Anthem for this quarter that were not timely disclosed. Even in Plaintiffs' telling, this information was disclosed no later than Sharecare's Q3 2023 10-Q, a disclosure from which Plaintiffs allege no harm. *See* ECF 32 ¶ 83.

Plaintiffs also argue that they have properly alleged that the revenues from

5

and payments to Anthem represent round-trip revenues. ECF 42 at 19–20. But the only case Plaintiffs cite is *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162 (4th Cir. 2007), where the Fourth Circuit affirmed that the plaintiffs stated no claim for statements concerning alleged round-trip revenues. As the *Hunter* court explained:

> The basis for alleging "round-tripping" does not exist when either of the transactions have economic substance because those transactions would not wash out. The mere existence of reciprocal dealing does not suggest "round-tripping."

*Id.* at 178-79. A complaint alleging round-tripping "must allege facts sufficient to support a reasonable belief that both legs of the round-tripping were a sham." *Id.* (citation omitted). Plaintiffs have made no such plausible allegations here.

## C.    The "Late Class Period" Statements Are Not Misstatements.

Although the Opposition is unclear as to exactly which statements count as "late class period" statements, the earliest statement referenced in this section of the Opposition is from August 9, 2023. *See* ECF 42 § III.B. Plaintiffs assert that the challenged statements from that date forward "were misleading because of the facts they concealed." *Id.* at 10. Plaintiffs thus do not allege that these statements were false but rather argue that additional information should have been disclosed to prevent the statements from being materially misleading, and they claim this "omission" theory distinguishes this case from *Express Scripts*, *id.* at 12-13.

But Plaintiffs are wrong. That is the exact situation that the court confronted in *Express Scripts*. There, like here, the plaintiff "argue[d] that because Defendants

6

spoke to investors about the purported strength of the Company's relationship with Anthem and its allegedly productive negotiations, Defendants were obligated to speak fully and truthfully, but did not." 2017 WL 3278930 at *12. The plaintiff likewise "argue[d] that Express Scripts, having provided investors details concerning the companies' purportedly 'great' relationship and supposedly 'active' negotiations, defrauded investors when it spoke falsely about currently existing facts." *Id.* That is precisely what Plaintiffs allege here. Those arguments were rejected in *Express Scripts* for the same reasons articulated in Defendants' motion to dismiss, and the Court should apply that same reasoning here.

Plaintiffs' reliance on *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157 (2d Cir. 2021), is also misplaced. There, the Second Circuit affirmed dismissal of all of the challenged statements (except one, discussed below) as optimistic generalities about the company's business that represented "inactionable corporate puffery." *Id.* at 161; *see also id.* at 170. That included similar statements that the company was "pretty confident" and "pretty positive" about the prospect of renewing partnerships in 2019, *id.,* even though the company had, as Plaintiffs here similarly allege, a "souring relationship with one of [its] largest customers," ECF 42 at 9. Thus, *Synchrony* actually supports Defendants' position, not Plaintiffs'.

The one misstatement the Second Circuit allowed to go forward in *Synchrony* further shows how that case does not support Plaintiffs here. The lone surviving

7

statement came in response to a narrow question about customer response to tightened underwriting practices and a given answer that was objectively false. The company representative responded by stating that the company "was not getting any pushback on credit," yet plaintiffs alleged with particularity that the company had, in fact, received such "pushback." *Id.* at 168 (quotations omitted). There is no direct contradiction of the sort here, and Plaintiffs have not alleged or shown otherwise.

Plaintiffs next attempt to defend their confidential witness (CW) allegations regarding the "late class period" statements by arguing that identifying the CW's dates of employment, job title, and role are all that is needed. ECF 42 § III.B.2. In doing so, however, Plaintiffs ignore that they have not alleged their CW was involved in—or even aware of—the negotiations between Sharecare and Anthem that were ongoing during the class period. *See* ECF 35-1 at 14. Plaintiffs also ignore that their CW left Sharecare in July 2023, *id.*, long before the alleged cessation of services under the Carelon Agreement and while the parties' negotiations were undoubtedly live. And even if biographical details can help substantiate a CW, the Eleventh Circuit standard looks for something more. For example, in *City of Warren Gen. Employees' Ret. Sys. v. Teleperformance SE*, 2024 WL 3965001, at *8 (S.D. Fla. Aug. 28, 2024), which Plaintiffs cite, the court credited high-profile news articles as key sources that corroborated the information proffered by the CW. There are no corroborating allegations here. The Court, moreover, cannot defer to

8

Plaintiffs' CW merely because this case involves the same "division" in which he worked for a portion of the class period. *See* ECF 35-1 at 12-14.

Finally, Plaintiffs assert that the challenged "late class period" statements are not puffery or opinion. *See* ECF 42 § III.C. But Plaintiffs do not identify a single statement that Defendants purportedly mischaracterized as such.[2] Instead, Plaintiffs reference a specific Q&A portion of an analyst call during the November 9, 2023 Q3 earnings call. *See id.* at 16. The analyst stated:

> Just wanted to talk about Carelon. I know you kind of saw some pressure with PMPMs earlier in the year. I just want to talk about how that relationship is going? And if you've kind of seen those PMPM stabilize? And then also, just kind of as open enrollment has started up again, I just wanted to see how Sharecare+ plus engagement is going and if that's kind of tracking in line with expectations.

