THE FOLLOWING IS THE P.D.F. OF AN OFFICIAL TRANSCRIPT.

OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE

OFFICIAL COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A

PERIOD OF 90 DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED

TRANSCRIPT BY THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND

LINE NUMBER, ONLY AFTER THE COURT REPORTER HAS FILED THE

OFFICIAL TRANSCRIPT.  HOWEVER, YOU ARE PROHIBITED FROM

ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED

WITH THE COURT.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VICTOR BUQUERAS, ET AL.,          )
                                  )
              PLAINTIFFS,         )
                                  )              DOCKET NUMBER
        VS.                       )              1:24-CV-2769-LMM
                                  )
SHARECARE, INC., ET AL.,          )              ATLANTA, GEORGIA
                                  )               APRIL 17, 2025
              DEFENDANTS.         )
                                  )
                                  )
_____ )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LEIGH MARTIN MAY,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:              JONATHAN HORNE
                               THE ROSEN LAW FIRM
                               NEW YORK, NEW YORK  10016

                               MARY ELLEN CONNOR
                               JOHNSON, FISTEL, LLP
                               MARIETTA, GEORGIA  30064

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)


*MECHANICAL STENOGRAPHY OF PROCEEDINGS
AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY*

OFFICIAL COURT REPORTER:       MONTRELL VANN, RPR, RMR, RDR, CRR
                               2160 UNITED STATES COURTHOUSE
                               75 TED TURNER DRIVE, SOUTHWEST
                               ATLANTA, GEORGIA  30303
                               (404)215-1549

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

APPEARANCES CONTINUED

FOR THE DEFENDANT:              WARREN POPE, JARED LAX &
                               JESSICA CORLEY
                               KING & SPALDING, LLP
                               ATLANTA, GEORGIA  30309

*(IN ATLANTA, FULTON COUNTY, GEORGIA, APRIL 17, 2025, IN OPEN COURT.)*

THE COURT:  OKAY.  GOOD MORNING.  YOU MAY BE SEATED. WE ARE HERE IN CIVIL ACTION 24-CV-2769, VICTOR BUQUERAS, ET AL. VS. SHARECARE, INC., ET AL.

AND STARTING WITH PLAINTIFF'S COUNSEL, IF COUNSEL WOULD INTRODUCE THEMSELVES, PLEASE.

MR. LAX:  GOOD MORNING, YOUR HONOR.  JARED LAX -- OH SORRY.

THE COURT:  WE'LL GET TO YOU IN A SECOND.

MR. POPE:  EAGER.

MR. HORNE:  GOOD MORNING --

MS. CONNER:  GOOD MORNING, YOUR HONOR.  MARY ELLEN CONNER WITH JOHNSON, FISTEL FOR PLAINTIFFS, AND I'M HERE ALSO WITH JONATHAN HORNE.

THE COURT:  OKAY.  GOOD MORNING.

MR. HORNE:  GOOD MORNING, YOUR HONOR.

MR. LAX:  GOOD MORNING AGAIN, YOUR HONOR.  JARED LAX FOR THE DEFENDANTS, JOINING ME, WARREN POPE AND JESSICA CORLEY.

MR. POPE:  GOOD MORNING, YOUR HONOR.

MS. CORLEY:  GOOD MORNING, YOUR HONOR.

THE COURT:  OKAY.  GOOD MORNING TO ALL OF YOU.  WE'RE HERE TODAY ON A HEARING ON DEFENDANTS' MOTION TO DISMISS.  AND JUST KIND OF A FEW HOUSEKEEPING MATTERS, I'VE GIVEN BOTH OF YOU 30 MINUTES FOR YOUR ARGUMENT.  SO THE TIMERS ARE THOSE CLOCKS

RIGHT THERE.  SO WHEN THE DEFENDANT STARTS ARGUING, THE CLOCK ON THE RIGHT WILL GO.  IF YOU WANT TO SAVE TIME FOR REBUTTAL, JUST WHEN YOU SIT BACK DOWN, WHATEVER TIME IS LEFT ON THE CLOCK, YOU'LL GET FOR REBUTTAL, SO YOU DON'T HAVE TO ASK FOR ANY TIME.  IF YOU USE ALL YOUR TIME UP, I'LL LET YOU KNOW. FROM THE PLAINTIFFS, IT WILL BE THE SECOND CLOCK, WILL BE YOUR TIMER.

SO JUST TO KIND OF GIVE YOU SOME INITIAL THOUGHTS, NONE OF THIS IS WRITTEN IN STONE, BUT I THINK IT'S ALWAYS HELPFUL FOR YOU TO KNOW SOME OF THE ISSUES THAT HAVE KIND OF BECOME MORE IMPORTANT TO ME AS I'VE READ THROUGH YOUR BRIEFS.  AND I HAVE READ THROUGH YOUR BRIEFS, SO IT'S NOT A SITUATION WHERE I COME HERE JUST ON A BLANK SLATE.  SO I HAVE READ THROUGH EVERYTHING. MY INITIAL THOUGHTS ON THIS ARE THAT WE HAVE A LOT OF STATEMENTS HERE THAT ARE ALLEGED IN THE COMPLAINT, I THINK SOMEWHERE AROUND 25.  AND WE HAVE SOME STATEMENTS IN THE '22 AND EARLY '23 PERIODS, AND THOSE LATER ON.  I HAVE A BIT OF AN ISSUE POTENTIALLY WITH THE PLAINTIFF'S SCIENTER PIECE IN TIMING.  I CAN SEE THAT SCIENTER IS PLED KIND OF REASONABLY WELL AS WE GET INTO THE APRIL AND JUNE AND OCTOBER '22, 2023 PERIOD.  BUT FOR THESE EARLY '22 TYPE STATEMENTS AND EARLY 2023 STATEMENTS, I DON'T KNOW HOW WELL THE SCIENTER IS TIED TO THE STATEMENTS THAT THE PLAINTIFF IS REFERENCING.  THERE'S SOMETHING IN THERE FOR THE EARLY TIME PERIOD ABOUT KIND OF THE ROUND-TRIP TYPE ALLEGATIONS, BUT MOST OF THE SCIENTER PLED, AT

LEAST THE WAY I SEE IT, HAS TO DO WITH KNOWLEDGE BASED UPON WHAT WAS HAPPENING IN KIND OF APRIL AND JUNE, WHICH CAUSES SOME ISSUES WITH, AT LEAST TO ME, POTENTIALLY THE SCIENTER IN THE EARLY PERIOD.

IN TERMS OF THE DEFENDANT, THERE'S, I GUESS, THE NEED ULTIMATELY TO KIND OF PARSE THROUGH ALL OF THESE STATEMENTS. NO ONE HAS REALLY EXACTLY DONE THE BRIEFING IN THAT WAY WHERE WE HAVE THE STATEMENT AND WHY EACH ONE IS A CERTAIN WAY.  AND I KNOW THAT THAT IS DIFFICULT WITH THE PAGE LIMITS AND HOW MANY STATEMENTS WE HAVE, BUT ULTIMATELY THAT'S SOME OF WHAT I'M GOING TO HAVE TO DECIDE.  I THINK THE DEFENDANTS HAVE SOME PROBLEMS WITH SOME OF THESE LATER, LIKE I SAID, APRIL, MAY, JUNE GOING INTO OCTOBER STATEMENTS GIVEN WHAT WAS HAPPENING AT THE TIME.  AND THERE IS THIS RELIANCE ON THIS EXPRESS SCRIPTS CASE AND THIS IDEA THAT THE DEFENDANTS WEREN'T REQUIRED TO KIND OF JUST UPDATE DAILY WHAT WAS GOING ON IN THEIR BUSINESS.  BUT I DO THINK THE PLAINTIFFS HAVE A GOOD ARGUMENT, AT LEAST AS IT RELATES TO SOME OF THE STATEMENTS, IS THAT, GIVEN THE CONTEXT IN WHICH THEY'RE BEING MADE, THAT THAT IS POTENTIALLY MORE PROBLEMATIC THAN WHAT WAS IN THE EXPRESS SCRIPTS CASE.  SO YOU'VE GOT A SPECIFIC QUESTION AND A SPECIFIC ANSWER, AND THAT MAY MAKE IT MORE MISLEADING THAN THIS OBLIGATION JUST TO CONFESS EVERYTHING THAT'S HAPPENING.  THE ANSWER TO THE QUESTION IN LIGHT OF WHAT WAS GOING ON INTERNALLY IS WHAT MAYBE CONCERNS ME.  BUT IN THAT WORLD OF STATEMENTS, I MEAN, I THINK

SOME ARE GOING TO BE POTENTIALLY PUFFERY, OPINIONS, FORWARD-LOOKING, BUT THERE'S GOING TO BE THE NEED TO KIND OF PARSE THROUGH ALL THAT AND FIGURE THAT OUT.  SO I'M NOT SAYING I'VE RULED ON ANY OF THIS.  I WANT TO HEAR FROM YOU, AND THIS IS JUST INITIAL THOUGHTS.  I HAVEN'T READ ALL THE CASE LAW, BUT I WANTED TO GIVE YOU SOME IDEAS OF WHERE I SAW SOME OF THE PITFALLS IN SOME OF YOUR ARGUMENTS.

SO, IN SUMMARY, IF I WERE TO RULE ON THIS ORALLY AT THIS MOMENT, I THINK THAT PLAINTIFFS WOULD HAVE SOME TROUBLE WITH SOME OF THE EARLIER STATEMENTS GIVEN THE SCIENTER, BUT SOME OF THE LATER STATEMENTS WOULD PROBABLY STAY.  BUT THAT'S A VERY KIND OF OVERBROAD, EARLY KIND OF THOUGHTS ON THIS.  SO WITH THAT KIND OF STARTING POINT, I'LL GO AHEAD AND HEAR FROM DEFENSE COUNSEL.

MR. LAX:  THANK YOU, YOUR HONOR.  KIND OF PICKING UP ON WHAT YOU JUST SAID, I THOUGHT WE MIGHT JUST JUMP RIGHT INTO THE FALSE MISLEADING STATEMENTS PIECE.  THOSE STATEMENTS, AS I'M SURE YOUR HONOR IS AWARE, ARE COLLECTED IN EXHIBIT F TO OUR MOTION TO DISMISS.  I BROUGHT --

THE COURT:  I HAVE THAT, YES --

MR. LAX:  -- GREAT.  I BROUGHT SOME EXTRA COPIES IN CASE ANYBODY ELSE NEEDS THEM.  AND KIND OF PICKING UP WHAT -- ON WHAT YOU JUST SAID, IT SOUNDS LIKE IT MIGHT BE MOST PRUDENT TO START WITH THE LATE CLASS PERIOD STATEMENTS.  THE PLAINTIFFS' MOTION TO DISMISS OPPOSITION CATEGORIZES STATEMENTS

INTO THREE BUCKETS.  THERE ARE THE STATEMENTS ABOUT THE DELAY IN SIGNING OR ENTERING INTO THE CARELON AGREEMENT FROM AROUND AUGUST OF 2022, STATEMENTS ABOUT THE SCOPE OF THE CARELON AGREEMENT ABOUT PAYMENTS AND REVENUES THERE, A LOT OF THAT CONTAINED IN THE S.E.C. FILINGS, AND THEN AGAIN THESE LATE CLASS PERIOD STATEMENTS WHICH KIND OF OPERATE AS A CATCH-ALL FOR ANY TIME THAT THE SHARECARE TEAM --

THE COURT:  AND SPEAK A LITTLE BIT MORE SLOWLY SO I CAN TAKE IT IN.

