IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VICTOR BUQUERAS and JOHN : 
DEMER, *individually and on behalf* :
*of themselves and all others* :
*similarly situated*, :
: 
      Plaintiffs, :
:
v. :      CIVIL ACTION NO.
:      1:24-cv-02769-LMM
SHARECARE, INC., *et al.*, :
:
      Defendants. :

## ORDER

    This case comes before the Court on Defendants' Motion to Dismiss [35].

After due consideration, the Court enters the following Order.

## I.    BACKGROUND

    This is a putative class action seeking damages under the Securities and

Exchange Act of 1934. Plaintiffs Victor Buqueras and John Demer purchased

securities from Defendant Sharecare, Inc. ("Sharecare"), a Delaware corporation

which operated a phone app to provide healthcare services to individuals. Dkt.

No. [32] ¶¶ 21–23, 27. The individual Defendants are Defendant Sharecare's

former officers, Jeffrey Arnold—Founder and Chairman—and Justin Ferrero—

Chief Financial Officer and President. Id. ¶¶ 24–25. Plaintiffs also rely on the

testimony of a Former Employee who served as Defendant Sharecare's Senior

Vice President and led its Advocacy & Wellness business. Id. ¶ 26.

In 2022, Defendant Sharecare entered a partnership with Anthem, a large insurer, that agreed to incorporate Defendant Sharecare's app as a benefit of its insurance plan.[1] Id. ¶¶ 30–34. The relationship between Defendant Sharecare and Anthem began with two contracts. Id. ¶¶ 33–34. The first was a $100 million 5-year contract where Defendant Sharecare acquired doc.ai, Inc. ("DocAI"), a specialized healthcare data company whose primary customer had been Anthem. Id. The second was a contract where Defendant Sharecare agreed to work with Anthem subsidiaries operating under the Carelon brand ("the Carelon Agreement"), and in return, Anthem integrated Defendant Sharecare's premium app, Sharecare+, into Carelon's Health Guide services. Id. ¶¶ 43–44. Because Defendant Sharecare immediately gained several hundred thousand users of its premium app from the Carelon Agreement, Defendants emphasized to potential investors and analysts how transformative the contract was and stated that the "Carelon partnership [was] a massive one" and that "it would be Sharecare's 'largest contract ever.'" Id. ¶¶ 44–45.

Despite Defendants' positive representations about the Carelon Agreement, Plaintiffs allege that Defendants' relationship with Anthem slowly began to collapse and that the Carelon Agreement implementation was not proceeding as planned. Beginning in August 2022, Defendant Sharecare announced a delay in the signing of the Carelon Agreement and withdrew its

---

[1] Anthem is now known as "Elevance Healthcare, Inc." Dkt. No. [32] ¶ 30. But for simplicity, the Court will refer to this entity as "Anthem."

2

previously issued 2022 revenue guidance. Id. ¶ 48. In response to questions from analysts, Defendants attributed the delay to the length and complexity of the contract, but according to Plaintiffs, the delay stemmed from Anthem not honoring its contractual promises. Id. ¶¶ 48, 92. Later, in March 2023, Defendants reported that a Carelon customer declined to use Sharecare+, but Defendants insisted that Carelon was a fantastic partner for them, that the number of Carelon users would not decrease, and that they only saw the relationship expanding. Id. ¶ 49.

In addition to Defendants' statements regarding the Carelon Agreement's delays, Plaintiffs also allege that Defendants misrepresented the profitability of the Carelon Agreement. As stated, Defendant Arnold represented that the Carelon Agreement as massive for Defendant Sharecare and would be their "largest contract ever." Id. ¶¶ 93, 96. But, Plaintiffs point to Defendants' filing of their "Related Party Transactions" which demonstrated that Defendants, in fact, did not profit from the Carelon Agreement, especially where Defendant Sharecare directly remitted most of its revenues back to Anthem. Id. ¶ 96.

Next, Plaintiffs allege that Defendants continued to misrepresent the status of Defendant Sharecare's relationship with Anthem. On or around March 2023, Defendant Arnold responded to questions regarding the Anthem partnership and stated that "provid[ing] AI services to Anthem" was "going well." Id. ¶ 112. Additionally, even after Defendant Sharecare reduced its revenue guidance for Q1 2023, Defendant Ferrero denied any deterioration in its relationship with

3

Anthem and assured investors that Anthem was a fantastic partner for them and that they saw "that relationship only expanding." Id. ¶ 115. Despite these statements, Plaintiffs allege that Anthem expressed dissatisfaction with the earlier DocAI agreement and breached its contracts in connection with Sharecare+. Id. ¶ 118.

Later, by August 2023, Anthem began taking more aggressive bargaining positions against Defendant Sharecare by fully cancelling the DocAI Agreement and breaching the Carelon Agreement by not paying its bills. Id. ¶ 120. In response, Defendant Sharecare also stopped paying its bills under the Carelon Agreement, but Defendants continued to inform analysts that the Carelon Agreement was "meeting expectations," "rolling out as expected," and that they were "implementing to [their] signed contracts." Id. ¶¶ 120–21. Eventually, in October 2023, Defendant Sharecare stopped providing services to Anthem and severed its agreement with Carelon. Id. ¶ 129. Still, Defendants stated that their results with Anthem had been "really good," "things [were] staying the course," and its relationship with Carelon was "business as usual." Id. ¶ 128. Defendants even reported in November 2023 that there were no material events they needed to disclose. Id. ¶ 131.