ECF 37-9 at 10.

In response to this broad question that mentioned the Carelon relationship but also posed a wide inquiry into Sharecare+ engagement during open enrollment, Defendant Arnold offered his opinions: "*I think* it's stay the course," "we've got current clients with Carelon that we're executing against, *which we believe* become great references for us and the results have been really good," and "*I would say* it's

---

[2] Plaintiffs incorrectly assert that Defendants did not identify the statements cited as puffery or opinion. *See* ECF 42 at 17. To the contrary, Defendants identified each statement that represents puffery or opinion and directed the Court to case law deeming essentially identical language inactionable. *See* ECF 35-1 at 15-16; ECF 37-7 (alleged misstatements chart with identified bases for dismissal).

business as usual." *See id.* (emphasis added). Thus, contrary to Plaintiffs' arguments (ECF 42 at 16-17), Defendant Arnold *did* convey his opinions and used "opinion words" in doing so. And the other complained-of "late class period" statements represent classic examples of inactionable puffery and opinion. *See* ECF 35-1 § I.B; *see also Express Scripts*, 773 F. App'x at 13 ("statements that the relationship was 'great' and 'very, very solid' and Express Scripts 'really enjoys'" held to be puffery).

### D.    Plaintiffs Ignore the PSLRA's Safe Harbor.

Plaintiffs' claims as to every challenged forward-looking statement further fail because, as Defendants explained, those statements were identified as such when made and accompanied by meaningful cautionary language, rendering them inactionable under the PSLRA safe harbor. *See* ECF 35-1 §  I.C. Plaintiffs offer no response whatsoever. By "fail[ing] to respond to such argument," Plaintiffs' claims as to these statements "are deemed abandoned and subject to dismissal." *Barnes v. AstraZeneca Pharms. LP*, 253 F. Supp. 3d 1168, 1171 (N.D. Ga. 2017).

## II.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE SCIENTER.

Plaintiffs' claims fail on the independent basis that the Complaint does not adequately plead that each statement was made with scienter, and nothing in the Opposition shows otherwise. Plaintiffs begin by suggesting that Defendants have conceded scienter by not disputing their allegation that Defendants "knew about the DocAI termination and the cessation of payments and services under the Carelon

10

Agreement when they made false statements." ECF 42 at 21. But Defendants have made no such concession, and, tellingly, Plaintiffs provide no citation for it. *Id*.

More importantly, however, Plaintiffs improperly collapse the elements of falsity and scienter. "[A]n inference that [Defendant] may have known his statement was false does not alone satisfy the scienter requirement[,]" as such "would read the scienter element out of the analysis in contravention of the PSLRA's exacting pleading standard." *Maguire Fin.*, 876 F.3d at 547–48; *see also In re AFC*, 348 F. Supp. 2d at 1371–72. In *Maguire*, the Fourth Circuit rejected the same argument that an executive's alleged knowledge of falsity showed scienter, noting that "scienter and knowledge . . . are distinct components of the requisite analytical framework." *Id.* As there, Plaintiffs impermissibly conflate the two here.

The lack of a "compelling" inference of scienter is further apparent because Plaintiffs allege no motive to commit fraud, and the Opposition does not argue otherwise. The lack of alleged motive leaves Plaintiffs with only their allegation that Defendants made incorrect statements, which again, cannot establish scienter. *See, e.g.*, *In re NCDHealth Corp., Inc. Sec. Litig.*, 2005 WL 6074918, at *15–16 (N.D. Ga. July 27, 2005) (dismissing complaint when plaintiff alleged no motive and relied on the existence of defendants' false statements to show scienter). Moreover, the fact that Defendants did not sell any of their stock during the class period weighs strongly against inferring scienter. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253

(11th Cir. 2008); *In re Aaron's, Inc. Sec. Litig.*, 2018 WL 11343741, at *8 and n.21 (N.D. Ga. Sep. 26, 2018). In the absence of such stock sales, there simply is no plausible reason alleged for Defendants to have delayed announcing any deterioration of the Anthem relationship. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (recognizing that scienter theory that defendant "would rather [have kept] the stock price high for a time and then face the inevitable fallout" "does not make a whole lot of sense" or "resonate [with] common experience").

The more compelling, nonculpable inference is that Defendants gave their overall assessment of the situation with Anthem as it unfolded over the course of the class period. Even crediting Plaintiffs' allegations that there were disagreements between Sharecare and Anthem along the way, that does not raise a strong inference that Defendants tried to deceive investors by not discussing the live issues between the parties before any certainty was reached as to those matters. *See Synchrony*, 988 F.3d at 170; *Express Scripts*, 773 F. App'x at 15. "[I]t is far more reasonable to conclude that although the [Carelon Agreement] simply didn't work out, the Defendants maintained reasonable (if unrealized) hopes" that their differences would be resolved and the relationship would continue. *Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*, 2010 WL 1287058, at *22 (E.D. Wisc. Mar. 30, 2010) (dismissing complaint for failure to allege scienter).