MR. LAX:  YES, MA'AM.  YES, YOUR HONOR.  -- OPERATE AS SORT OF A CATCH-ALL FOR WHENEVER THE SHARECARE TEAM, ITS EXECUTIVES WERE EXPRESSING OPTIMISM OR POSITIVITY ABOUT THE SHARECARE ANTHEM RELATIONSHIP AND PLAINTIFFS' ALLEGATIONS THAT DEFENDANTS SHOULD HAVE BEEN GLOOMIER IN PUBLIC COMMENTS ABOUT THE EVOLVING NATURE OF THE RELATIONSHIP.  AND, YOUR HONOR, I KNOW YOU REFERENCE THE EXPRESS SCRIPTS CASE ALREADY THIS MORNING WHICH IS CITED IN OUR BRIEF.  AND I THINK THAT THE FACTS OF THAT CASE DO HAVE SOMETHING TO SAY ABOUT THE CONCERNS THAT YOU'VE EXPRESSED THIS MORNING.

AS I'M SURE YOU'RE AWARE, BUT JUST A QUICK RUN-DOWN OF WHAT WAS HAPPENING IN THAT CASE, EXPRESS SCRIPTS HAD A CONTRACTUAL RELATIONSHIP WITH ANTHEM.  IT TOUTED ANTHEM AS ITS LARGEST CUSTOMER.  ANTHEM ACCOUNTED FOR ABOUT 16 PERCENT OF THE COMPANY'S REVENUES, AND THEY HAD WHAT ENDED UP BEING A 15-BILLION-DOLLAR PRICING DISPUTE THERE, WENT ON FOR A PERIOD

OF OVER A YEAR. THERE WERE MANY NOTICE -- MULTIPLE NOTICES OF BREACH OF CONTRACTS THAT WERE EXCHANGED, BREWING DISAGREEMENT BETWEEN THE PARTIES IN A SIGNIFICANT WAY. EVEN SO, WHILE ALL THAT WAS GOING ON, EXPRESS SCRIPTS IN THAT CASE CHOSE TO SPEAK ABOUT MANY THINGS, INCLUDING SPEAKING ABOUT ANTHEM. AND THE PLAINTIFFS ULTIMATELY IN THAT CASE SAID THAT BECAUSE EXPRESS SCRIPTS SPOKE ABOUT ANTHEM, IT HAD TO DO SO HONESTLY AND NOT MISLEADINGLY, AND THAT NOT DISCUSSING OR DISCLOSING SOME OF THE DETAILS OF THAT CONTRACTUAL DISAGREEMENT, AGAIN, FOR $15 BILLION, VIOLATED THE SECURITIES LAWS. THAT INCLUDED STATEMENTS SIMILAR TO THE ONES THAT WE HAVE IN THIS CASE. JUST SOME QUICK EXAMPLES, WE'VE GOT A GREAT RELATION -- THESE ARE FROM EXPRESS SCRIPTS. WE'VE GOT A GREAT RELATIONSHIP WITH ANTHEM. OUR TEAMS WORK CLOSELY EACH AND EVERY DAY. THE RELATIONSHIP IS VERY, VERY SOLID. IT'S BUSINESS AS USUAL. WE CONTINUE TO WORK WITH THEM VERY, VERY, CLOSELY JUST AS WE ALWAYS DO. ANTHEM IS AN INCREDIBLY IMPORTANT CLIENT TO US. WE REALLY ENJOY THAT RELATIONSHIP. I DO THINK IT'S A TWO-WAY STREET. THE CONTRACT THAT WAS AT ISSUE THERE, THEY ESTIMATED HAD 15 MORE YEARS OF USEFUL LIFE EVEN THOUGH THEY HAD RECEIVED MULTIPLE NOTICES OF BREACH OF CONTRACT FROM ANTHEM BY THAT POINT. AND THEY ALSO DISCUSSED IT AS HAVING A HIGH PROBABILITY OF RENEWAL.

SO WITH ALL OF THOSE EXAMPLES, THE PLAINTIFFS CONTEND THAT THE STATEMENTS TO INVESTORS WERE MATERIAL MISSTATES BECAUSE THE

COMPANY CHOSE TO DISCUSS ITS RELATIONSHIP WITH ANTHEM IN EARNINGS CALLS AND S.E.C. FILINGS, BUT FAILED TO DISCLOSE THE IN'S AND OUTS OF ITS FIGHT WITH ANTHEM OVER THE PRICING AND SERVICES INCLUDING THE POOR PROSPECTS FOR CONTRACT RENEWAL THAT ENDED UP COMING TO PASS.

THAT SAID, THE COURT STILL FOUND THAT THE CHALLENGED STATEMENTS WERE INACTIONABLE EXPRESSIONS OF OPTIMISM, CORPORATE PUFFERY OR OPINION.  FROM THE COURT, IN SHORT, THE CORE OF ALLEGATION -- THE CORE ALLEGATIONS OF PLAINTIFF'S ACTION IS THAT DEFENDANTS, RATHER THAN INFORMING INVESTORS OF THE TRUE NATURE OF EXPRESS SCRIPTS' RELATIONSHIP WITH ANTHEM, REPEATEDLY MISREPRESENTED WHAT PLAINTIFF USED AS EXPRESS SCRIPTS' CONTENTIOUS RELATIONSHIP WITH ANTHEM.

THE COURT:  SO I READ THE -- I GUESS TO KIND OF JUMP INTO IT A LITTLE BIT MORE, THERE'S, LIKE, THE EXPRESS SCRIPTS CASE THAT'S HERE, AND AT LEAST MY READING OF HAS IT A LITTLE BIT MORE ON THE SIDE OF -- IT SEEMS LIKE IN EXPRESS SCRIPTS THEY WERE RENEGOTIATING A CONTRACT.  BUT HERE THERE WERE -- THERE WAS A CONTRACT, AND IT WAS BEING POTENTIALLY BREACHED AND PEOPLE WERE STOPPED IN MAKING PAYMENTS, SO IT'S A LITTLE BIT DIFFERENT.  BUT THEN WE'VE GOT THE HIGH CRUSH PARTNERS CASE THAT'S KIND OF ON THE OTHER SIDE WHERE IT'S MATERIAL ADMISSIONS BECAUSE OF THIS KIND OF STRAINED RELATIONSHIP AND THAT THERE WAS A BREACH OF CONTRACT.  SO THAT'S KIND OF THE OTHER KIND OF BOOK END.  AND SO AT LEAST MY READING OF THIS, IS THIS CASE

KIND OF FALLS BETWEEN BOTH OF THOSE CASES IN TERMS OF THE SITUATION.  I DON'T KNOW IF IT'S AS STRONG AS THE MATERIAL -- THE BREACH, BUT I THINK IT'S MORE IN LINE WITH THAT.  SO TALK ABOUT THE HIGH CRUSH (PHONETIC) CASE AND HOW THAT RELATES TO THE EXPRESS SCRIPTS CASE BECAUSE I THINK WE'RE IN THE MIDDLE OF THE TWO.

MR. LAX:  SURE, YOUR HONOR.  AND IN MY RECOLLECTION I DON'T BELIEVE HIGH CRUSH WAS BRIEFED BY EITHER SIDE IN THIS CASE.  I DO KNOW IT'S REFERENCED IN THE EXPRESS SCRIPTS CASE.  SO I'LL SPEAK ABOUT IT FROM MY KNOWLEDGE OF THAT CASE.  BUT ALSO, YOUR HONOR, I WILL SAY THAT THOSE CASES, TWO THE TWO OF THEM, SHARE SOMETHING IN COMMON WITH THIS CASE IN THAT WE HAVE THE NOTICES OF BREACH FROM THE EXPRESS SCRIPTS CASE REPEATEDLY.  AND THOSE NOTICES OF BREACH ULTIMATELY RESULTED IN LITIGATION BETWEEN THE PARTIES.  AND EXPRESS SCRIPTS, THE DEFENDANTS, THOUGHT THAT THINGS HAD GONE WRONG ENOUGH WITH ANTHEM THAT THEY ENDED UP COUNTER-SUING AS WELL.  SO I DO THINK THAT THE NOTICES OF BREACH THERE -- I KNOW THE EXPRESS SCRIPTS COURT ITSELF DIFFERENTIATES THE CASE FROM HIGH CRUSH, BUT THERE ARE BREACHES OR NOTICES OF BREACHES OR SOMETHING TO THAT EFFECT IN BOTH CASES.  HERE IN OUR CASE I THINK IT HUES MUCH MORE CLOSELY TO THE EXPRESS SCRIPTS CASE AND THE FACT THAT, YES, WE'RE COMMUNICATING AND, YES, I THINK THERE ARE ALLEGATIONS --

THE COURT:  EXCUSE ME.

MR. LAX:  OH, YOU'RE OKAY.  THERE ARE ALLEGATIONS IN

THE COMPLAINTS ABOUT THE STOPPING PAYMENTS AND ABOUT ULTIMATELY A CESSATION OF SERVICES.  THOSE, IF ANYTHING, SEEM LESSER TO ME THAN ACTUAL FORMAL NOTICES OF BREACH BEING EXCHANGED BETWEEN THE PARTIES LIKE THEY WERE IN EXPRESS SCRIPTS THAT THEN AGAIN RESULTED IN LITIGATION ABOUT THOSE EXACT BREACHES.  SO THAT'S --

THE COURT:  KEEP GOING.

MR. LAX:  OKAY.  AND MAYBE WE CAN MOVE ON FROM EXPRESS SCRIPTS, TOO.  IT'S NOT THE ONLY CASE CITED IN OUR BRIEF OR, FRANKLY, IN PLAINTIFFS' BRIEF THAT SUPPORTS THIS POSITION.  WE ALSO HAVE THE MICHIGAN CARPENTERS CASE FROM THE SOUTHERN DISTRICT OF FLORIDA.  WE HAVE THE SYNCHRONY CASE CITED IN THE PLAINTIFF'S OPPOSITION AND OUR REPLY FROM THE SECOND CIRCUIT, I BELIEVE BOTH GOOD EXAMPLES AS WELL OF CONTENTIOUS, CONTRACTUAL NEGOTIATIONS, DISAGREEMENTS, EVEN BREACHES.  THE COURTS ULTIMATELY FIND THE STATEMENTS ABOUT THEM EVEN WHERE THE DEFENDANTS CHOSE TO SPEAK ABOUT THOSE CUSTOMER RELATIONSHIPS WERE NOT MATERIAL, FALSE OR MISLEADING STATEMENTS.  AND WE WOULD ARGUE THAT THE STATEMENTS HERE -- COMPLAINED OF HERE ARE THE EXACT SAME KIND OF PUFFERY OR OPINION STATEMENTS THAT YOU'RE SEEING IN THOSE CASES.

YOU DISCUSSED -- WELL, YOUR HONOR, WOULD IT BE HELPFUL TO DISCUSS THE EARLIER CATEGORIES OF MISSTATEMENTS, OR WOULD OUR TIME BE BETTER SPENT ELSEWHERE?

THE COURT:  I THINK THAT'S A LITTLE UP TO YOU.  I

MEAN, I THINK YOU MIGHT WANT TO ADDRESS THE -- I MEAN, I BROUGHT UP THE SCIENTER ISSUE WITH SOME OF THE EARLIER STATEMENTS.  I DON'T KNOW IF THAT'S AN APPROACH YOU AGREE WITH OR NOT, BUT I THINK THAT IS SOMETHING THAT I'M INTERESTED IN HEARING ABOUT.