Finally, in March 2024, Defendants held a call to discuss their Q4 2023 earnings, which reported revenues well below their previous guidance, and Defendants revealed that Defendant Sharecare missed its revenue guidance, because it terminated its contract with Anthem and Carelon, causing it to lose

$14 million in Q4 2023 revenues. Id. ¶ 140. Defendants also filed their 2023 10-K where they reported that "[i]n October 2023, [Defendant Sharecare] ceased providing patient advocacy services in accordance with" its contract with Anthem. Id. ¶ 142. Following this disclosure, Defendant Sharecare's stock "shares closed at $0.55, down $0.22 (28.3%) from its previous close." Id. ¶ 143.

Plaintiffs filed this suit, attempting to represent themselves and all purchasers/acquirers of Defendant Sharecare's common stock during the relevant class period—between August 10, 2022, and March 28, 2024. Id. ¶ 1. Plaintiffs ultimately allege that, in ignorance of the misleading nature of Defendants' statements about their relationship with Anthem, Plaintiffs and other potential class members relied on the statements and, as a result, suffered economic loss by purchasing Defendant Sharecare's common stock at prices that were artificially inflated. Id. ¶ 186. Plaintiffs' Amended Complaint brings two counts, seeking damages under Section 10(b) of the Exchange Act and Rule 10b-5 in Count One, and Section 20(a) of the Exchange Act in Count Two. Id. ¶¶ 181–93. Defendants move to dismiss both claims. See Dkt. No. [35].

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will

not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." <u>FindWhat Inv. Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1261 (11th Cir. 2006)). However, this principle does not apply to legal conclusions set forth in the complaint. <u>Iqbal</u>, 556 U.S. at 678.

Because Plaintiffs' Complaint alleges a securities fraud claim under Rule 10b-5, Plaintiffs must satisfy not only the typical Rule 8 pleading requirements but also the "heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995." <u>Carvelli v. Ocwen Fin. Corp.</u>, 934 F.3d 1307, 1317–18 (11th Cir. 2019). "Failure to meet any of the three standards will result in a complaint's dismissal." <u>Id.</u> at 1318. To properly allege fraud under Rule 9(b), a plaintiff must "state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also allege facts supporting a "strong inference of scienter" for each Defendant with respect to each alleged violation. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008).

## III.    DISCUSSION

Defendants move to dismiss each of Plaintiffs' claims against them. Dkt. No. [35]. To state a claim under Section 10(b) of the Securities and Exchange Act and Rule 10b-5, Plaintiffs must plead: (1) a material misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.[2] Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). Defendants argue that Plaintiffs have failed to adequately plead the first, second, and sixth elements of this claim. See Dkt. No. [35-1]. Plaintiffs respond, arguing that they have pled sufficient facts for each of these elements. Dkt. No. [42]. The Court addresses the parties' arguments below.

---

[2] Plaintiffs' Section 20(a) claim is a derivative claim, so it only succeeds if Plaintiffs plead a Section 10(b) violation. Additionally, the Court notes that Count One is based on Section 10(b) of the Exchange Act and Rule 10b-5, promulgated under Section 10(b). For clarity, the Court generally refers to Count One simply as Plaintiffs' "Section 10(b) claim."

### A. Material Misrepresentation or Omission

First, Defendants argue that Plaintiffs have failed to allege a material misrepresentation or omission—the first element of their Section 10(b) claim. Dkt. No. [35-1] at 14–28. Specifically, Defendants contend that: (1) statements regarding its relationship with Anthem are not actionable, (2) several challenged statements are inactionable puffery and opinions, and (3) certain statements are protected by the PSLRA safe harbor provision. Id. Plaintiffs disagree, arguing that all of Defendants' statements constitute material misrepresentations or omissions. Dkt. No. [42] at 15–27.

Before turning to the merits of the parties' arguments, the Court must acknowledge the heightened pleading requirements for this element. In a securities fraud case of this nature, Plaintiffs face a "triple-layered" pleading standard to show a material misrepresentation or omission. Carvelli, 934 F.3d at 1317. First, Plaintiffs must satisfy typical Rule 8 standards. Second, Plaintiffs must also satisfy Rule 9(b), which requires securities fraud plaintiffs to specifically allege four elements: "(1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." Id. at 1318. And third, Plaintiffs must satisfy the PSLRA, which "requires a complaint to 'specify each statement alleged

to have been misleading' and 'the reason or reasons why the statement is misleading.'" Id. (quoting 15 U.S.C. § 78u-4(b)(1)(B)).

As to the merits, under Section 10(b), materiality of a misrepresentation or omission depends on if a "substantial likelihood exists that a reasonable investor would have viewed a misrepresentation or omission as significantly altering the total mix of information made available." Id. at 1317 (citation modified). Further, unless there is a duty to disclose, an omission is only material if it renders information that the issuer has disclosed misleading. Id. Materiality is a mixed question of law and fact that "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." Id. at 1320 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)). "Accordingly, when considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Id. at 1320–21 (citing Ganino v. Citizens Util. Co., 228 F.3d 154, 162 (2d Cir. 2000)).

Plaintiffs allege three categories of misrepresentations: (1) statements regarding the delay in signing the Carelon Agreement, (2) statements about the scope of the Carelon Agreement, and (3) statements regarding the status of Defendant Sharecare's relationship with Anthem. Dkt. No. [32] ¶¶ 87–132.