The way Plaintiffs present their argument—asserting that Defendants'

12

statements were "extravagantly false, are repeated, [and] respond[ed] to repeated inquiries"—one would think that Defendants were directly asked if Sharecare believed that Anthem had breached the contracts and Defendants bluntly responded "no." But that is *not* what Plaintiffs allege. Rather, Plaintiffs allege that analysts asked Defendants whether other contracts besides Sharecare's Anthem contracts were being delayed. ECF 32 ¶ 87. Defendant Arnold truthfully responded that everything was on schedule except the Carelon Agreement, which he believed would eventually get signed. *Id.* He told analysts that he believed the Carelon Agreement was delayed because of its size and complexity—a statement that Plaintiffs do not allege to be false. *Id.* No analyst inquired about Anthem's contract performance or "hard bargaining," the two things Plaintiffs allege needed to be disclosed. *Id.* ¶ 92.[3]

According to the Complaint, the closest someone came to those topics was when someone asked, "It's not like there's a cancellation of the contract?," and Arnold answered "No." *Id.* ¶ 88. That was true: Plaintiffs do not allege that there was any cancellation of the Carelon Agreement during the class period. And the alleged fact that Anthem subsequently attempted to terminate the DocAI Agreement

---

[3] Plaintiffs' cited cases are not analogous. *See, e.g.*, *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *8–10 (S.D.N.Y. June 16, 2020) (scienter pled where defendants allegedly lied about whether the FDA had agreed to approve a drug that would change the company's fortune); *accord Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 706–09 (7th Cir. 2008) (finding scienter pled where executives told investors that a new product was "available" and had strong demand when it was not available and had not been sold to anyone).

likewise does not show that Defendants attempted to deceive anyone. Sharecare responded by disputing the termination because the DocAI Agreement was not terminable, prompting further negotiations and discussions with Anthem concerning their disagreements. *See* ECF 37-5 at 48. As in *Express Scripts*, the alleged failure to disclose the existence of those disagreements or negotiations—which remained ongoing *throughout* the class period—does not show scienter. 773 F. App'x at 15.

Plaintiffs' remaining arguments are equally deficient. They cannot rely on Defendants' positions at Sharecare or that they were privy to the Company's "core operations." ECF 35-1 at 21–22. And the alleged failure to publicly file the Carelon Agreement does not show that Defendants intended to deceive. On that point, Plaintiffs fail to engage with the governing regulation, instead pontificating that a company's "largest contract ever" has to be filed with the SEC. That is not what the regulation says. Plaintiffs also contend the Carelon Agreement was not made in the ordinary course of business because Sharecare was not in the "customer service" business until the Carelon Agreement. But the Carelon Agreement was a contract to provide Sharecare's healthcare services and application, which is its principal line of business. A contract that adds another dimension to those services is not outside Sharecare's "ordinary course of business." 17 C.F.R. § 229.601(b)(10)(i)(A). The more plausible inference is that Defendants did not file the Carelon Agreement because they did not think they were required to do so (and they were right).

14

## III.    PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.

Plaintiffs concede that they did not hold Sharecare stock through the alleged 2023 corrective disclosure, which means that disclosure caused them no loss. *See MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1248 (11th Cir. 2023). The two class-certification decisions Plaintiffs cite are unavailing.[4]

And after the alleged 2024 corrective disclosure, Sharecare's stock price rebounded to its pre-disclosure price barely *one week* after Sharecare announced that it had stopped providing services under the Carelon Agreement and wrote down related revenue. *See* ECF 32 ¶¶ 133–43; Ex. M (stock price demonstrative). In response, Plaintiffs incorrectly argue that the rebound was due to the June 21 announcement of Sharecare's acquisition, but the rebound had already occurred by April 8. As a result, Plaintiffs have failed to plead loss causation,[5] and the Opposition cites inapplicable cases where the stock price did not rebound until *months* later.[6]

### CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint.

Dated: February 18, 2025

/s/ *Jessica P. Corley*
Jessica P. Corley
Ga. Bar No. 572733

---

[4] Plaintiffs offer no response to Defendants' argument that this disclosure did not correct any falsehood or reveal that any prior statement was false or misleading.
[5] *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011); *Ross v. Walton*, 668 F. Supp. 2d 32, 43 (D.D.C. 2009).
[6] *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37–40 (2d Cir. 2012); *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1276 (N.D. Ga. 2014).

B. Warren Pope
Ga. Bar No. 583723
Brandon R. Keel
Ga. Bar No. 300303
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: 404-572-4600
Facsimile: 404-572-5100
jpcorley@kslaw.com
wpope@kslaw.com
bkeel@kslaw.com

*Counsel for Defendants*

16

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

*/s/ Jessica P. Corley*
Jessica P. Corley
Ga. Bar No. 572733

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of February 2025 a copy of the foregoing was filed and served using the Court's CM/ECF system, which will send notification of such filing to ECF registered participants.

/s/ Jessica P. Corley
Jessica P. Corley
Ga. Bar No. 572733

*Counsel for Defendants*

18