MR. LAX:  IF THE -- IF THE QUESTION IS DO WE ALSO THINK THAT THE SCIENTER PLEADED WITH THE EARLIER STATEMENTS IS WEAK, WE WOULD AGREE WITH THAT.  WE THINK THAT EXTENDS THROUGHOUT ALL OF THE STATEMENTS IN THE WHOLE CLASS PERIOD.  AS YOUR HONOR IS AWARE, SECURITIES FRAUD PLAINTIFFS MUST PLEAD WITH PARTICULARITY THAT EACH ALLEGED MISSTATEMENT WAS MADE WITH SCIENTER, WHICH MEANS INTENT TO DEFRAUD OR SEVERE RECKLESSNESS. JUDGE JONES IN THE IN RE AARON'S CASE, WHICH IS CITED IN OUR REPLY, DISCUSSES THE STANDARD.  HE SAYS, THE COMPLAINT WILL SURVIVE THE MOTION TO DISMISS ONLY IF A REASONABLE PERSON WOULD DEEM THE INFERENCE OF SCIENTER COGENT AND AT LEAST AS COMPELLING AS ANY OPPOSING INFERENCE ONE COULD DRAW FROM THE FACTS ALLEGED.  AND HE NOTES THAT THE COURT DRAWS REASONABLE INFERENCES AVAILABLE ON THE FACE OF THE COMPLAINT IN THE PLAINTIFF'S FAVOR.  THIS IS A MOTION TO DISMISS.  BUT BECAUSE OF RULE 9(B) AND BECAUSE OF THE P.S.L.R.A., THE COURT ALSO, EVEN AT THIS PLEADING STAGE, LOOKS TO PLAUSIBLE, NON-CULPABLE EXPLANATIONS FOR THE DEFENDANTS' CONDUCT IN EVALUATING AN INFERENCE OF SCIENTER.

SO, AGAIN, UNLIKE A NORMAL 12(B)(6), THERE IS SOME

WEIGHING OR EVALUATION OF THE COMPETING INFERENCES BETWEEN PLAINTIFFS AND DEFENDANTS HERE.  THE PLAINTIFFS HERE ALLEGE FIVE FACTS THAT ARE PURPORTEDLY PROBATIVE OF SCIENTER, FALSE EXCULPATORY STATEMENTS, IMPORTANCE OF THE CARELON AGREEMENT, ARNOLD'S POSITION AS C.E.O., REPEATED FALSE STATEMENTS AND FAILURE TO FILE THE CARELON AGREEMENT.  THOSE ARE PRETTY INDICATIVE OF FIVE ALLEGATIONS OF SCIENTER THAT YOU'LL SEE IN MOST SECURITIES FRAUD CASES.

JUDGE JONES, AGAIN, IN THAT SAME IN RE AARON'S CASE, DEALT WITH A PRETTY SIMILAR LIST, KNOWLEDGE OF MATERIAL ADVERSE FACTS.  TOPIC OF THE MISSTATEMENTS WERE OF THE CORE OPERATIONS OF DEFENDANTS' BUSINESS.  DEFENDANTS MADE REPEATED, SPECIFIC FALSE REFERENCES.  EACH OF THE INDIVIDUAL DEFENDANTS WAS A SENIOR OFFICER OF THE COMPANY.  THEY ALSO HAD SOME ADDITIONAL ALLEGATIONS OF SCIENTER THAT DON'T REALLY APPLY TO OUR FACTS HERE.  AND, AGAIN, EVEN WITH THAT CONSOLATION, JUDGE JONES SKIPPED PAST WHETHER THE P.S.L.R.A. SAFE HARBOR PROVISION APPLIED.  HE SKIPPED PAST WHETHER THE STATEMENTS WERE ACTUALLY FALSE OR MISLEADING THEMSELVES.  HE SAID, LET'S ASSUME THAT THEY ARE AND LET'S ASSUME THAT THE SAFE HARBOR DOESN'T APPLY.  EVEN ASSUMING THOSE THINGS AND EVEN WITH THESE ALLEGATIONS OF SCIENTER, STATEMENT BY STATEMENT HE WENT AND FOUND THAT THOSE PLAINTIFFS HAD NOT PLEADED SCIENTER.  WE HAVE SIMILAR SET OF FACTS HERE, SIMILAR SET OF ALLEGATIONS THAT PURPORT, (VERBATIM) SUPPORT SCIENTER.  AS YOUR HONOR KNOWS, WE'VE MOVED TO DISMISS

BECAUSE WE DON'T THINK THE STATEMENTS ARE FALSE OR MISLEADING. WE DON'T THINK THAT THEY'VE ADEQUATELY PLEADED SCIENTER.  WE DON'T THINK THAT THEY'VE PLEADED LOSS CAUSATION.  ANY ONE OF THOSE THREE ARE ADEQUATE REASONS FOR THIS COURT TO GRANT THE MOTION TO DISMISS AND DISMISS THE COMPLAINT.  AND JUDGE JONES --

THE COURT:  -- THIS IDEA, AND I DON'T KNOW IF THIS IS EXACTLY WHAT THE PLAINTIFF IS ARGUING, BUT IF -- IT'S ALMOST LIKE THIS ASSUMPTION THAT YOU DO HAVE SCIENTER IF YOU DO HAVE FALSE AND LEADING MISSTATEMENTS THAT ARE BEING MADE BY THE C.E.O., AND SO THEY KIND OF ARE PART AND PARCEL THE SAME BECAUSE THE C.E.O. IS GOING TO HAVE KNOWLEDGE OF ALL THIS INFORMATION.  AND SO IT'S NOT NECESSARILY -- YES, YOU HAVE TO PARTICULARLY PLEAD SCIENTER, BUT THE FACT THAT THE STATEMENTS ARE FOUND TO BE MISLEADING AND NOT PUFFERY AND BLAH, BLAH, BLAH, THAT DOES JUST KIND OF FIT TOGETHER IN A WAY THAT THEY DON'T HAVE TO DO MUCH MORE FOR THAT.

MR. LAX:  WE WOULD DISAGREE.  AND THE JUDGE JONES CASE WE ARE JUST DESCRIBING, AGAIN, ASSUMED THE STATEMENTS WERE FALSE AND MISLEADING, AND THAT INCLUDED STATEMENTS MADE BY SENIOR OFFICERS OF THE COMPANY.  SO THAT'S AN EASY EXAMPLE FROM THIS DISTRICT WHERE THAT'S NOT THE CASE.

THE COURT:  AND EXPLAIN TO ME WHY THAT'S RIGHT.

MR. LAX:  BECAUSE IT COLLAPSES THE FALSITY INQUIRY WITH THE SCIENTER OR THE INTENT INQUIRY.  THE MAGUIRE CASE FROM

THE FOURTH CIRCUIT ALSO CITED IN OUR BRIEF COVERS THIS EXACT TOPIC AS WELL.  THAT KNOWLEDGE -- IN THE MAGUIRE CASE IT WAS KNOWLEDGE OR ALLEGED KNOWLEDGE THAT THE STATEMENTS WERE FALSE IS NOT THE EXACT SAME THING AS SCIENTER.  THERE IS THIS GAP BETWEEN THEM.  THERE IS THIS INTENT ELEMENT.  THE INTENT -- AS YOUR HONOR KNOWS FROM THE SCIENTER ANALYSIS, INTENT TO DEFRAUD OR SEVERE RECKLESSNESS, WHICH IS WELL-DEFINED IN THIS DISTRICT. AND IF FALSITY IS THE SAME AS SCIENTER, THEN THE P.S.L.R.A. PLEADING STANDARDS ARE KIND OF RENDERED --

THE COURT:  BUT IF THE STATEMENT IS BEING MADE BY THE C.E.O., IT'S NOT THE SAME AS DEFLATING THEM BECAUSE IF THE STATEMENT WAS MADE BY SOMEONE ELSE, THAT WOULDN'T DEFLATE THE STANDARD.

MR. LAX:  BUT, AGAIN, WE KNOW THAT'S NOT THE CASE FROM AT LEAST THE IN RE AARON'S CASE WHERE WE DID HAVE SENIOR EXECUTIVES THAT WERE ASSUMED TO BE MAKING FALSE OR MISLEADING STATEMENTS.

THE COURT:  YOU HAVE TO BE CAREFUL CITING ANOTHER DISTRICT COURT CASE HERE BECAUSE THAT -- I MAY NOT AGREE WITH THAT, SO KIND OF BACK UP A LITTLE BIT AND EXPLAIN THAT TO ME.

MR. LAX:  WELL, SURE.  IT'S JUST THE ADEQUATE PLEADING, AGAIN, AT THIS STAGE, THANKS TO RULE 9(B) IN THE P.S.L.R.A. OF INTENT.  AND IN A FALSE STATEMENT, SPOKEN OR ALLEGED, IS NOT SYNONYMOUS WITH INTENT TO DEFRAUD, INTENT TO MISLEAD OR SPEAKING WITH SEVERE RECKLESSNESS.  THEY ARE JUST

TREATED DIFFERENTLY AND CONSIDERED DIFFERENTLY IN THE SECURITIES LAWS AND IN THE CASES INTERPRETING THEM.

ON THIS POINT, TOO, ON THE REPEATED FALSE STATEMENTS, AND, AGAIN, WE ARGUE IN THE MOTION TO DISMISS, AND WE'VE TALKED A LITTLE BIT THIS MORNING, ABOUT HOW THESE STATEMENTS AREN'T FALSE OR MISLEADING, AND ALSO THE MERE EXISTENCE OF MULTIPLE STATEMENTS DOESN'T ESTABLISH SCIENTER ON ITS OWN, TOO. OTHERWISE, SCIENTER WOULD BE FOUND IN EVERY CASE WHERE MORE THAN ONE STATEMENT IS ALLEGED.  AND, YOUR HONOR, TO THE POINT OF ARNOLD'S POSITION AS C.E.O., THAT ALSO IN AND OF ITSELF IS NOT ENOUGH.  THE C.E.O.'S NAME IS ALWAYS GOING TO BE ON S.E.C. FILINGS.  THAT PERSON IS ALWAYS GOING TO BE SPEAKING ABOUT THE COMPANY.  THAT PERSON IS ALWAYS GOING TO BE NAMED AS A DEFENDANT IN THESE KINDS OF CASES.  AND COURTS DON'T CONSIDER THAT ENOUGH TO INFER SCIENTER EVEN IN AND OF ITSELF.  AGAIN, PLAINTIFFS' ALLEGATION IN ARNOLD MUST HAVE HAD KNOWLEDGE OF SOMETHING DOESN'T PLEAD WITH PARTICULARITY THE INTENT TO DEFRAUD OR SEVERE RECKLESSNESS THAT WOULD MEAN HE MADE ACTIONABLE MISSTATEMENTS UNDER 10(B).  OH, YES, FROM THE MAGUIRE CASE, TOO, YOUR HONOR, SAYING THAT KNOWLEDGE -- SAYING THAT A MISSTATEMENT WAS FALSE BECAUSE THE SPEAKER HAD KNOWLEDGE SATISFYING SCIENTER WOULD READ THE ACTUAL SCIENTER REQUIREMENT OUT OF THE P.S.L.R.A. PLEADING STANDARDS.

I WANT TO TALK A LITTLE BIT ABOUT LOSS CAUSATION AS WELL, YOUR HONOR, WHICH, AGAIN, WOULD BE ADEQUATE GROUNDS IN AND OF

ITSELF FOR THE CASE TO BE DISMISSED.  THERE ARE TWO ALLEGED CORRECTIVE DISCLOSURES IN THE CASE.  ONE COMES FROM MARCH OF 2023, AND ONE COMES FROM MARCH OF 2024.  SECURITIES FRAUD PLAINTIFFS NEED TO PLEAD LOSS CAUSATION WHICH IN PLAIN TERMS IS THE CAUSAL CONNECTION BETWEEN THE ALLEGED MISSTATEMENTS AND THE ALLEGED ECONOMIC HARM.  AND LIKE I MENTIONED, A CORRECTIVE DISCLOSURE IS SOMETHING THAT PLAINTIFFS WILL PLEAD TO SATISFY LOSS CAUSATION, WHICH MEANS THAT THE TRUTH ABOUT SOME ALLEGED MISSTATEMENT IS REVEALED AND BECOMES RESPONSIBLE FOR A SUBSTANTIAL AMOUNT OF THE DROP IN THE STOCK PRICE.  AND IN ORDER TO QUALIFY AS CORRECTIVE, THE DISCLOSURE MUST CONTAIN THE SAME SUBJECT MATTER AS THE PRIOR MISSTATEMENT.  ONLY THEN CAN THE DISCLOSURE BE SAID TO HAVE A CORRECTIVE EFFECT RATHER THAN JUST A NEGATIVE ONE.