9

Defendants argue that none of these statements are actionable. Dkt. No. [35-1] at 14–28; Dkt. No. [44] at 3–11. The Court analyzes each category in turn.

### 1. *Delays in Signing Carelon Agreement*

First, Plaintiffs' Amended Complaint alleges that Defendants made false and misleading statements surrounding delays in the signing and implementation of the Carelon Agreement. Dkt. No. [32] ¶¶ 87–92. In August 2022, Defendants held a call to discuss its Q2 2022 earnings, and while on the call, Defendants withdrew their previous guidance of anticipated revenue and attributed the withdrawal to "delays in signing the Carelon Agreement." Id. ¶ 87. When analysts asked about the delay, Defendant Arnold expressed that there were hundreds of people involved in the implementation, that it was their "largest contract ever," and that the delay stemmed from the agreement's complexity. Id. ¶¶ 87–91. Defendant Arnold further ensured the analysts that there was no cancellation of the contract and emphasized that "there's a lot of detail in the implementation work" of the agreement. Id. ¶ 88. Plaintiffs allege that these statements were misleading, because Defendants attributed the delays to the complexity and breadth of the contract, when the delays were in part due to "Anthem's hard bargaining and failure to honor its contractual promises." Id. ¶ 92. Defendants disagree, raising several arguments as to why these statements are not actionable, including the following: (1) these statements were forward-looking and are thus protected by the PSLRA's safe harbor provision; (2) Plaintiffs do not sufficiently allege that Defendants made these statements with

actual knowledge of their falsity; and (3) these challenged statements are inactionable puffery and opinions. Dkt. No. [35-1] at 14–28.

The Court agrees with Defendants. First, the Court finds that most of these statements are protected by the PSLRA's safe harbor provision. The PSLRA "includes a 'safe harbor' provision that immunizes certain 'forward-looking' statements from liability." Carvelli, 934 F.3d at 1324. This provision insulates defendants from liability for statements "1) if they are identified as forward-looking statements and are accompanied by the appropriate cautionary language; 2) if such statements are immaterial; or (3) if the plaintiff fails to prove that the statements were made with actual knowledge of their falsity." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n.7 (11th Cir. 1999) (citing 15 U.S.C. § 78u-5(c)(1)). Here, Plaintiffs point to Defendant Arnold's and Ferrero's statements that that the Carelon Agreement will be "the largest contract ever," that Carelon will have "hundreds of health guides that [Defendant Sharecare] will be transitioning," and that the Carelon piece of the agreement "could be tens of millions of dollars." Dkt. No. [32] ¶¶ 87–88, 90. The Court finds that these statements are predictive and optimistic of the economic success of Defendants' agreement with Anthem, and thus, are sufficiently forward-looking. See Carvelli, 934 F.3d at 1324 (stating that the crux of a forward-looking statement is "a prediction, projection, or plan"); Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999) (finding that "statements of future economic performance" were "forward-looking").

Additionally, the Court agrees with Defendants that the statements were accompanied by cautionary statements, including the incorporation of the Risk Factors from Form 10-K. See, e.g., Dkt. No. [37-4] at 5 ("These forward-looking statements are subject to various risks and uncertainties and reflect our current expectations based on our beliefs, assumptions, and information currently available to us."); Dkt. No. [37-8] at 5 (noting that factors "that could cause actual results to differ materially from these forward-looking statements are discussed in more detail in our filings with the SEC"). Thus, the Court agrees with Defendants and finds that some of these statements are insulated from liability by the safe harbor provision.

Plaintiffs also point to Defendant Arnold's statement regarding the complexity of the Carelon Agreement where he represented that "there's a lot of detail in the implementation work." Dkt. No. [32] ¶ 88. The Court finds that Plaintiffs have failed to allege that Defendant Arnold made this statement with knowledge that it was false or misleading. See 15 U.S.C. § 78 u-5(c)(1)(B) (excluding liability where the plaintiff fails to demonstrate that the forward-looking statement was made with actual knowledge that the statement was false or misleading). Here, Plaintiffs' allegations implicitly acknowledge that the complexity and length of the negotiations contributed to the delay. Dkt. No. [32] ¶¶ 92–95. Specifically, they alleged that the delay was "*in part*, because of Anthem's hard bargaining and failure to honor its contractual promises." Id. ¶ 92 (emphasis added). By noting that the hard bargaining was not the sole cause of

12

delay, Plaintiffs implicitly acknowledge that Defendant Arnold's statement was true to an extent, and thus, Plaintiffs have not satisfied their burden of demonstrating that Defendant Arnold made a misrepresentation with actual knowledge of its falsity. Therefore, this statement is also shielded from liability by the safe harbor provision.

Thus, because Defendants' statements regarding the delay in signing the Carelon Agreement were forward-looking and ultimately discussed the projected scale and complexity of the contract, the Court finds that they are not actionable and cannot form a basis for Plaintiffs' Section 10(b) claim.

### 2. *Scope of the Carelon Agreement*

Plaintiffs' second category of misrepresentations is based on Defendants' statements about the scope of Defendant Sharecare's agreement with Carelon and Anthem. Plaintiffs argue that Defendants' statements about the size and profitability of the Carelon Agreement were false and misleading, because the individual transactions lacked true economic substance and were ultimately "round-trip agreements." Dkt. No. [32] ¶¶ 93–111. Because Defendant Sharecare directly remitted their revenue from the Carelon Agreement back to Anthem, Plaintiffs contend that Defendants' revenue was negligible, and thus, their statements regarding the size of the contract were misleading. Dkt. No. [42] at 25–27.