FOR THE MARCH 2023 EARNINGS CALL, THE SIMPLEST ANSWER THERE IS THAT PLAINTIFFS WERE NOT YET SHAREHOLDERS.  THERE -- THEY HAD NO LOSS THAT COULD BE CAUSED.  THERE ARE CASES CITED IN OUR BRIEF, MACPHEE, AND IN THEIR BRIEF, CATALINA AND THORPE, THAT KIND OF PLAY WITH THIS ISSUE SOME.  MACPHEE HAD PLAINTIFFS THAT SOLD BEFORE A CORRECTIVE DISCLOSURE.  PLAINTIFFS DID NOT SUFFER ANY LOSS, AND THE COURT SAID NO LOSS CAUSATION ESTABLISHED.  THIS CASE IS SO MUCH SIMPLER.  PLAINTIFFS DID NOT OWN STOCK THAT COULD HAVE BEEN IMPACTED BY THE REVEALING OF THE PURPORTED TRUTH IN MARCH OF 2023, AND, THEREFORE, THEY COULD NOT HAVE SUFFERED LOSS FROM STOCK THAT THEY DID NOT OWN.  AND

PLAINTIFFS TELLING A CORRECTIVE DISCLOSURE MEANS THE TRUTH COMES OUT, THE PRICE ADJUST TO FACTOR IN THE FRAUD.  AND SO, IF ANYTHING, PLAINTIFFS BUYING AFTER THAT POINT ARE BUYING THE QUOTE, UNQUOTE, CORRECT PRICE.  SO THEY HAVEN'T SUFFERED A LOSS THERE.  FROM THE MARCH 2024 DISCLOSURE, WHICH WAS THE COMPANY'S 10K AND ATTENTIVE EARNINGS CALL, PLAINTIFFS ALLEGE THAT THE PRICE DROPPED ON APRIL 1ST, WHICH WAS THE FIRST TRADING DAY AFTER THE PURPORTED CORRECTIVE DISCLOSURE.  THE PRICE REBOUNDED ABOVE IT IS -- ITS CLOSING PRICE FROM APRIL 1ST SEVEN DAYS LATER ON APRIL 8TH.  THAT PART OF OUR ARGUMENT IS NOT ADDRESSED IN THE PLAINTIFFS' BRIEF AT ALL.  THEY FOCUS ON A JUNE 21ST PRICE REBOUND, WHICH IS ALSO CITED IN OUR BRIEF. EXHIBIT M TO OUR MOTION TO DISMISS CONTAINS A STOCK PRICE DEMONSTRATIVE.  PLAINTIFFS DIDN'T OBJECT TO IT BEING INCLUDED. COURTS TAKE JUDICIAL NOTICE OF THESE KINDS OF STOCK PRICE DEMONSTRATIVES IN SECURITIES FRAUD CASES ALL THE TIME.  AND THEN SHOWS, AGAIN, THAT BUMP BACK UP ABOVE THE CLOSING PRICE ON APRIL 8TH.  BUT, YOUR HONOR, IF YOU LOOK, THERE'S 63 TRADING DAYS REPRESENTED IN EXHIBIT M.  35 OF THEM, THE STOCK PRICE CLOSED AT OR ABOVE THE APRIL 1ST DROP FROM THE CORRECTIVE DISCLOSURE --

THE COURT:  ISN'T YOUR ARGUMENT, THOUGH, CONTRARY TO THE ACTICON CASE?

MR. LAX:  NO, YOUR HONOR, IT'S NOT CONTRARY TO ACTICON OR TO THE JUDGE THORPE CASE -- JUDGE THRASH CASE AFTER

IMMUCOR CITING IT ABRAMS.  THOSE ARE INSTANCES WHERE A HANDFUL OF DAYS, MONTHS LATER THE STOCK PRICE REBOUNDED.  AND JUDGE THRASH ACKNOWLEDGED IN ABRAMS THAT HE HAD LOOKED AT IMMUCOR AND THAT HE HAD HELD IMMUCOR AS HE DID WHERE HE DECIDED THAT THE STOCK PRICE REBOUND MEANT THAT LOSS CAUSATION WAS NOT ESTABLISHED.  NOTABLY HE DOES NOT OVERTURN IMMUCOR WHEN HE THE ABRAMS DECISION.  HE REFERENCED --

THE COURT:  WELL, IMMUCOR IS NOT BINDING, SO IT'S NOT -- WHEN YOU'RE DEALING WITH OTHER DISTRICT COURT CASES, IT'S NOT A -- HE DOESN'T HAVE THE RIGHT TO OVERTURN THINGS, SO...

MR. LAX:  SURE.  FAIR POINT, YOUR HONOR.  I WOULD NOT BE SURPRISED IF IN CITING AN EARLIER OPINION FROM HIMSELF IF HE WOULD ACKNOWLEDGE THAT HE GOT IT WRONG IF IT WAS BAD LAW OR IF ABRAMS -- I MEAN, ACTICON, A SECOND CIRCUIT CASE THAT HE WAS REFERENCING IN A CASE A COUPLE OF YEARS LATER, MEANT THAT THE LAW HAD CHANGED HERE.  AGAIN, THOSE CASES, ABRAMS, ACTICON, YOU HAVE A COUPLE OF DAYS, TWO TO THREE MONTHS LATER WHERE THE STOCK PRICE IS AT OR ABOVE.  AND THE COURT SAYS, I DON'T KNOW, LET'S DEAL WITH THIS LATER.  HERE WE HAVE 35 OUT OF 63 OF THE FOLLOWING DAYS, MORE THAN HALF THE TIME THE STOCK PRICE IS CLOSING AT OR ABOVE.  WHERE IS THE LOSS?  THE STOCK PRICE --

THE COURT:  BUT HOW DO WE KNOW -- I THINK AT THIS STAGE THAT IT WOULDN'T HAVE BEEN HIGHER ABSENT THE PROBLEMS WITH THE INFORMATION BEING DISCLOSED.  SO, YES, IT REBOUNDS,

BUT IT REBOUNDS -- IT SOUNDS TO ME LIKE A VERY FACTUAL ISSUE AS TO WHY IT'S DOING THAT WHEN WE HAVE A PLEADING FROM THE PLAINTIFF THAT POINTS TO THIS AND ALLEGES THIS AND SHOWS THIS. BUT I GUESS MY QUESTION IS WHY DON'T WE HAVE TO GET INTO THE WEEDS AS TO WHAT ELSE WAS HAPPENING AND WHY DO YOU GET THE BENEFIT OF THE DOUBT HERE?  BECAUSE WE DON'T KNOW THAT THE STOCK PRICE WOULDN'T HAVE REBOUNDED MORE ABSENT THE ALLEGED KIND OF FRAUD HERE.

MR. LAX:  ON THE QUESTION OF REBOUNDED MORE OR WOULDN'T THE STOCK HAVE BEEN HIGHER, THE SECURITIES LAWS FOCUS SPECIFICALLY ON WHAT DID THE PLAINTIFFS LOSE, NOT WHAT MIGHT THE PLAINTIFFS HAVE GAINED.  AND SO THE HYPOTHETICAL IS INTERESTING AND I'M SURE COMES UP IN DISCOVERY OR EXPERT REPORTS OF THIS CASE, BUT THAT'S NOT THE EXACT INQUIRY FOR THE --

THE COURT:  WELL, I GUESS YOU COULD SAY IT THE OTHER WAY.  SO SAY IT THE FLIP WAY THEN, THAT THIS ISN'T INDICATIVE IN SOME WAY OF WHAT THEY LOSS.  THE FACT THAT THE MARKET WENT UP LATER, WE DON'T REALLY KNOW WHY.  SO WE DON'T KNOW -- YOU'RE SAYING THAT THEY DIDN'T LOSE ANYTHING BECAUSE THE MARKET WENT UP.  THEY SAY THAT THEY DID LOSE SOMETHING AND, YES, THE MARKET DID GO UP, BUT THAT DOESN'T CHANGE THE FACT THAT THEY LOSS SOMETHING.

MR. LAX:  UNDERSTOOD, YOUR HONOR.  THE ONLY OTHER THING I WOULD FLAG ON THIS, TOO, AND I THINK I MENTIONED THIS

AT THE START, BUT JUST IN CASE I DIDN'T, PLAINTIFFS' OPPOSITION DOES NOT MENTION THIS AT ALL.  PLAINTIFFS' OPPOSITION JUST SAYS, HEY, IN (VERBATIM) JUNE 21ST OF THAT THIS YEAR, YOU ANNOUNCED AN ACQUISITION, SO THE STOCK PRICE WENT UP.  SO THEY IGNORE THE ENTIRE PERIOD THAT WE ARE TALKING ABOUT HERE.  AND SO THEY HAVEN'T PROFFERED ANY EXPLANATION OR ARGUMENT FOR THAT PERIOD EITHER.  I MIGHT --

THE COURT:  YOU'VE GOT TEN MINUTES.

MR. LAX:  I MIGHT SIT THERE --

THE COURT:  OKAY.

MR. LAX:  -- AND RESERVE FOR REBUTTAL.

THE COURT:  THAT'S FINE.

OKAY.  MR. HORNE.

MR. HORNE:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING.

MR. HORNE:  I'D LIKE TO GO BRIEFLY THROUGH OUR RESPONSE TO DEFENDANTS' ARGUMENTS.  WE THINK THAT THE BIGGEST DIFFERENCE BETWEEN EXPRESS SCRIPTS AND THIS CASE IS THE STATEMENTS THEMSELVES.  AND, YOU KNOW, I'D LIKE TO GO THROUGH THEM BRIEFLY.  I KNOW THERE ARE A LOT OF THEM, BUT, YOU KNOW, MAYBE THAT WILL BE HELPFUL TO THE COURT.  SO IF YOU LOOK AT THE NOVEMBER 2023 STATEMENT, I'LL READ THE STATEMENT IN FULL.  I THINK IT'S STAY THE COURSE --

THE COURT:  AND, MR. HORNE, MOVE THAT MICROPHONE JUST A LITTLE CLOSER TO YOU.

MR. HORNE:  OH, GOD.  I'M SO SORRY.

THE COURT:  NO.  YOU'RE FINE.  THE ACOUSTICS HERE ARE VERY, VERY POOR EVEN THOUGH YOU'RE CLOSE TO ME.  SO GO AHEAD.