Defendants disagree and first point out that Defendant Sharecare's financial dealings with Anthem were adequately disclosed in the "Related Party

13

Transactions" section of their SEC filings. Dkt. No. [35-1] at 26–27. Because the Carelon Agreement transactions were disclosed and accurately reflected Defendant Sharecare's revenue, expenses, and liabilities, Defendants contend that Plaintiffs had the requisite information to discern the truth behind the transactions, and thus, their statements regarding the scope of the Carelon Agreement cannot form the basis for an actionable omission or misrepresentation. Id. at 27. Defendants also argue that, despite Plaintiffs' characterization, the Carelon transactions had economic substance and thus did not "wash out." Id. at 27–28.

The Court agrees with Defendants. Plaintiffs don't contend that Defendants' transactions were not disclosed but instead take issue with their alleged lack of economic substance and Defendants' representations about the size of the agreement. Dkt. No. [32] ¶¶ 93–111. The Court finds that this does not form the basis for an actionable misrepresentation or omission, especially where the transactions did, in fact, have economic substance. As stated, there is no dispute that the transactions were adequately reported and available to Plaintiffs. For example, in Q2 of 2023, Defendants stated in their "Related Party Transactions" that it entered a revenue contract with "the Series A Preferred Stockholder"—who Plaintiffs understood to be Anthem—"to provide advocacy services." Dkt. No. [32] ¶ 107. The reporting stated that the revenues related to these services totaled $10.9 million and $23.0 million. Id. Defendants also reported that it entered into separate agreements "for the purchase of distinct

goods and services from [Anthem] for amounts totaling $9.5 million and $20.4 million." Id.

"A typical 'round tripping' scheme involves parties entering into reciprocal contracts to exchange similar amounts of money for similar services." Teachers' Ret. Sys. of Louisiana v. Hunter, 477 F.3d 162, 178 (4th Cir. 2007). Notably, these transactions are actionable when "the transactions 'wash out' without any economic substance." Id. The Court does not find such a situation here. First, Defendant Sharecare was still profiting from the Carelon transactions, although not significantly. Specifically, Plaintiffs note that "[i]n Q1, Q2, and Q3 of 2023, Sharecare remitted to Anthem 99.1%, 84.1%, and 90.3% of the revenues it earned from the Carelon Agreement, respectively, to service the contract." Dkt. No. [42] at 26. These margins demonstrate that Defendant Sharecare was retaining some revenue from the transactions, and thus, the transaction did not lack economic substance. Second, the Court finds that Defendant Sharecare was receiving a notable benefit from the transactions, especially where Anthem was (1) actively increasing the number of users by incorporating the Sharecare app into its insurance plan, and (2) servicing Sharecare+. Thus, because at least one party in the agreement received an economic benefit, Plaintiffs have not sufficiently alleged that the transactions lacked economic sense.

Therefore, because Plaintiffs have not sufficiently alleged that the transactions lacked economic substance, the Court agrees with Defendants and

finds that Plaintiffs' claims regarding the scope of the Carelon Agreement are not misrepresentations, and thus, are inactionable for their Section 10(b) claim.

### 3. *Status of the Anthem Relationship*

Next, Plaintiffs allege that Defendants made affirmatively misleading statements about its relationship with Anthem. Notably, Plaintiffs point to Defendants' statements about the importance of its contractual relationship, that their selling was meeting expectations, that everything was progressing as planned, and that they were implementing to their signed contracts. See Dkt. No. [32] ¶¶ 112–132. Despite these statements, Plaintiffs allege that Defendants' relationship with Anthem was collapsing to the point where neither Defendant Sharecare nor Anthem had been paying its bills under the Carelon Agreement, Anthem had already cancelled its previous DocAI Agreement, and Defendant Sharecare had no reason to expect to collect revenues from any of its contracts with Anthem. Id.

According to Plaintiffs, Defendants' representations unlawfully concealed its problems with Anthem and thus amounted to material misrepresentations. Dkt. No. [42] at 16–17. Defendants disagree, contending that (1) contractual developments short of termination need not be disclosed and (2) the statements regarding the contractual success are mere puffery and opinion. Dkt. No. [35] at 16–19. The Court agrees with Plaintiffs and finds that some of Defendants' statements were material misrepresentations.

16

"Rule 10b–5 prohibits not only literally false statements, but also any omissions of material facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" FindWhat Inv. Grp., 658 F.3d at 1305 (quoting 17 C.F.R. § 240.10b–5(b)). "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" Id. (citing Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc)); see Lorman v. U.S. Unwired, Inc., 565 F.3d 228, 248 (5th Cir. 2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."). But regardless of whether a defendant had a duty to disclose, "[a] statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." FindWhat Inv. Grp., 658 F.3d at 1305 (citation omitted).