MR. HORNE:  I THINK IT'S STAY THE COURSE.  EVERYTHING IS KIND OF TRACKING ON EXPECTATIONS.  IT'S KIND OF THE SAME STORY AS THE LAST QUESTION I ANSWERED, IS THAT WE'VE GOT CURRENT CLIENTS WITH CARELON THAT WE'RE EXECUTING AGAINST.  WE HAVE LOTS OF OPPORTUNITIES WITHIN CARELON THAT WE'RE PURSUING AND THINGS ARE STAYING THE COURSE.  I WOULD SAY IT'S BUSINESS AS USUAL.  BY THIS POINT THE RELATIONSHIP IS OVER.  THEY'VE CUT OFF CARELON.  THEY'RE NOT PROVIDING ANY SERVICES.  THEY DON'T HAVE ANY CURRENT CLIENTS WITH CARELON.  THEY DON'T HAVE ONGOING POSES (VERBATIM).  THEY HAVE NOTHING.  THE RELATIONSHIP IS OVER.  THOSE STATEMENTS ARE FALSE IN A WAY THAT GENERALLY PRAISING AN AGREEMENT ISN'T.  SAYING THAT AN AGREEMENT IS GREAT WHEN IT'S ONGOING AND IT'S BEING ACTIVELY NEGOTIATED AS AN EXPRESS SCRIPTS IS VERY DIFFERENT THAN MAKING SPECIFIC, FACTUAL FALSE STATEMENTS.  I CAN USE THAT AS AN EXAMPLE --

THE COURT:  I THINK IT'S VERY CLEAR TO YOUR ARGUMENT AS IT RELATES TO THESE, FOR EXAMPLE, NOVEMBER 2023 STATEMENTS. I DO THINK KIND OF, AS WHAT I LED WITH, IS THAT WHEN YOU'RE STARTING -- WHEN WE'RE TALKING ABOUT SOME OF THESE EARLIER STATEMENTS, I UNDERSTAND YOU HAVE A SEPARATE ARGUMENT ABOUT THE AGREEMENT NOT ACTUALLY ADDING ANY VALUE BECAUSE OF THE CHARGE-BACKS.  BUT IN TERMS OF THESE SAME KIND OF ISSUES ABOUT

THE RELATIONSHIP AND SUCH, IT'S NOT AS COMPELLING TO ME UNTIL WE GET TO THIS LATER PERIOD OF TIME, IF YOU WANTED TO ADDRESS THAT.

MR. HORNE: OKAY. ABSOLUTELY. I'LL MOVE ON THEN, YOUR HONOR. SO FOR THE EARLIER STATEMENT, I KNOW THE COURT MENTIONED SPECIFICALLY SCIENTER. WOULD THE COURT PREFER IF I WENT DIRECTLY TO SCIENTER?

THE COURT: IT DOESN'T MATTER. IT'S JUST THAT THEY'RE A LITTLE BIT RELATED. I MEAN, THEY'RE NOT EXACTLY THE SAME, BUT THEY ARE RELATED. AND I CAN -- IT GOES TO THE SAME FACT, I GUESS, IS SOME OF THEM SEEM TO BE MORE FALSE OR MISLEADING OR LESS FALSE AND MISLEADING OR MORE PUFFERY KIND OF GIVEN THE BACKGROUND OF WHAT'S GOING ON AT THE TIME. I THINK THE BEHIND-THE-SCENES IS IMPORTANT, AS YOU'VE STATED, TO KIND OF VIEW THE COMMENTS IN LINE WITH WHAT WAS HAPPENING INTERNALLY. AND SOME OF IT DOES SEEM TO BE PUFFERY OR KIND OF FORWARD-LOOKING AND SUCH, ESPECIALLY IN THE TIME PERIOD WHERE NO ONE KNEW THIS WAS ALL GOING TO FALL APART. AND SO I'M LOOKING AT POTENTIALLY DRAWING A LINE AT A CERTAIN POINT. SO THAT MIGHT BE SOMETHING THAT YOU WOULD WANT TO ADDRESS.

MR. HORNE: AND SO FOR THE STATEMENTS -- IF I'M UNDERSTANDING THE COURT CORRECTLY, FOR THE STATEMENTS ABOUT THE SIZE AND SCOPE OF THE CARELON AGREEMENT, THE WAY WE THINK ABOUT IT, THERE'S TWO DISTINCTIONS --

THE COURT: WELL, I GUESS LET ME ASK IT DIFFERENTLY.

ARE ALL OF THESE EARLY STATEMENTS, YOU'RE JUST KIND OF GOING WITH THE SIZE AND THE SCOPE IDEA UNTIL WE GET TO THE APRIL AND JUNE PERIOD OF TIME?  BECAUSE THAT'S NOT HOW I READ IT, THAT THAT WAS THE KIND OF THE WAY THAT YOU WERE KIND OF BUCKETING THIS, OR ARE YOU ALSO SAYING THAT THESE EARLIER STATEMENTS, KIND OF GIVEN THE FACT THAT THIS NEVER DOES ACTUALLY WORK OUT, ARE ALSO FALSE AND MISLEADING?

MR. HORNE:  THAT'S CORRECT.  THERE'S TWO SEPARATE REMAINING BUCKETS OF STATEMENTS.  AND IT SOUNDS LIKE THE COURT MAY HAVE AN ISSUE WITH BOTH OF THEM, SO IF I COULD ADDRESS THEM SUCCESSIVELY.

THE COURT:  YES.

MR. HORNE:  THE STATEMENTS ABOUT THE CARELON AGREEMENT ARE FALSE -- THEY'RE STATEMENTS THAT ARE MADE IN S.E.C. FILINGS.  AND THOSE STATEMENTS ARE FALSE BECAUSE WHILE THEY REPORT TRANSACTIONS WITH ANTHEM, CARELON IS NOT MENTIONED. THE STATEMENTS LIST A BUNCH OF TRANSACTIONS.  THEY DON'T MATCH THE TWO.  AND THE PROBLEM IS WHATEVER MONEY IS COMING IN, IS GOING RIGHT BACK OUT.  AND SO THAT'S THE KEY FACT.  THIS ARRANGEMENT IS NOT EARNING THEM ANY MONEY.  IT'S EARNING THEM REVENUES THAT THEY IMMEDIATELY HAVE TO PAY BACK FOR CUSTOMER SERVICE.  IN OTHER WORDS, THEIR SHARECARE PLUS, SHARECARE PROVIDE SHARECARE.  CARELON PROVIDES PLUS.  AND THE ONLY THING CUSTOMERS CARE ABOUT IS PLUS.  THEY'RE NOT ADDING ANY VALUE. THEY'RE NOT GETTING PAID.  AND SO THIS RELATIONSHIP WHICH THEY

DESCRIBE, THE STATEMENTS THAT THEY MAKE IN S.E.C. FILINGS, THEY REFER TO THOSE OTHER PAYMENTS AS SEPARATE AGREEMENTS AND DISTINCT PAYMENTS, BUT THEY'RE THE SAME THING.  THEY'RE JUST MONEY RECIRCULATING.  I KNOW THE COURT HAD SOME QUESTIONS ABOUT ROUND-TRIP TRANSACTIONS.  THE USUAL CONTEXT IN WHICH ROUND-TRIP TRANSACTIONS SHOW UP IS A COMPANY CAN'T CONSIDER ROUND-TRIP REVENUES.

THE COURT:  I GUESS A BETTER QUESTION IS YOU'RE NOT SAYING THAT THESE ARE ROUND-TRIP.  YOU'RE SAYING THAT THEY'RE FALSE AND MISLEADING BECAUSE THEY'RE KIND OF BRAGGING ABOUT TRANSACTIONS THAT AREN'T PRODUCING ANY MONEY, BUT YOU'RE NOT GOING ON THE ROUND-TRIP IDEA, OR ARE YOU?

MR. HORNE:  THE ROUND-TRIP IS NOT OUR PRIMARY POINT.

THE COURT:  OKAY.

MR. HORNE:  THE PRIMARY POINT IS --

THE COURT:  -- THAT THEY'RE FALSE AND MISLEADING IN THE CONTEXT OF THE UNDERLYING CONTRACT.

MR. HORNE:  YEAH.  AND JUST IF I COULD EXPLAIN, THE REASON WHY ROUND-TRIP IS IMPORTANT IN THOSE CASES IS BECAUSE THERE'S NO OTHER DISCLOSURE ABOUT THE STATEMENTS THAT COULD MAKE -- THE ARRANGEMENTS, I'M SORRY, THAT COULD MAKE THEM FALSE.  IN THOSE CASES IT'S JUST THEY RECOGNIZE REVENUE.  AND THEY CAN'T RECOGNIZE REVENUE IF IT'S ROUND-TRIP.  HERE THEY ACTUALLY DESCRIBE THE TRANSACTIONS.  AND SO THE STATEMENTS DESCRIBING THE TRANSACTIONS CAN BE FALSE AND CAN GROUND A CASE.

AND SO IT'S --

THE COURT:  BUT IT'S NOT PURE ROUND-TRIPPING HERE, WAS MY READING OF THINGS.  BECAUSE THERE WAS PAYMENT BEING MADE.  IT JUST WASN'T AS LARGE AS THE WAY IT WAS BEING DESCRIBED.

MR. HORNE:  WE'LL CONCEDE THAT, YOUR HONOR.

THE COURT:  WELL, I'M ASKING YOU.  THAT'S WHAT I READ.  I DON'T KNOW IF THAT'S TRUE OR NOT.

MR. HORNE:  YEAH, THAT'S CORRECT.

THE COURT:  OKAY.

MR. HORNE:  IT'S NOT -- THIS ISN'T A PURELY ROUND-TRIPPING CASE BECAUSE IT DOESN'T HAVE TO BE.  AND IN ADDITION TO THE MISDESCRIPTION IN THE S.E.C. FILINGS, THERE ARE ALSO SOME FALSE STATEMENTS THAT WERE MADE ABOUT THE ARRANGEMENT ITSELF.  IN THE MARCH 29, 2023 CALL, A DEFENDANT FERRERO DESCRIBED GENERALLY HAVING TO MAKE PAYMENTS ACCORDING TO THE AGREEMENT, BUT HE DESCRIBES IT AS MAKING PAYMENTS TO OUTSOURCE PARTNERS.  AND CARELON IS NOT AN OUTSOURCED PARTNERS.  FOR INSTANCE, TO START WITH, IT'S SINGULAR.  IT'S ONE ENTITY.  NOR IS IT OUTSOURCED.  IT'S A PARTY TO THE AGREEMENT.

THE COURT:  BUT WHY DOES THAT MATTER?  BECAUSE THE IMPORTANT PART IS THAT PAYMENTS ARE BEING MADE TO OUTSIDE PARTIES.  WHY WOULD ANYONE THAT WAS AN INVESTOR CARE WHO WAS GETTING THE PAYMENT?

MR. HORNE:  BECAUSE IT MAKES IT SOUND LIKE THEY ARE

HIRING CALL CENTERS, YOUR HONOR.  THEY'RE HIRING CALL CENTERS TO SERVICE THE CONTRACT.  CALL CENTERS ARE GOING TO COST SOMETHING, BUT THEY'RE NOT GOING TO COST THE ENTIRETY OF THE REVENUES, AND THAT'S THE PROBLEM THAT THEY HAVE.  YOU KNOW, YOU MAY NEED TO SERVICE THE CONTRACT.  YOU MAY NEED TO HAVE TO PAY MONEY, BUT IN THIS CASE YOU HAVE TO PAY ALL THE MONEY.  YOU'LL NEVER MAKE ANY MONEY BECAUSE ALL OF IT IS GOING RIGHT BACK OUT AGAIN.  AND SO LOOKING INTO THE FUTURE, THIS CONTRACT IS NEVER GOING TO BE GOOD FOR SHARECARE, AND THAT'S THE DIFFERENCE.  YOU KNOW, YOU HIRE CALL CENTERS FOR A LITTLE BIT.  YOU PAY THEM SOME MONEY.  YOU KNOW, IT DOESN'T TO BE ALL OF IT.  AND THERE'S NO LINKAGE TO THE TWO.  I MEAN, IF YOU LOOK AT THE EXPENSES AND THE REVENUE IN 2022, THEY'RE EXACTLY THE SAME, $18.0 MILLION. EVERY SINGLE DOLLAR THAT'S COMING IN IS GOING RIGHT BACK OUT. THAT'S NOT WHAT YOU WOULD THINK OF WHEN YOU HEAR, WE HAVE OUTSOURCED PARTNERS.  YOU WOULD JUST THINK YOU'RE SAYING SOMETHING TO A CALL CENTER, AND THAT'S WHY IT MATTERS, YOUR HONOR.