Defendants contend that a company has no duty to disclose all information about its operations and thus argue that they had no duty to provide updates on the status of its ongoing operations with Anthem. Dkt. No. [35-1] at 16–17 (citing Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1206 (11th Cir. 2001)). Defendants analyze this case to In re Express Scripts Holding Co. Sec. Litig. ("Express Scripts"), 16 Civ. 3338 (ER), 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017), where the court found that the defendants had no duty to disclose ongoing negotiations

with their largest customer.[3] There, the plaintiff alleged that the defendants were required to speak fully and truthfully about negotiations with its largest customer, especially after the defendant stated that the relationship was "great," "solid," and "business as usual." Id. at 12. The court dismissed the plaintiff's Section 10(b) claim, finding that, because there was no definitive statement that the customer no longer intended to do business with the defendants, there was no duty to disclose the inner dealings. Id. at 13. Defendants in this case contend that, just like in Express Scripts, there was no certainty that the relationship between Defendant Sharecare and Anthem would fail, and thus, there was no obligation to disclose the obstacles and pitfalls of their relationship with Anthem. Dkt. No. [35-1] at 19.

Plaintiffs look at it differently. Specifically, their allegations do not plainly allege that Defendants had a duty to disclose the developments of the Carelon Agreement. Rather, they allege that Defendants made "affirmatively misleading statements" about its relationship by making concrete, positive representations while also intentionally concealing issues related to the Carelon Agreement. Dkt. No. [42] at 16. For example, Plaintiffs point to events from April 2023 until November 2023 such as Anthem and Defendant Sharecare no longer making payments as required by the Carelon Agreement. Dkt. No. [32] ¶ 120. Following this, Defendant Arnold stated that Defendant Sharecare's sales through Carelon

---

[3] This decision was later affirmed by the Second Circuit in In re Express Scripts Holdings Co. Sec. Litig., 773 F. App'x 9 (2d Cir. 2019).

were "meeting expectations" and "progressing as planned." Id. ¶¶ 119, 121, 128. Additionally, even when Defendant Sharecare had cut off Carelon and the parties' contract was no longer in effect, Defendant Arnold continued to represent that Defendants were "super encouraged," "[e]verything [was] tracking on expectations," "things were staying the course," and it was "business as usual." Id. ¶ 128. Therefore, because Defendants were concealing the problems and bolstering the relationship, Plaintiffs allege that Defendants' statements were actionable misrepresentations under Section 10(b).

The Court agrees. As stated, under Eleventh Circuit precedent, "[a] statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." FindWhat Inv. Grp., 58 F.3d at 1305 (citation omitted). Here, Defendants' statements created the impression that Defendant Sharecare was working with Carelon and Anthem to seek new opportunities, but, based on Plaintiffs' allegations, this was not the case. Defendant Arnold stated that the Agreement was tracking with their expectations, that the number of users would increase, and that it was fulfilling its duties under the contract—all positive representations. But, the Court finds that the true dealings depict the opposite.

Defendants contend that there is no direct contradiction between their statements to the investors and its relationship with Anthem, Dkt. No. [44] at 9, but the Court disagrees. For example, a contradiction appears in November 2023 when Defendant Arnold responded to a question about whether Sharecare+

implementation was tracking in line with expectations, and he stated that

Defendant Sharecare had "lots of opportunities with Carelon" and that "things

[were] staying the course." Dkt. No. [32] ¶ 128. Meanwhile, Defendant Sharecare

had "altogether stopped providing patient advocacy services to Carelon" in the

previous month. Id. Another example appears in a conference call where

Defendant Arnold insisted that there had not been surprises with the Carelon

Agreement and that Defendants were "implementing to [their] signed contracts."

Id. ¶ 121. To the contrary, neither party to the contract had been paying their bills

under the Carelon Agreement.[4] Id. ¶ 120.

Although Defendants contend that there was no clear indication that the

relationship with Anthem was ending, this is not necessary to find that their

statements were misleading, especially where Defendants continued to make

positive but false affirmations. The facts of this case are similar to In Re

Synchrony Fin. Sec. Litig., 988 F.3d 157 (2d Cir. 2021) where the Second Circuit

held that the defendants wrongfully concealed a souring relationship with its

largest customer. Specifically, the plaintiffs there alleged that the defendant's

largest customer expressed concerns about the upcoming contract renewal and

---

[4] As stated previously, Plaintiffs rely on the statements of a Former Employee who worked for Defendant Sharecare until July 2023. Dkt. No. [32] ¶ 26. The Court finds that this Former Employee's statements mainly focus on the DocAI Agreement. See id. ¶¶ 36, 63–79. Thus, because the Court finds that the material misrepresentations stemmed from the statements about the Carelon Agreement rather than the DocAI Agreement, the Court finds that it is not necessary to consider the Former Employee's statements.

even solicited competing bids from other companies. However, defendants represented having no "pushback" during the negotiation of the renewal. Id. at 163–64, 168. The Second Circuit held that the defendants' representation that it received "no pushback" was materially misleading, especially since it "was not a vague expression of opinion" but a "concrete description and a 'factual representation' that purported to describe the state of [the defendant's] business relationships." Id. at 167–68. The Court finds a similar situation here, particularly where Defendants stated that (1) Defendant Sharecare was implementing to its signed contract but had stopped paying its bills, (2) Defendant Sharecare had lots of opportunities with Carelon, even though Anthem had already breached the Carelon Agreement and (3) Defendant's Sharecare's relationship with Anthem was business as usual despite the Carelon Agreement no longer being in effect. Dkt. No. [32] ¶¶ 120–28.