THE COURT:  NOW, BACK TO THE SCIENTER PIECE, LET'S TALK ABOUT IT FOR THIS CONTRACT VALUE PIECE BECAUSE WE HAVEN'T REALLY TALKED ABOUT THAT YET.  WHEN I WAS TALKING TO MR. LAX ABOUT THIS, THIS IDEA -- AND I MAY HAVE IT WRONG.  THE WAY I READ YOUR BRIEFING IN YOUR COMPLAINT IS BASIC, LIKE, THE C.E.O. AND THE C.F.O. KIND OF KNEW OF THE ARRANGEMENTS OF THIS CONTRACT, AND THAT IT WASN'T GOING TO PROVIDE VALUE TO

SHAREPOINT. AND SO THE STATEMENTS THAT THEY WERE MAKING THAT WERE FALSE AND MISLEADING AND OMITTING THINGS, THAT THAT IS WHAT SHOWED SCIENTER. I DIDN'T SEE MUCH OF THAT PLUS HERE. AND I GUESS TWO QUESTIONS. ONE, IS DO YOU NEED THAT AND WHY NOT? AND, TWO, IF YOU NEED IT OR JUST IN CASE I GO THE OTHER WAY, WHAT PLUS DO YOU HAVE TO ADD TO THAT?

MR. HORNE: SO LET ME ADDRESS THE COURT'S QUESTIONS SUCCESSIVELY. WE DON'T THINK WE NEED ANYTHING MORE. AND PART OF IT IS THE SPECIFICITY OF THE STATEMENT. THE MARCH 29, 2023 STATEMENT IS MADE BY DEFENDANT FERRERO. AND IN IT HE SAYS THREE THINGS. HE MENTIONS THE GROSS MARGIN. HE MENTIONS THE PEOPLE THEY HIRED. AND THEN HE MENTIONS THE COST THAT ARE SPENT. AND IF YOU KNOW THE GROSS MARGIN, THE PEOPLE THEY HIRED AND THE COST, YOU KNOW THAT THEY'RE PAYING ALL THEIR MONEY OUT TO SHARECARE BECAUSE THAT'S WHO THEY HIRED OR THAT'S WHO IS PROVIDING THE SERVICES. THAT'S WHAT THE GROSS MARGIN IS, ZERO. AND THAT'S WHAT THE MONEY THAT'S GOING OUT. SO HE'S MENTIONING ALL OF THE FACTS THAT HE NEEDS TO KNOW IN ORDER TO KNOW THAT THIS IS JUST A REALLY BAD -- THIS IS AN AGREEMENT THAT'S NEVER GOING TO GENERATE PROFITS. AND BY MAKING A STATEMENT THAT'S REFERENCING EVERYTHING HE NEEDS TO KNOW, HE'S SHOWING THAT HE KNOWS IT AND HE'S SHOWING THAT HE KNOWS THE FACTS MAKING HIS STATEMENT FALSE.

FOR THE S.E.C. FILINGS -- AND FORGIVE ME. THE REFERENCE TO OUTSOURCED PARTNERS ITSELF, IT'S VERY ARTFUL LANGUAGE. IT'S

EVASIVE AND IT'S PROBATIVE OF SCIENTER, I THINK VERY SIMILAR TO IN THE TELEPERFORMANCE CASE THAT THE DEFENDANTS CITED.  FOR THE S.E.C. FILINGS, THOSE STATEMENTS ARE REPEATED QUARTER AFTER QUARTER.  AND THERE IS A REFERENCE TO SEPARATE AGREEMENTS AND DISTINCT PAYMENTS.  THAT'S LANGUAGE THAT'S DESIGNED TO OBFUSCATE THAT THEY'RE NOT SEPARATE AGREEMENTS AND THEY'RE NOT DISTINCT PAYMENTS.  IT'S THE SAME AGREEMENT.  IT'S JUST CARELON IS PROVIDING THE PLUS.  SHARECARE'S PROVIDING THE SHARECARE. AND THE ONLY THING PEOPLE ARE PAYING FOR IS THE PLUS.

THE COURT:  NOW, WHAT ABOUT DEFENDANTS' ARGUMENT IS THAT THAT IS JUST CONFLATING THE TWO AND THAT IS NOT PUTTING ANY TEETH INTO THE SCIENTER REQUIREMENT WHEN THE WHOLE REASON IT'S MISLEADING IS WHAT YOU'RE ARGUING IS WHAT GIVES IT SCIENTER?

MR. HORNE:  JUST TO -- I WAS SURPRISED WHEN I SAW THE DEFENDANTS' ARGUMENTS THAT MAKING A DELIBERATELY FALSE OR A KNOWINGLY FALSE STATEMENT, WHICH, YOU KNOW, MY PRIMARY SCHOOLTEACHER WOULD HAVE TAUGHT ME IS LYING MAKE -- IS NOT SCIENTER.  AND, YOU KNOW, THE REASON YOU HAVE ALL THOSE CASES SAYING SEPARATE, IS BECAUSE YOU CAN MAKE A STATEMENT THAT'S FALSE WITHOUT KNOWING IT'S FALSE.  A.F.C. ENTERPRISES, WHICH IS ONE OF THE TWO CASES THAT THEY CITE, ACTUALLY SAYS KNOWLEDGE IS THE TOUCH STONE OF SCIENTER.  IT'S CITED FOR THE OPPOSITE PROPOSITION.  AND, YOU KNOW, IN MAGUIRE, THE ISSUE WAS THE STATEMENT WAS INADVERTENT AND WAS VERY CLEARLY JUST A POORLY

CHOSEN WORD.  THE FACTS OF MAGUIRE WERE --

THE COURT:  SO IT'S MORE JUST THE SPECIFICITY OF THE STATEMENTS THEMSELVES AND THE -- KIND OF THE DETAILED -- YOU DON'T COME WITH THAT DETAIL AND SPECIFICITY UNLESS YOU KNOW WHAT'S BASICALLY GOING ON.  I GUESS THE HARDER THING IS IF HE WAS FED THAT BY SOMEONE.  BUT AT THE SAME TIME, THE IDEA IS THAT THE C.E.O. IS THE ONE THAT HAS TO HAVE THE CORRECT INFORMATION TO MAKE THOSE STATEMENTS.

MR. HORNE:  YEAH, AND IT'S PRETTY INCREDIBLE TO THINK THAT HE WOULDN'T KNOW THIS BASIC FACT ABOUT SOMETHING THAT HE HIMSELF CALLED THE LARGEST CONTRACT EVER.  I MEAN, THAT'S PRETTY IMPORTANT, THAT THAT'S -- YOU KNOW, WHEN YOU USE LANGUAGE LIKE THAT, YOU'RE TELLING EVERYONE, PAY ATTENTION TO THIS CONTRACT, YOU KNOW, YOU SHOULD VALUE US BASED ON THIS CONTRACT.  AND NOT KNOWING THE BASIC FACTS ABOUT THE CONTRACT WHEN YOU SAY THAT, THAT IS AT THE VERY LEAST ITS RECKLESSNESS, YOUR HONOR.

THE COURT:  OKAY.  WHAT ABOUT THE SCIENTER FOR THE OTHER BUCKET, THE BUCKET ABOUT THE FAILING, CONTRACTUAL RELATIONSHIP IN THE EARLY TIMES?

MR. HORNE:  OKAY.  I DO HAVE SOME CORRECTIONS TO MAKE.

THE COURT:  OKAY.

MR. HORNE:  AND, YOU KNOW, DEFENDANTS PRESENTED -- AND WE'RE NOT SUGGESTING ANY MISCONDUCT OR ANYTHING LIKE THAT.

THEIR TRANSCRIPT -- WELL, I MEAN, LET ME RUN THROUGH IT.  SO THE FIRST QUESTION FROM AN ANALYST IS, YOU KNOW, DOES THE CARELON DELAY REPRESENT ACROSS-THE-BOARD PROBLEMS?  AND, YOU KNOW, THE DEFENDANTS' ANSWER WAS NO.  AND THE REASON FOR THE CARELON AGREEMENT DELAY IS THE SIZE OF THE CONTRACT.  NOW, THE ANALYST IS -- APPEARS TO BE A LITTLE BAFFLED BY THAT.  AND SO THE ANALYST ASKS, CAN YOU CONFIRM THAT THE REASON FOR THE DELAY IS THE SIZE OF THE CONTRACT?  AND THE DEFENDANT SAID, YEAH, THAT'S THE ONLY REASON.  THE QUOTE IS, IT'S ONLY THE CONTRACT NEGOTIATION CONTRACT (VERBATIM) IS ONLY LONGER NOW THAN IT WAS AT THE BEGINNING.  IT'S JUST A LOT OF WORK.  NOTHING ELSE. AND, YOU KNOW, THE -- AGAIN, WE'RE NOT SUGGESTING MISCONDUCT BECAUSE DEFENDANTS' TRANSCRIPT MISATTRIBUTES THE ANALYST'S QUESTION, THE BAFFLED QUESTION TO SOMEBODY ELSE AT SHARECARE. SO, YOU KNOW, THEY'RE RELYING ON THAT.  THAT'S FINE.  THAT'S NOT CORRECT, THOUGH.  THAT STATEMENT COMES FROM THE ANALYST. AND, YOU KNOW, WE LISTENED TO THE TRANSCRIPT TO CONFIRM IT. AND SO, YOU KNOW, THAT HAS MEANING BECAUSE, YOU KNOW, THE ANALYST IS CLEARLY WONDERING, AND THEN YOU KEEP SAYING, YOU KNOW, YES, OF COURSE, OF COURSE.  AND, YOU KNOW, THERE'S A THIRD QUESTION, WHICH IS --

THE COURT:  WELL, WHY DON'T WE DO THIS WITH THE TRANSCRIPT.  I DIDN'T SEE KIND OF A SIMILAR DOCUMENT FROM YOU WITH THE CORRECTIONS, AND I THINK IT WOULD BE HELPFUL.  WHY DON'T YOU CONFER WITH DEFENDANTS' COUNSEL, AND MAYBE YOU CAN

GET SOME AGREEMENT ON A VERSION OF THE LANGUAGE, OR, IF NOT, YOU CAN GIVE ME MORE YOUR PROPOSED ONE. AND AT THIS STAGE IT'S A MOTION TO DISMISS, SO THE FACTS WILL BE -- BUT I THINK IT WOULD BE HELPFUL TO HAVE A VERSION OF THIS THAT YOU'RE COMFORTABLE WITH AS WELL ON THE DOCKET.

MR. HORNE: ABSOLUTELY, YOUR HONOR. AND THE ONLY DIFFERENCE IS THE SPEAKER.

THE COURT: OKAY.

MR. HORNE: AND THEN, YOU KNOW, THE ANALYST, YOU KNOW, ASKS AGAIN, CAN YOU CONFIRM THAT THE ONLY REASON FOR THE DELAY IS THE SIZE OF THE CONTRACT? AND QUOTING THE QUESTION, IT'S NOT HEADWINDS OR A POTENTIAL RECESSION THAT ELEVATES THE SPACING. IT'S SIMPLY THE SIZE OF THE IMPLEMENTATION. AND THE DEFENDANT SAYS YES, THE DEFENDANT FERRERO IN THIS CASE. AND SO YOU'VE GOT AN ANALYST ASKING OVER AND OVER AGAIN, OKAY, ARE YOU SURE THAT THERE'S NOTHING GOING ON HERE? AND THEN THEY SAY, YES, YES, YES. AND WHEN AN ANALYST -- THIS IS SIMILAR TO THE CASE IN AVAYA (PHONETIC). WHEN YOU'VE GOT AN ANALYST ASKING A BUNCH OF QUESTIONS OVER AND OVER AGAIN, AND YOU KEEP GIVING THE SAME ANSWER, EVEN THOUGH IT'S VERY CLEAR THAT THE ANALYST IS WEIGHING YOUR ANSWER CAREFULLY, OH, AND, BY THE WAY, YOU'VE JUST CALLED THIS CONTRACT THE LARGEST CONTRACT EVER, YOU WANT PEOPLE TO FOCUS ON THIS. YOU HAVE AN OBLIGATION AND IT'S RECKLESS NOT TO FOLLOW THAT OBLIGATION TO ENSURE THAT WHAT YOU'RE SAYING IS TRUE, AND IT WASN'T.