Defendants are correct that they are not required to disclose all operations with a specific partner or customer, but they are not allowed to misrepresent them and depict them in a light more favorable to Defendant Sharecare. The Court finds that whether the individual Defendants were certain as to the formal repudiation or termination of the Carelon Agreement is immaterial. Defendants Arnold and Ferrero made positive statements about the agreement and represented that there were no issues, but this was not true. Based on Defendants' statements, investors and analysts likely believed that the Carelon Agreement was moving along successfully and that there would be a steady

21

increase in the number of users. Additionally, investors likely accepted that Anthem and Carelon would continue to service the contracts and pay Defendant Sharecare, but the actual events demonstrated the contrary. Even if Defendants were not certain of the outcome of negotiations, their representations did not demonstrate uncertainty but instead confidence that painted a materially different picture.

Lastly, even though the Court finds that several statements regarding Defendant Sharecare's relationship with Anthem are actionable, not all of them are. Particularly, the Court holds that some statements are puffery and opinions that reflect optimistic generalities about Defendant Sharecare's business. Defendants' representations that (1) Carelon was a fantastic partner for Defendant Sharecare, (2) Defendant Sharecare and Anthem "complemented each other well in the sales room," and (3) Defendant Sharecare's artificial intelligence services were "an important part of [their] relationship" all reflect opinions that are generalized and optimistic, instead of "embedded statements of fact." Id. ¶¶ 110, 115, 123; Carvelli, 934 F.3d at 1320. Therefore, because these statements are opinions and puffery, the Court finds that not all of Defendants' statements about the status of its relationship are material, and thus, the Court holds that these representations are not actionable.

In sum, Plaintiffs allege that Defendant Sharecare and its individual officers represented a flourishing and successful relationship with Anthem through an agreement with one of its subsidiaries. Despite their representations

and statements to that effect, the relationship was stifled by hard bargaining and breaches of contractual promises by both Defendant Sharecare and Anthem. Although Defendants attempt to frame their statements as optimism about the success of the agreements, the Court still finds that Defendants made material misrepresentations that significantly altered the total mix of information available to analysts and investors. Consequently, Plaintiffs have sufficiently pled that the Defendants' statements regarding the status of its relationship with Anthem were materially misleading.

In short, the Court finds that Plaintiffs have adequately pled the first element of their Section 10(b) claim—material misrepresentations and omissions—based on Defendants' statements about their relationship with Anthem. Plaintiffs' allegations regarding the scope of the Carelon Agreement and the delays in signing, however, are not sufficient to support their claims. The Court now turns to whether Plaintiffs have shown scienter for the actionable statements.

## B. Scienter

Next, Defendants contend that Plaintiffs have failed to allege facts supporting the scienter requirement of a Section 10(b) claim. Dkt. No. [35-1] at 28–35. Plaintiffs disagree, arguing that the totality of their allegations establishes a strong inference of scienter. Dkt. No. [42] at 27–35. The Court agrees with Plaintiffs.

The PSLRA heightened pleading also applies to scienter. The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each act or omission alleged. Carvelli, 934 F.3d at 1318 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The required state of mind is an intent to defraud or severe recklessness by Defendants. Id. "And a 'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Id. (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007)). The Court must consider Plaintiffs' Complaint in its entirety for the scienter analysis: "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc., 551 U.S. at 322–23. Plaintiffs have satisfied this burden.

Looking at the allegations of Plaintiffs' Amended Complaint, the Court holds that there is a compelling inference that Defendants were aware of its collapsing relationship with Anthem but knowingly misrepresented its success to investors. In securities fraud cases, the scienter element is focused on ensuring that defendants are not held liable for statements that were negligent or inadvertent and instead targets "an intent to deceive, manipulate, or defraud." Ganino, 228 F.3d at 168. The Court finds that Plaintiffs' allegations here satisfy the requisite mental state for scienter. Here, Defendants do not contest having knowledge of the Carelon Agreement breaches. See Dkt. No. [32] ¶¶ 154–59.

Additionally, Plaintiffs' allegations demonstrate that the Carelon Agreement was critical to the success of Defendant Sharecare's business, and thus Defendants Arnold and Ferrero would have had extensive knowledge regarding its contractual promises and whether both parties to the Carelon Agreement were fulfilling their duties. See, e.g., Dkt. No. [32] ¶ 147 (pointing to Defendant Arnold's statement that the "Carelon partnership is a massive one for us"). Thus, the Court finds that the individual Defendants were sufficiently knowledgeable about the inner dealings with Carelon, especially where Defendant Arnold, as the Chairman, likely approved the decision to cease providing patient advocacy service to Carelon. Id. ¶ 158.

In response, Defendants argue that Plaintiffs incorrectly rely on the "core operations" doctrine which attributes knowledge to executives who were part of Defendant Sharecare's core operation. Dkt. No. [35-1] at 29. Specifically, Defendants contend that the Eleventh Circuit has not adopted this doctrine and point to decisions holding that "it very rarely can create a strong inference of scienter on its own." Id. at 29 (citing Plymouth Cnty. Ret. Sys. v. Carter's Inc., No. 1:08-cv-02950-JOF, 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011)). The Court finds that reference to this alone does not infer scienter, but the Court agrees with Plaintiffs that it establishes the Defendants' requisite knowledge about the inner dealings and negotiations with Anthem. Plaintiffs point out that "[c]ertain types of fraud . . . undeniably require the participation of senior management because these frauds simply cannot be carried out by low-level

25

employees acting on their own." <u>Mizzaro</u>, 544 F.3d at 1249–50. Here, Defendants

Arnold and Ferrero were knowledgeable about (1) Defendant Sharecare's

responsibilities and actions regarding the Carelon Agreement, and (2) both

parties' breaches. Based on Plaintiffs' allegations, Defendant Sharecare would not

have breached the Carelon Agreement without the knowledge of its Chairman

and President. Thus, the Court finds that the core operations doctrine bolsters

Plaintiffs' allegations by demonstrating that the individual Defendants had the

requisite knowledge of Defendant Sharecare's dealings with Anthem.