THE COURT: WELL, I THINK I'M KIND OF OPERATING AT A DIFFERENT LEVEL IN THAT WHEN I LOOK AT YOUR COMPLAINT AND I LOOK AT YOUR BRIEF AND I LOOK AT YOUR SCIENTER SECTIONS AND YOUR ARGUMENTS, I SEE KIND OF A MORE SIMPLISTIC BRIEFING AND PLEADING OF THE SCIENTER ISSUE BECAUSE WHEN I LOOK AT THOSE SECTIONS, AND WE'RE TALKING ABOUT SCIENTER, I SEE ARGUMENTS ABOUT THE FIRST BUCKET THAT WE JUST TALKED ABOUT. BUT WHEN RELATING TO THE SECOND BUCKET, THE ONLY ARGUMENTS AND PLEADING I SEE IN THE COMPLAINT RELATES TO THINGS THAT HAPPENED LATER DOWN THE ROAD. I DON'T SEE THAT IN WHAT YOU'VE PRESENTED TO THE COURT. AND SO THAT'S WHAT'S GOT ME CONCERNED BECAUSE I DON'T HAVE THAT. AND, I MEAN, I JUST HAVE A VERY SHORT BRIEFING ON IT, AND IT'S TIED TO LATER EVENTS AND NOT EARLIER EVENTS.

MR. HORNE: OKAY. I SEE, YOUR HONOR. I SEE THIS -- I APOLOGIZE. I HADN'T UNDERSTOOD THAT TO BE THE COURT'S QUESTION. THERE ARE LATER EVENTS, BUT THE LATER EVENTS ARE REFLECTIONS ABOUT WHAT HAPPENED. AND SO WHEN THE AGREEMENT TERMINATES, THE DEFENDANT SAID, WELL, IT WASN'T JUST THAT QUARTER. YOU KNOW, WE'VE HAD A LOT OF PROBLEMS WITH THESE PEOPLE, AND THEY HAVEN'T HONORED THEIR CONTRACTUAL PROMISES, AND THAT'S CAUSED US TO NOT BE ABLE TO PREDICT REVENUES, NOT BE ABLE TO FORMULATE GUIDANCE. AND, YOU KNOW, IT'S CLEARLY A REFERENCE TO EVENTS THAT HAD OCCURRED IN THE PAST. AND IT'S NOTABLE THAT THE ONLY TIME THAT THEY REMOVED GUIDANCE WAS IN

AUGUST 2022. THAT'S THE ONLY TIME. AND SO WHEN THEY SAY, WE WEREN'T ABLE TO PREDICT -- TO FORMULATE GUIDANCE AND WEREN'T ABLE TO MEET IT, WHAT THEY'RE SAYING IS, BY IMPLICATION, THAT'S WHY WE HAD PROBLEMS. I MEAN, THE FAILURE -- THEIR FAILURE TO HONOR THEIR PROMISES IS WHY WE WERE NOT ABLE TO MEET THE AUGUST '22 AGREEMENT OR TO SIGN THE AUGUST '22 AGREEMENT IN TIME.

THE COURT: OKAY. THAT STILL CAUSES ME PROBLEMS WITH WHY WE KNOW AND THAT YOU'VE PLED THAT THEY HAD SCIENTER AT THE TIME THEY MADE THE STATEMENT, THAT YOU PLED -- I SEE THAT IT'S MISSING THAT YOU'VE PLED THAT THEY HAD SCIENTER AT THE TIME THEY WERE MAKING, FOR EXAMPLE, THE 2022 STATEMENTS BECAUSE LATER THEY SAID, YEAH, OKAY, THIS ALL WENT TO HELL BASICALLY BECAUSE ALL THE STUFF WAS GOING ON, BUT AT THE TIME IT WAS GOING ON, I DON'T KNOW THAT IT IS IN THE RECORD THAT THEY KNEW ULTIMATELY THAT THAT WAS GOING TO BE THE DOWNFALL OF EVERYTHING. SO THERE'S A TIMING ISSUE THAT I'M STRUGGLING WITH, BUT YOU CAN MOVE ON OR KIND OF ADDRESS IT AGAIN. IT'S A PROBLEM.

MR. HORNE: I'M NOT SURE IF I HAVE ANYTHING TO ADD TO THE COURT.

THE COURT: OKAY. THAT'S FINE.

MR. HORNE: BUT I THINK THE WAY WE READ THE STATEMENT IS IT HAD GONE TO HELL BEFORE.

THE COURT: OKAY. THAT'S FINE. YOU CAN KEEP GOING.

MR. HORNE: I THINK --

THE COURT:  I THINK IT WOULD BE HELPFUL TO ADDRESS THE ARGUMENT ABOUT LOSS CAUSATION IN THAT -- I HAVE TO GO BACK AND LOOK AT IT.  I THINK THE LAW IS A LITTLE BIT CLOSER TO WHAT YOU HAVE ARGUED PERHAPS, BUT I AM TROUBLED BY WHAT THE DEFENDANT SAYS ABOUT YOUR POTENTIALLY NOT RESPONDING TO A PERIOD OF TIME THAT THEY ALLEGED IN THEIR BRIEF.  AND I NEED TO GO BACK AND LOOK AT IT, BUT I DIDN'T KNOW IF YOU WANTED TO RESPOND TO THAT.

MR. HORNE:  YEAH, I DON'T BELIEVE THAT'S ACCURATE, AND PART OF THE REASON IS THERE'S A LOT LESS TO THE REBOUND THAN MEETS THE EYE.  UNTIL MAY 9, 2024, THE STOCK PRICE CLOSED ABOVE THE PRE-DISCLOSURE PRICE ON THREE NON-CONSECUTIVE DAYS.  SO, YOU KNOW, STOCK PRICES GO UP, STOCK PRICES GO DOWN.  IN THIS CASE IT JUST MOVED.  WHAT HAPPENED ON MAY 9 -- AND, YOU KNOW, WE THINK IT'S THEIR BURDEN, SO WE DON'T THINK WE NEED TO PUT THIS INTO THE RECORD, BUT WHAT HAPPENED ON MAY 9 IS THEY ISSUED A STATEMENT SAYING, QUOTE, SHARE -- THAT SHARECARE IS, QUOTE, IN ACTIVE DISCUSSIONS WITH MULTIPLE BIDDERS FOR A POTENTIAL SALE OF THE COMPANY.  SO, YOU KNOW, IF YOU SELL THE COMPANY, THE BIDDER IS GOING TO HAVE TO PAY MORE.  THAT'S JUST THE MAY IT WORKS.  AND SO WHAT THEY'RE SAYING IS WE'RE PROBABLY GOING TO SELL OURSELVES.  AND OF COURSE THAT MAKES THE STOCK PRICE GO UP, BUT, ALSO, OF COURSE IT HAS NOTHING TO DO WITH THE FRAUD.  AND SO THEY MENTIONED HOWEVER MANY DAYS THAT THE STOCK PRICE WAS ABOVE THE POST DISCLOSURE PRICE.  WELL, YOU KNOW, WE

DON'T THINK IT'S OUR BURDEN TO SHOW ANYTHING, BUT IN REALITY IT WAS BECAUSE THEY SAID THEY WERE GOING TO BE BOUGHT OUT.  AND THEN THEY WERE BOUGHT OUT.  BUT, AGAIN, I THINK THIS IS EXACTLY WHY THIS HAS TO BE RESOLVED LATER IN THE CASE.  IT'S NOT A MOTION TO DISMISS ARGUMENT.

THE COURT:  WHAT ABOUT THE ARGUMENT THAT THE PLAINTIFFS DIDN'T OWN STOCK AT THESE VARIOUS POINTS IN TIME?

MR. HORNE:  I THINK BECAUSE THIS IS A CLASS ACTION THE PLAINTIFFS DON'T NEED TO SHOW THAT THEY HAVE STANDING FOR EVERY CORRECTIVE DISCLOSURE.  THE DIFFERENCE IN MACPHEE IS THEY HAD STANDING -- MACPHEE DOESN'T USE THE WORD "STANDING," BUT IN MACPHEE THEY WEREN'T ABLE TO SHOW THAT THEY HAD PROXIMATE CAUSE FOR ANY DISCLOSURE.  AND SO THEY WERE THROWN OUT ENTIRELY. THAT DOESN'T MEAN IF A PLAINTIFF LEGITIMATELY HELD THROUGH A CORRECTIVE DISCLOSURE THAT THE PLAINTIFF NEEDS TO HAVE HELD THROUGH ALL CORRECTIVE DISCLOSURES.

THE COURT:  OKAY.  I'LL LOOK AT THE LAW ON THAT.  I'M NOT SURE WHO IS RIGHT ON THAT.  I DO THINK THAT WITH A MOTION TO DISMISS WE ARE DEALING WITH DISMISSALS OF THE CLAIMS THAT ARE IN HERE, BUT I'LL LOOK AT THE LAW.  I DON'T KNOW HOW WELL THAT WAS BRIEFED, BUT I'M SURE THERE'S SOME LAW ON IT, SO I CAN TAKE A LOOK AT THAT.

MR. HORNE:  YOU KNOW, WITH THAT SAID --

THE COURT:  IT'S FINE.  YOUR BRIEFS ARE GOOD.  THIS IS JUST ASKING QUESTIONS, SO THERE'S NOT ANYTHING -- I MEAN,

I'M GOING TO -- ULTIMATELY WHEN I MAKE A DECISION, I'M GOING TO SPEND TIME WITH THE BRIEFS AND THE CASES AND ALL OF THAT, SO...

MR. HORNE:  YEAH, I JUST -- I'LL JUST -- JUST A COUPLE MORE MINUTES JUST TO GO OVER EXPRESS SCRIPTS.  THERE'S TWO THEORIES IN EXPRESS SCRIPTS.  ONE OF THEM IS BY MAKING VAGUE STATEMENTS ABOUT THE AGREEMENT, YOU'RE OBLIGATED TO DISCLOSE ALL OF THE PROBLEMS WITH THE AGREEMENTS.  THAT'S NOT OUR ARGUMENT.  AND THERE'S A SEPARATE -- THERE'S A SEPARATE PROBLEM THAT'S ADDRESSED IN A DIFFERENT SECTION, AND THAT'S -- I MEAN, THE FIRST ONE IS SECTION 3A1 ROMAN NUMERAL I.  THE SECOND IS 3A1 ROMAN NUMERAL TWO.  SO IN THE SECOND SECTION, ALL THE COURT SAYS IS YOUR STATEMENTS WERE TRUE, YOU KNOW, YOU SAID -- OR THE DEFENDANT SAID YOU WERE ENGAGED IN ACTIVE NEGOTIATIONS.  WELL, I MEAN, LOOK AT THE PLEADINGS.  THERE'S, LIKE, PAGES AND PAGES OF ACTIVE NEGOTIATIONS IN THE COMPLAINT.  THAT'S TRUE.  PLAINTIFFS CAN'T REALLY COMPLAIN IF THE DEFENDANTS MADE TRUE STATEMENTS.