The Court also agrees with Plaintiffs' contentions regarding the impact of

Defendants' repeated statements. Courts have commonly found that "when a

defendant makes a statement or statements repeatedly, it can more strongly

evince an inference that the defendant spoke with scienter." <u>Theodore v.

Purecycle Techs., Inc.</u>, No. 6:21-cv-809-PGB-RMN, 2023 WL 4035880, at *6

(M.D. Fla. June 15, 2023); <u>see also</u> <u>In re Sci.-Atlanta, Inc. Sec. Litig.</u>, 239 F. Supp.

2d 1351, 1365 (N.D. Ga. 2002) ("[E]ven if individual pieces of evidence would be

sufficient to prove a point, the combination of more than one piece of evidence

may prove it."). Here, Plaintiffs point to the analysts' questions about the success

of the Carelon Agreement and Defendants' insistence that there were no

negatives occurrences regarding its relationship with Anthem. <u>See</u> Dkt. No. [32] ¶

115 ("The momentum with [Carelon] hasn't reduced . . . . And so we see that

relationship only expanding."). Later, in August 2023, Defendant Arnold

represented that their selling with Carelon was "meeting expectations" and that

"all those things are progressing as planned." Id. ¶ 119. Shortly after, in response to more questions, Defendant Arnold affirmed that "there haven't been surprises" and noted that they "implementing to [their] signed contracts." Id. ¶ 121. Lastly, in November 2023, in response to questions about the progress of Sharecare+ and whether it is "tracking in line with expectations," Defendant again confirmed that it was executing with Carelon, that Defendant Sharecare was "tracking in line with expectations," and that there were lots of opportunities looking forward with Carelon. Id. ¶¶ 127–28. The Court finds that the repetitive nature of the analysts' questions and Defendants' responses—which have already been found to be misleading—demonstrate that the individual Defendants' statements were not accidental.[5]

Additionally, taking all of Plaintiffs' allegations together, Plaintiffs have sufficiently alleged that Defendants either knew that their misrepresentations were false or were severely reckless in making these statements to analysts. Plaintiffs' Amended Complaint points to a plethora of repeated statements in response to analysts' questions regarding the relationship with Anthem. Despite both parties to the Carelon Agreement declining to fulfill their contractual duties,

---

[5] Plaintiffs also contend that Defendants' failure to file the Carelon Agreement as an exhibit to their 10-K or 10-Q reports creates a strong inference of scienter. Dkt. No. [32] ¶¶ 163–64 (citing 17 C.F.R. § 229.601(a)(4)). The Court disagrees. Whether the Carelon Agreement was filed is immaterial as to whether Defendants had the scienter to make false or misleading statements about the status of Sharecare's relationship with Anthem. Despite this, the Court still finds sufficient factual allegations to support scienter.

27

Defendants Arnold and Ferrero—who had the requisite knowledge about whether Defendant Sharecare and Anthem were complying with the agreement—represented continuously that business was progressing without any surprises. Looking at these allegations holistically, there is a compelling inference that Defendants either knew that their representations were false or were severely reckless in sharing false information about its relationship with Anthem.

Nonetheless, to determine whether this inference is sufficient to support scienter, the Court must weigh it against competing inferences in Defendants' favor. Defendants contend that a non-fraudulent inference is more plausible here and argue that Plaintiffs are attempting to fault Defendants for their optimism and inability to predict the outcome of the Anthem relationship. Dkt. No. [35-1] at 27. The Court disagrees and is not persuaded by Defendants' characterization of optimism regarding the outcome of the Carelon Agreement. In response to questioning, Defendants directly responded with factual assertions regarding the present status of their relationship with Anthem. Most of these statements were not merely "forward-looking," predictions, or opinions regarding their relationship in the future. Instead, they were false representations about the present payments, negotiations, and operations with Anthem. Thus, the Court disagrees with Defendants' characterization that their statements were solely optimistic of its dealings with Anthem.[6]

---

[6] Additionally, Defendants argue that Plaintiffs must point to an alternative motive or conduct such as the sale of stock at inflated prices. Dkt. No. [35-1] at

Taking all of Plaintiffs' allegations together, they create a strong inference that the individual Defendants knew about Defendant Sharecare and Anthem's breaches and obstacles in their relationship but recklessly represented the relationship as successful. To find a strong inference of scienter at least as compelling as any opposing inference, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. With the frequent inquiries from investors, the knowledge of the individual Defendants, repeated false statements, and the importance of the Carelon Agreement—alongside Plaintiffs' other allegations—there is a strong inference of scienter. While Defendants point to an inference that their relationship with Anthem would rebound, it is not more compelling than the inference that Defendants made the false and materially misleading statements with severe recklessness to their truth. Accordingly, Plaintiffs have met their heightened pleading burden for scienter.

---

33–34. The Court agrees that this would help establish a fraudulent motive, but the Court finds that this is not necessary to find that Defendants were knowledgeable or severely reckless regarding their misleading statements.