AND, YOU KNOW, I COULDN'T REALLY TELL ON REPLY WHETHER THEY RETREAT FROM THEIR ARGUMENT THAT LITERALLY NOTHING NEEDS TO BE DISCLOSED UNLESS THE AGREEMENT COLLAPSES.  I CAN'T TELL IF THEY'RE RETREATING FROM IT, BUT THEY ALSO HAVE YET TO ADDRESS ANY OF OUR STATEMENTS, YET TO EXPLAIN WHY THEY'RE NOT FALSE, YET TO EVEN TRY.  AND I THINK THAT'S A WAIVER.  YOU KNOW, I JUST WANT TO SPEAK BRIEFLY ABOUT MAGUIRE WHICH THERE'S SOME STRONG LANGUAGE IN THE CASE, BUT I THINK IF YOU LOOK AT

THE ACTUAL CASE AND THE REASON WHY THEY WERE USING THE STRONG LANGUAGE, THERE'S A LOT LESS TO IT THAN MEETS THE EYE AND, FRANKLY, MAKING A KNOWINGLY FALSE STATEMENT, IT'S LYING. YOU KNOW, IT SOUNDS KIND OF LIKE FRAUD TO ME. BUT IN MAGUIRE -- SO THE COMPANY HAD SIGNED A NEW CONTRACT WITH AN EXISTING CUSTOMER. THE DEFENDANT STATED THAT THE CONTRACT WAS RENEWED, BUT IT WASN'T RENEWED. IT WAS A NEW CONTRACT. AND THAT'S NOT A VERY STRONG MISSTATEMENT, AND IN FACT THE FOURTH CIRCUIT DIDN'T THINK IT WAS STRONG. IT CAN QUOTE FROM THE RELEVANT PART. APPELLANT ASKS US TO FIND INTENT TO DECEIVE INVESTORS IN AN EXECUTIVE'S USE OF A SINGLE, POSSIBLY AMBIGUOUS, EMPHASIS ON ORIGINAL, WORD ON A LIVE ANALYST CALL THAT APPROPRIATELY MISCHARACTERIZED AN AGREEMENT THAT HAD HISTORICALLY ACCOUNTED FOR APPROXIMATELY 4.1 PERCENT OF THE COMPANY'S ANNUAL REVENUE. AND WHAT THEY'RE SAYING IS IT'S OBVIOUS THIS WAS JUST A MISTAKE. THAT'S NOT THE CASE HERE. THAT'S NOT THE CASE WHERE THEY MAKE THE STATE -- SAME STATEMENTS OVER AND OVER AGAIN, THEY'RE VERY FALSE, DRAMATICALLY FALSE, AND THERE'S NO -- THERE'S NOTHING THAT THEY'RE JUST KIND OF SLIGHTLY MISDESCRIBING. THEY'RE VERY, VERY FALSE. ALL RIGHT. I REALLY DON'T HAVE ANYTHING MORE, YOUR HONOR. SO IF THE COURT HAS ANY QUESTIONS?

THE COURT: YOU KNOW I'VE ASKED THEM, SO WE'RE GOOD.

MR. HORNE: THANK YOU, YOUR HONOR.

THE COURT: THANK YOU.

OKAY.  MR. JACKSON, YOU HAVE ABOUT TEN MINUTES.

MR. LAX:  JUST A FEW QUICK POINTS MYSELF, YOUR HONOR. THE TWO OF YOU JUST DISCUSSED EXPRESS SCRIPTS A LITTLE BIT MORE, AND ALSO I KNOW THAT YOU AND I EARLIER DISCUSSED HIGH CRUSH AND GLOBIS (PHONETIC) OR HIGH CRUSH.  GLOBIS IS ANOTHER CASE CITED IN EXPRESS SCRIPTS FOR SIMILAR PROPOSITIONS.  I JUST WANTED TO NOTE THAT IN THOSE TWO CASES, HIGH CRUSH AND GLOBIS, IT WAS UNDISPUTED THAT THE CONTRACT HAD TERMINATED, VERSUS IN EXPRESS SCRIPTS THERE WERE EXCHANGES, AGAIN, OF NOTICES OF BREACH.  WHEREAS, HERE THERE IS AN ALLEGATION -- THERE IS NOT AN ALLEGATION THAT THE CARELON AGREEMENT HAS BEEN LEGALLY TERMINATED.  THERE WERE ALLEGATIONS ABOUT PAYMENT DISPUTES, SUPER SIMILAR TO WHAT WAS HAPPENING IN EXPRESS SCRIPTS. THERE'S AN ALLEGATION THAT IN OCTOBER OF 2023, THERE WAS A CESSATION OF SOME OF THE SERVICES OF THE AGREEMENT.  SO IF THE COURT IS INCLINED TO FIND A PIVOT POINT OR FIND SOMETHING THAT CHANGED IN THE FACTS OR IN THE CONTRACTUAL RELATIONSHIP BETWEEN THE PARTIES UNDER THE CARELON AGREEMENT, WE DON'T SEE HOW IT COULD BE BEFORE, IF ANYTHING, THAT CESSATION OF SERVICES IN OCTOBER OF 2023, WHICH IS THEN TIMELY DISCLOSED IN THE 10K AND DISCUSSED ON THE EARNINGS CALL IN MARCH OF 2024.

ON THE STATEMENTS FROM AUGUST 2022 THAT PLAINTIFFS' COUNSEL WAS JUST DISCUSSING WITH YOU, WE WOULD ENCOURAGE THE COURT TO READ THE QUESTIONS THAT ARE ASKED AND THE ANSWERS THAT ARE PROFFERED INSTEAD OF PLAINTIFF'S CHARACTERIZATION OF THEM.

FOR INSTANCE, ABOUT THE DELAY IN THE CONTRACT, WE WERE ASKED FOR THE ENTERPRISE DIVISION OF SHARECARE'S BUSINESS, IS THAT DELAY SORT OF THE ONLY CHANGE RELATIVE TO YOUR PREVIOUS THINKING, OR WERE THERE ALSO OTHER CLIENTS YOU WERE GOING TO ON-BOARD THAT HAVE ALSO DELAYED, OR IS THERE AN ELONGATION ACROSS THE BOARD?  THE NEXT QUESTION THAT WAS CITED, WE WERE ASKED, AND, QUITE FRANKLY, IT'S SO BIG AND SO LARGE AND SO IMPORTANT, THAT'S WHAT'S LEADING TO THE DELAY.  IT'S NOT LIKE THERE'S A CANCELLATION OF THE CONTRACT.  IT'S NOT ALLEGED THAT THERE WAS.

THEN THE LAST QUESTION, THE SAME ANALYST SAYS THAT THEY WERE HEARING SIMILAR THINGS FROM ANTHEM'S EARNING CALL AROUND THIS EXACT SAME TIMEFRAME.  AND SO FOR THOSE STATEMENTS, BUT REALLY FOR ALL OF THE STATEMENTS CONTAINED IN EXHIBIT F THAT ARE ALLEGED TO BE FALSE OR MISLEADING, WE WOULD ENCOURAGE THE COURT TO READ WHAT IS ASKED AND WHAT WE ANSWERED.  AND LINKING THOSE STATEMENTS TO THE IDEA THAT SOMEHOW THINGS HAD GONE WRONG BEFORE OR THINGS WERE WRONG THE WHOLE TIME, THAT'S KIND OF CLASSIC FRAUD-BY-HINDSIGHT.  AND WE WOULD SAY THAT EVEN IF THE PLAINTIFFS ALLEGE THAT ANTHEM FAILED TO HONOR CONTRACTUAL PROMISES LATER OR WAS A HARD BARGAINER LATER, IT ISN'T PLEADED WITH ANY SPECIFICITY THAT THEY WERE A HARD BARGAINER OR WERE FAILING TO HONOR CONTRACTUAL PROMISES BACK IN AUGUST OF 2022 OR IN RELATION TO ENTERING INTO THIS AGREEMENT.  FOR THE REVENUES PIECE OF THE CARELON AGREEMENT, WE WOULD NOTE THAT PAYMENTS

COMING IN AND OUT RELATED TO SHARECARE AND ANTHEM AND CARELON'S RELATIONSHIP ARE DISCLOSED IN THE S.E.C. FILINGS. THEY'RE DISCLOSED IN SUFFICIENT DETAIL TO FORM THE BASIS OF THE PLAINTIFFS ALLEGATIONS HERE. AND SO WE DON'T SEE WHERE THAT DISCLOSURE, HOWEVER THOSE PAYMENTS ARE CHARACTERIZED ACCORDING TO THE PLAINTIFFS OR THE REFERENCE TO OUTSOURCED PARTNERS, INVESTORS ARE ABLE TO SEE WHAT IS HAPPENING WITH PAYMENTS, WITH ASSETS, WITH LIABILITIES, HOW ALL OF THOSE THINGS ARE EBBING AND FLOWING UNDER THE RELATED PARTIES' TRANSACTION SECTION OF THE COMPANY'S S.E.C. FILINGS.

ON SCIENTER, I'M NOT SURE THAT I NOTED, SO I JUST WANT TO MAKE SURE I DID, THAT THERE'S NO ALLEGATION OF STOCK SALES BY ANY OF THE DEFENDANTS, NONE FROM ARNOLD, FERRERO, OR THE COMPANY ITSELF. OFF-LOADING SHARES, WHICH ACCORDING TO MIZZARO, IS A, QUOTE, STRONG INFERENCE AGAINST SCIENTER, THE IDEA KIND OF BEING THAT WHY WOULD PLAINTIFFS JUST SIT ON THIS FRAUD ONLY FOR THE STOCK TO TANK LATER INSTEAD OF PROFITING FROM IT WITH THE INTENT TO DEFRAUD IN THE MEANTIME. THAT MIGHT BE ALL I HAVE TO ADD, YOUR HONOR.

THE COURT: OKAY. THANK YOU.

MR. LAX: THANK YOU.

THE COURT: WELL, I APPRECIATE Y'ALL BEING PATIENT WITH THE QUESTIONS I ASKED. AND SOME OF THEM, TOO -- I MEAN, OBVIOUSLY I'M GOING TO GO BACK AND LOOK AT THE CASES AND LOOK AT THIS IN MORE DETAIL. SO IF YOU'RE WORRIED THAT I WAS GOING

ON SOME AREA THAT'S CONTRARY TO THE LAW, I AM GOING TO GO BACK AND LOOK AT ALL OF THAT.  SOMETIMES I THINK ABOUT THINGS WHILE I'M UP HERE AND HAVEN'T READ ABOUT IT SPECIFICALLY, SO DON'T GET TOO WORRIED ABOUT THAT OR READ TOO MUCH INTO MY QUESTIONS BECAUSE I'M GOING TO SIT DOWN AND GET A COMPREHENSIVE ORDER OUT.  SO I'M NOT GOING TO RULE FROM THE BENCH.  THESE CASES ARE TOO COMPLICATED FOR THAT.  BUT I HOPE TO GET YOU AN ORDER SHORTLY, SO I APPRECIATE YOUR PATIENCE.  AND, WITH THAT, WE'RE ADJOURNED.  THANK YOU.

                    (PROCEEDINGS ADJOURNED.)

43

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

I, MONTRELL VANN, RPR, RMR, RDR, CRR, OFFICIAL COURT
REPORTER OF THE UNITED STATES DISTRICT COURT, FOR THE NORTHERN
DISTRICT OF GEORGIA, ATLANTA, DO HEREBY CERTIFY THAT THE
FOREGOING 42 PAGES CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS
HAD BEFORE THE SAID COURT, HELD IN THE CITY OF ATLANTA,
GEORGIA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS, THE
25TH DAY OF APRIL 2025.


                                   /S/ MONTRELL VANN
                                   MONTRELL VANN, RPR, RMR, RDR, CRR
                                   OFFICIAL COURT REPORTER
                                   UNITED STATES DISTRICT COURT