**C. Loss Causation**

Lastly, Defendants argue that Plaintiffs have not sufficiently alleged loss causation, because they have not pled facts demonstrating that the decline in the stock price followed a "corrective disclosure" that revealed the truth about a misstatement. Dkt. No. [35-1] at 35–37. Plaintiffs respond that they have established that Defendants' fraud was both "the but-for and proximate cause" of Plaintiffs' losses. Dkt. No. [42] at 35–37. The Court agrees with Plaintiffs.

The Eleventh Circuit has not adopted a heightened pleading standard for loss causation. Accordingly, the Court considers Plaintiffs' loss causation allegations under the typical Rule 8 standard. To establish loss causation, "[t]he plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses." FindWhat Inv. Grp., 658 F.3d at 1309. "However, the plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause' of his injury; he need only show that the defendant's act was a 'substantial' or 'significant contributing cause.'" Id. (quoting Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997)). Here, Plaintiffs' Amended Complaint relies on two corrective disclosures: (1) Defendant Sharecare's announcement on March 29, 2023, that Carelon had decided to use a lower cost product, instead of Sharecare+, and (2) Defendant Sharecare's announcement on March 28, 2024, that it had stopped providing services under the Carelon Agreement. Dkt. No. [32] ¶¶ 133–43. Defendants contend that neither demonstrate loss causation. Dkt. No. [35-1] at 36–38.

30

For the first announcement, Defendants contend that neither of the Plaintiffs here held stock in Defendant Sharecare when the disclosure was made on March 29, 2023. Dkt. No. [35-1] at 36. Thus, because they did not hold stock, the corrective disclosure could not have caused them any loss. Id. (citing MacPhee v. MiMedx Grp. Inc., 73 F.4th 1220, 1248 (11th Cir. 2023)). For the second announcement, Defendants point out that, after the price of Defendant Sharecare's stock dropped from its previous close, within one week, "the stock rebounded and even exceeded" its previous close and doubled in the following months. Dkt. No. [35-1] at 36–37. Therefore, because Defendant Sharecare's share price rebounded shortly after the disclosure, Defendants argue that Plaintiffs cannot allege loss causation, particularly where they could have sold their shares for profit later on. Id. at 37 (citing In re Immucor, Inc. Sec. Litig., No. 1:09-CV-2351-TWT, 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011)).

The Court disagrees. First, the rebound in Defendant Sharecare's stock price does not defeat Plaintiffs' allegations of loss causation. Defendants rely on the court's decision in In Re Immucor where the court dismissed the plaintiff's securities claim, because there was a rebound in the defendant's stock and "Plaintiff could have sold its shares for a profit in the months following the [alleged corrective] disclosures." 2011 WL 2619092, at *4. The Second Circuit rejected this approach. In Acticon AG v. China N. E. Petroleum Holdings Ltd., 692 F.3d 34, 41 (2d Cir. 2012), the Second Circuit held that "a share of stock that has regained its value after a period of decline is not functionally equivalent to an

31

inflated share that has never lost value." The court emphasized that "it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons." Id. That is precisely what Defendants attempt to argue here. Defendants contend that, since Defendant Sharecare's stock increased after the March 2024 corrective disclosure, then there was no loss causation since there was a net increase. Dkt. No. [35-1] at 36–37. But, the increase was caused by Defendants' announcement that it was being acquired, which is "completely unrelated" from its previous disclosures and announcements. Dkt. No. [42] at 36. Therefore, the recovery and increase in Defendant Sharecare's stock price does not defeat Plaintiffs' claim for loss causation based on the March 2024 corrective disclosure.

Next, for the March 2023 announcement, the Court also disagrees with Defendants. Defendants state that neither of the Plaintiffs held Defendant Sharecare's stock at the time of this disclosure, and thus, cannot allege loss causation. Dkt. No. [35-1] at 26. Defendants rely on MacPhee v. MiMedx Grp., Inc., 73 F.4th 1220 (11th Cir. 2023), where the Eleventh Circuit dismissed a securities claim, because the plaintiffs did not hold shares during *any* of the corrective disclosures. The current case is different, because Plaintiffs here held stock during the latter March 2024 disclosure. Defendants cite no authority requiring Plaintiffs to hold stock during every single corrective disclosure. Therefore, because Plaintiffs sufficiently alleged loss causation based on the

32

March 2024 disclosure, Defendants' argument regarding the March 2023 disclosure is immaterial, and Plaintiffs have adequately pled loss causation.

In conclusion, Plaintiffs have adequately pled their Section 10(b) and Rule 10b-5—and consequently their Section 20(a)—claims. However, Plaintiffs' claims are narrowed: Plaintiffs cannot rely on (1) statements regarding the delay in signing the Carelon Agreement, (2) statements about the scope of the Carelon Agreement, and (3) statements regarding the status of the Carelon Agreement that the Court identified as inactionable puffery and opinions. The remainder of Plaintiffs' allegations are sufficient to proceed.

## IV.    CONCLUSION

In accordance with the foregoing, Defendants' Motion to Dismiss [35] is **GRANTED in part and DENIED in part**. Defendants' Motion is **GRANTED** as to Plaintiffs' claims based on the scope of the relevant agreements, the delays in signing the agreement, and other inactionable statements identified by the Court. Defendants' Motion is otherwise **DENIED**.

**IT IS SO ORDERED** this 25th day of September, 2025.

**Leigh Martin May**
**Chief United States District Judge**

33